STATE OF INDIANA
LAKE COUNTY SUPERIOR COURT

MARK MCPHAIL,                              )
                                          )
                    Plaintiff,             )        CAUSE NO.:
                                          )
        v.                                 )
                                          )
THE TRUSTEES OF INDIANA                    )
UNIVERSITY, KEN IWAMA, in his individual   )
and official capacities; VICKI             )
ROMÁN-LAGUNAS, in her individual and       )
official capacities; and DAVID KLAMEN,     )
in his individual and official capacities; )
                                          )
                    Defendants.            )
                                          )

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES the plaintiff, Mark Lawrence McPhail ("Plaintiff" or

"McPhail"), by counsel, and for his Complaint against the defendants, the Trustees

of Indiana University ("IU" or "the University"), Ken Iwama, ("Iwama"), Vicki

Román-Lagunas, ("Román-Lagunas"), and David Klamen ("Klamen") (collectively

"Defendants"), alleges as follows:

## **Introduction**

1.     On August 1, 2015 IU hired Mark McPhail, an African-American professor of

       Communication, as Executive Vice Chancellor for Academic Affairs for the IU

       Northwest campus, and simultaneously as a tenured full professor (the

       highest academic rank) in IU Northwest's Department of Communication.

McPhail resigned from the administrative position in 2016 and assumed a faculty position.

2.  After McPhail criticized the administration for lack of adherence to university policies and held a forum in which he said IU Northwest's campus climate contributed to racial disparities, Defendants banned him from teaching and reduced his salary by 70%. When he appealed, Defendants terminated his employment abruptly and without a hearing, substantially damaging if not ending his career.

3.  McPhail brings this action for breach of contract, intentional interference with contract, violation of the First Amendment to the United States Constitution, negligence *per se* for violation of IC 21-39-3 ("the Academic Whistleblower Statute"), violation of the Due Process Clause of the Fourteenth Amendment, and discrimination and retaliation as prohibited by the Civil Rights Act of 1866.

## Parties

4.  From August of 2015 until September of 2021, McPhail was employed at IU. He currently resides in Michigan.

5.  At all times relevant hereto, Román-Lagunas and Klamen were employees of IU.

6.  Iwama was appointed Chancellor of IU Northwest in 2020, and since that time has served as the chief administrative officer of the IU Northwest campus.

7.   At all times relevant hereto, IU was a public educational institution established under Title 21, Article 20 of the Indiana Code.

## Jurisdiction, Venue & Cause of Action

8.   This action is authorized and instituted pursuant to Indiana statutory and common law.

9.   This Court is a court of general jurisdiction, and thereby has jurisdiction over Plaintiff's federal claim.

10.   Lake County, Indiana is an appropriate venue for this action by virtue of Trial Rule 75 because Indiana University Northwest is located here, most of the actions alleged occurred here, and most of the evidence relevant to this action is likely to be located here.

## Factual Allegations

11.   In 1987, McPhail earned a Doctor of Philosophy in Communication from the University of Massachusetts. Thereafter, he served in several faculty and academic administrative positions, published widely, and spoke in numerous domestic and international academic conferences.

12.   In May of 2015, IU and McPhail entered into an employment contract through which IU Northwest hired McPhail as the Executive Vice Chancellor for Academic Affairs ("EVCAA") as well as a tenured Professor of Communication. Exhibit H, attached hereto.

13.   Shortly thereafter, the IU Northwest Communication Department Chair, the College of Arts and Sciences Promotion and Tenure Committee as well as the

Campus Promotion and Tenure Committee reviewed McPhail's record of teaching, research and administrative background and unanimously supported his promotion to the rank of full professor of Communication.

14. Through his employment contract with IU, McPhail was assured a number of substantive and procedural employment rights, including those reflected in Exhibits A through G to this Complaint.

15. Among those employment policies is IU's Academic Freedom policy, which guaranteed academic appointees the freedom "to express views on matters having to do with the university and its policies, and on issues of public interest generally." Policy ACA-32. Exhibit A.

16. IU also protects the right of faculty to raise concerns about wrongful conduct through UA-04, IU's Whistleblower Protection Policy. Ex. B.

17. IU also guaranteed tenured faculty several procedural protections as prerequisites to the imposition of discipline and termination. Exs. C-G.

18. McPhail served as EVCAA from May of 2015 until July 31, 2016. At that point, he resigned due to the fact that then-Chancellor Lowe undermined his authority and resisted his attempts to implement certain IU policies.

19. McPhail was then appointed to the faculty position for which he was approved at his hire, that of Professor of Communication.

20. After McPhail's resignation, Román-Lagunas assumed the EVCAA position following the interim appointment of  Anna Sue Rominger and continues in that position to this day.

4

21. On April 18, 2018 McPhail organized a public forum titled "Diversity: An unfulfilled promise at IU Northwest." The forum highlighted challenges faced by black students at IU Northwest, especially in the area of retention, and identified ways in which IU Northwest had failed to support those students. Several members of the Indiana Black Legislative Caucus of the Indiana state legislature spoke at the forum, as did McPhail.

22. During the forum, McPhail presented a report highlighting findings of the Gary Commission ("the Commission") on the Social Status of Black Males. He presented the Commission's statistical reports about achievement gaps along racial and socioeconomic lines and its recommendation that Universities provide comprehensive supports for at-risk students." McPhail highlighted the fact that the diversity of the staff, faculty and student population on campus is important to the campus's success in retention, and that overemphasis on institutional "diversity" initiatives can obscure or frustrate progress.

23. In the summer of 2018, IU Northwest announced that the Departments of Fine Arts and Performing Arts would be merged with the Communication Department, removed from the College of Arts and Sciences ("COAS") and placed in a new School of the Arts. IU Northwest hired Klamen, the former Associate Dean of COAS and former Chair of the Department of Fine Arts and Performing Arts, into the role.

24. On August 1, 2018 McPhail contacted IU Northwest's EEO Director, Aneesah Ali ("Ali") by phone and by electronic mail and alleged that Klamen was appointed to the position without a search and without any transparency in violation of IU's requirement that it make hiring decisions "based upon [applicants'] individual qualifications," as required by UA-01, IU's Non-Discrimination/Equal Opportunity/Affirmative Action policy.

25. The next spring, Bonita Neff ("Neff") then-Chair of the Communication Department filed a complaint with the Faculty Board of Review alleging that Klamen's appointment violated IU policies.

26. Klamen, who was Neff's direct supervisor, initiated termination proceedings against her within less than two weeks after her complaint, Román-Lagunas supported his recommendation, and Iwama made the final decision, rejecting the recommendation of the Faculty Board of Review.

27. As for McPhail, after he complained about Klamen's appointment, the University transferred him to the IU Bloomington for a two-year project. During the 2019-20 academic year, McPhail began making preparations for his return, and sought course assignments from Klamen. Klamen was non-responsive, so McPhail sought answers from Román-Lagunas. Contrary to standard practice, Klamen made unilateral course assignments nearly four months after McPhail began requesting them and shortly before the semester was to begin, without even discussing the assignments with McPhail.

28.  Klamen refused to communicate with McPhail starting on or about March 26, 2020 regarding his teaching assignment for the fall semester despite repeated requests to the Dean's representative and the EVCAA.

29.  On July 14, 2020, McPhail filed a charge with the Gary Commission on Human Relations ("the July 2020 Gary Commission complaint") alleging that Klamen and Román-Lagunas refused to assign him courses despite repeated requests because he had alerted IU that the appointment of David Klamen violated the University's EEO policy. In that charge, he alleged that Respondent adopted hiring practices that privileged white employees in appointment to high-level administrative positions.

30.  McPhail taught in the Communication Department during the 2020-21 academic year.

31.  In July of 2021, at the first opportunity for formal evaluation following McPhail's July 2020 Gary Commission complaint, Klamen issued McPhail a performance evaluation characterizing his teaching as inadequate. The evaluation relied on criteria such as McPhail's "reputation as a teacher," which Klamen gleaned from unspecified "reports," and the contention that McPhail issued failing grades to too many students.

32.  McPhail responded to Dean Klamen's evaluation, providing context for some of the stated concerns and asking for specifics and guidance. He noted, among other things, that the students who received failing grades in the course did

not submit the work required, and asked for suggestions about how he could lower the number of failing grades without lowering standards.

33. Dean Klamen provided none of the clarification McPhail requested and made no corrections to the report, instead characterizing McPhail's attempt to defend his performance as a violation of the Code of Academic Ethics. In response to McPhail's contention that the students who received failing grades did not complete the required work, Klamen responded, "I find it inappropriate that you attempt to shift blame to students for your own professional shortcomings." He concluded, "Given that your responses and desire to shift blame to the student do not mitigate these concerns, I am recommending to the Executive Vice Chancellor that you teach no classes this upcoming semester."

34. The next day, Executive Vice Chancellor Vicki Román-Lagunas concurred with Dean Klamen's recommendation, suspended McPhail from teaching for the fall semester and reduced his salary by 75%. On information and belief, Román-Lagunas made the final decision on this suspension.

35. On August 30, 2021 the American Association of University Professors ("AAUP") wrote to Iwama expressing concern about the suspension, noting that McPhail was not provided a hearing before his peers before issuing the sanction.

36. Iwama ignored the AAUP's letter.

37.   McPhail appealed the decision to the Faculty Board of Review ("FBR") on September 13, 2021, alleging that the suspension violated several policies. He alleged that the decision was in retaliation for his complaints about Klamen's appointment and his complaints about racial discrimination and retaliation.

38.   In that September 13, 2021 appeal, McPhail also alleged that by creating a new School within the College of Arts and Sciences and appointing Klamen as Dean without any timely consultation with faculty and without creating a search committee, IU and Román-Lagunas violated the requirements of ACA-79, Merger, Reorganization and Elimination of Academic Units and Programs Involving Core Schools; BL-ACA-B12, Search and Screen Procedures for Campus Administrators; and EEO guidelines. He explained, "The Administration engaged the faculty only after the fact and had created the School based upon an arrangement between the EVCAA and Dean that clearly violated EEOC guidelines and ACA-79."

39.   The next day, on September 14, 2021, IU terminated McPhail's employment and informed him of the termination in a dramatic and humiliating manner, by sending police to his home with the termination letter.

40.   In the letter, Román-Lagunas cited as the purported reason for the termination that McPhail made "a threat of physical violence." She wrote that Iwama had "been consulted and he agrees that these are exigent circumstances for which dismissal is warranted."

41. Dumbfounded by this accusation, McPhail asked for further information about what he was being accused of. IU informed McPhail that he was terminated because he was reported to have said "words to the effect that 'the only way to end racism is to kill all the white people.'"

42. McPhail never said words to that effect. Specifically, McPhail did not threaten to kill any people, nor did he say anything that could reasonably construed as calling for such a thing. On the contrary, McPhail published scholarship in which he characterized it as problematic that the catalyst for several significant civil rights victories was the death of white individuals.

43. When pressed for further details, IU's Senior Associate General Counsel Marcia Gonzales wrote,

> Prof. McPhail's statement was reported directly by a very concerned member of the IUN Community to EVCAA Roman-Lagunas on or about September 10th and the report was made in confidence. During this same week, Dean Klamen was also advised confidentially by a colleague that he should avoid Prof. McPhail for fear that an 'incident' may result and that he should be very concerned if he were to encounter him in person. . . . [I]n both cases, each person reported that Prof. McPhail was very angry.

44. Neither individual has been identified, nor has McPhail ever been informed whether there was any objective basis for the fears allegedly expressed to Klamen.

45. IU also declared McPhail's appeal of his salary reduction and ban from teaching as moot.

46. On November 29, 2021, the FBR nonetheless decided the appeal, finding that the salary reduction and teaching ban failed to adhere to IU's post-tenure

review policy. The FBR recommended that McPhail's salary and position be restored.

47.    On January 28, 2022, Iwama rejected the FBR's recommendation and affirmed McPhail's salary reduction and teaching ban.

48.    McPhail's appeal of his termination is pending.

49.    On February 5, 2022 McPhail sent certified mail notice of his claims to the Trustees of Indiana University and to the Indiana Political Subdivision Risk Management Commission.

50.    On April 12, 2022 the AAUP wrote to Iwama again, expressing "grave concern" about IU's having terminated the employment of a tenured professor without a hearing. The AAUP characterized a pre-dismissal hearing as an "indispensable safeguard to academic freedom" and that failure to provide one "effectively renders tenure all but meaningless at the university."

51.    The termination has been devastating to McPhail's once brilliant career. McPhail has since applied to many academic and administrative positions and has not received any offers.

52.    As a result of the above-described actions, Plaintiff suffered and continues to suffer damages that include restricted speech, loss of salary, loss of job opportunities, damage to reputation, humiliation, severe emotional distress, litigation expenses, attorney fees, and other compensatory damages.

11

## Legal Claims

### Count I
### Breach of Contract
### McPhail v. IU

53.   Each paragraph of this Complaint is incorporated as if fully restated herein.

54.   The University's academic policies (reflected in part by Exhibits A-G) contain clear promises and mutual obligations. These documents were among the policies explicitly incorporated into McPhail's employment contract. Ex. H. At all relevant times, they were available on IU's website.

55.   IU breached its employment contract with McPhail when it removed him from teaching, reduced his salary by 70%, and terminated his employment.

56.   When McPhail raised concerns about the racial climate on the IU Northwest campus and procedural violations relating to Klamen's hire, he was exercising his right as a professor to "express views on matters having to do with the university and its policies, and on issues of public interest generally." Ex. A.

57.   IU took the adverse actions described in this Count because of that protected speech, violating its Academic Freedom Policy. Ex. A.

58.   The adverse actions also violate IU's Whistleblower Protection Policy, which prohibits retaliation "against anyone who has made a good faith report of wrongful conduct." Ex. B.

59.    IU's procedural protections prohibit discipline or termination of tenured faculty members accused of <u>inadequate performance</u> without affording them notice and a chance to improve. Ex. F at § C; Ex. G ¶¶ 2, 5, 8.

60.    Prior to reducing McPhail's salary by 70%, IU did not follow the requirements of the University's Faculty and Librarian Annual Reviews policy. Ex. F at § C. Specifically, Klamen's July 2021 review of McPhail's teaching a) did not provide for peer review of McPhail's teaching, and b) was not intended nor used to "facilitate communication, openness, fairness, and faculty participation in merit-based salary decisions." Instead, Klamen raised a number of concerns and then reprimanded McPhail when he defended himself against some of those concerns and asked for clarification about others.

61.    IU also violated its post-tenure review policy, which provides that reviews "*must be clearly aimed at performance enhancement*" rather than as a punishment for performance inadequacies." Ex. G p. 1 (emphasis in original).

62.    IU is required to develop defined standards of performance, provide faculty with notice of those standards, and provide a review process following notification of "persistent substandard performance over at least two or more consecutive annual reviews." Ex. G ¶ 5.

63.    The review committee which administers that process must consist exclusively of faculty members, must provide the faculty member with findings as to any deficiencies and then must work with the faculty member

to create a development plan. *Id.* The faculty member is also afforded the right to appeal during this process. *Id.*

64. Defendants did not follow any of these procedural protections before suspending and terminating McPhail.

65. IU's procedural protections also prohibit discipline or termination of tenured faculty members accused of <u>misconduct</u> without first affording them the right to defend themselves in a hearing after being apprised of the full details of the accusations against them. Ex. C at § B(I); Ex. D at § D; Ex. E at § II; Ex. G ¶¶ 2, 5, 9.

66. AC-52 guarantees the faculty member up for dismissal the right to "[a] statement with reasonable particularity of the ground proposed for the dismissal." Ex. D § D(2). Similarly, the IU Northwest Dismissal Procedures provide that a faculty member to whom formal notice of dismissal proceedings has been issued "is entitled to full access to all relevant information regarding the case possessed by the dean or other administrative officers, including the names and location of all witnesses. No information to which the faculty member or librarian is denied access shall be used by the administration." Ex. E p. 7.

67. IU did not provide McPhail with notice of the allegations or evidence against him, nor an opportunity to defend himself, prior to terminating his employment.

68. The IU Northwest Dismissal Procedures provide for detailed informal and formal review processes and a hearing prior to termination. Ex. E. § II. Similarly, ACA-52(D) requires specific notice of grounds for a hearing and a hearing as prerequisites to termination. Ex. D. IU dispensed with those procedures entirely. Instead, Román-Lagunas simply issued a letter, copied to Klamen and Iwama, informing McPhail that his employment was terminated.

**Count II**
**Tortious Interference with Contract**
**Against Iwama, Román-Lagunas and Klamen**
**in their individual capacities**

69. Each paragraph of this Complaint is incorporated as if fully restated herein.

70. IU and McPhail were parties to a valid and enforceable employment contract which included the documents attached as Exhibits A-G.

71. Iwama, Román-Lagunas and Klamen knew of the existence of this contract.

72. Iwama, Román-Lagunas and Klamen intentionally induced breach of McPhail's employment contract by developing and implementing *ad hoc* procedures which were not reflected in IU policies to exclude McPhail from the University.

73. Iwama, Román-Lagunas and Klamen induced these breaches without justification.

74. The actions of Iwama, and Klamen were unauthorized and exceeded the scope of their authority.

15

75. The individual defendants' inducement of a breach caused McPhail to suffer lost salary and benefits, severe emotional distress, attorneys' fees, and litigation costs.

**Count III**
**First Amendment Retaliation**
**(42 U.S.C. §§ 1983, 1985)**
**Against all Defendants**

76. Each paragraph of this Complaint is incorporated as if fully restated herein.

77. Plaintiff's August 1, 2018 and September 13, 2021 speech about administrative circumvention of faculty and the equal opportunity policy in the appointment of administrators related to matters of public concern and was protected under the First Amendment to the U.S. Constitution.

78. Plaintiff's speech about the racial dynamics on IU Northwest's campus related to matters of public concern and was protected under the First Amendment to the U.S. Constitution.

79. Plaintiff's right to voice his concerns outweighed any interest of Iwama, Román-Lagunas and Klamen in suppressing that speech.

80. Acting under the color of law, Román-Lagunas and Klamen used their authority as EVCAA and Dean to suspend McPhail from teaching and terminate his employment.

81. Román-Lagunas and Klamen took the actions alleged in order to punish Plaintiff for the protected activity alleged and preclude him from further speech along those lines.

82. In approving the recommendations of Román-Lagunas and Klamen, Iwama acted with deliberate indifference to Plaintiff's clearly established right to criticize public officials and institutions.

83. Plaintiff's protected speech was a substantial motivating factor in Defendants' actions.

84. Were it not for Plaintiff's protected speech, Defendants would not have taken the actions alleged herein.

85. Plaintiff seeks relief in the form of reinstatement from IU and from Iwama, Román-Lagunas and Klamen in their official capacities. He seeks monetary damages from Iwama, Román-Lagunas and Klamen in their individual capacities.

**Count IV**
**Negligence Per Se**
**McPhail v. IU**

86. Each paragraph of this Complaint is incorporated as if fully restated herein.

87. On August 1, 2018 McPhail reported to Ali that IU violated state rules by hiring Klamen without any faculty involvement. Ali copied Román-Lagunas in her response to that complaint.

88. On September 13, 2021, McPhail alleged that by creating a new School and appointing Klamen as Dean without any timely consultation with faculty, IU and Román-Lagunas violated IU's EEO policy.

89.   IU had a clear statutory duty pursuant to the Academic Whistleblower Statute, IC 21-39-3, to refrain from disciplining and terminating McPhail for his report of violations of state law.

90.   IU did not discipline or terminate McPhail's employment on the claim that he filed a knowingly false report.

91.   Because of McPhail's August 1, 2018 and September 13, 2021 complaints, IU reduced his salary, banned him from teaching, and terminated his employment.


**Count V**
**Violations of Right to Procedural Due Process**
**(42 U.S.C. §§ 1983, 1985)**
**Against all Defendants**

92.   Each paragraph of this Complaint is incorporated as if fully restated herein.

93.   McPhail had a protected property interest in his tenured position at IU.

94.   Before terminating McPhail's employment, Defendants did not provide him with oral or written notice of the allegations against him, did not provide him an explanation of any evidence against him, and did not provide him the opportunity to tell his side of the story to an impartial decisionmaker.

95.   In recommending and approving McPhail's termination, Iwama, Román-Lagunas and Klamen acted with deliberate indifference to Plaintiff's rights.

96.   Plaintiff's pending appeal will not provide a meaningful post-termination remedy because a) McPhail still has not been provided an explanation of the evidence against him nor an opportunity to respond to that evidence by

18

presenting his side of the story and b) Iwama has authority to accept or reject the recommendation of the Faculty Board of Review, so the post-termination appeal will therefore not be decided by an impartial decisionmaker.

97. Plaintiff seeks relief in the form of reinstatement from IU and from Iwama, Román-Lagunas and Klamen in their official capacities. He seeks monetary damages from Iwama, Román-Lagunas and Klamen in their individual capacities.

**Count** VI
**Race Discrimination**
**Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1983, 1985**
**Against All Defendants**

98. Each paragraph of this Complaint is incorporated as if fully restated herein.

99. IU terminated McPhail's employment on the purported basis that he threatened to commit genocide against white people.

100. McPhail's research on race and racism has focused on reconciliation and racial justice, and he has never said or suggested that anyone should kill white people.

101. Defendants relied on stereotypes of black men as irrationally angry and violent to exile McPhail from the University permanently.

102. McPhail's race was a motivating factor in Defendants' decision to discharge him.

103. Plaintiff seeks relief in the form of reinstatement from IU and from Iwama, Román-Lagunas and Klamen in their official capacities. He seeks monetary

damages from Iwama, Román-Lagunas and Klamen in their individual

capacities.

**Count** VII
**Retaliation for Allegations of Employment Discrimination**
**Civil Rights Act of 1866, 42 U.S.C. § 1981, 1983, 1985**
**Against All Defendants**

104.    Each paragraph of this Complaint is incorporated as if fully restated herein.

105.    Plaintiff engaged in statutorily protected activity by filing the July 2020 Gary

Commission complaint.

106.    Pursuant to McPhail's first employment evaluation following that complaint,

Klamen and Román-Lagunas reduced McPhail's salary by 70% and

terminated his employment shortly thereafter.

107.    Defendants would not have taken these adverse actions were it not for

Plaintiff's complaint.

108.    Plaintiff seeks relief in the form of reinstatement from IU and from Iwama,

Román-Lagunas and Klamen in their official capacities. He seeks monetary

damages from Iwama, Román-Lagunas and Klamen in their individual

capacities.

**WHEREFORE** Plaintiff respectfully requests the following relief:

1.    Reinstatement to his tenured position (against IU and the individual

defendants in their official capacities);

2.    Compensation for lost salary;

3.    Prejudgment interest;

4.    Emotional distress damages;

5.    Punitive damages (against the individual defendants in their personal capacities);

6.    Attorney's fees;

7.    Litigation expenses; and

8.    Such other relief as law and justice allow.

## REQUEST FOR TRIAL BY JURY

Plaintiff hereby requests a trial by jury with respect to any issues so triable.

WHEREFORE, Plaintiff prays that this Court grant judgment against Defendants in an amount commensurate with their damages, punitive damages, interest as allowed by law, and all other relief just and proper in the premises.

Dated:  April 18, 2022                    Respectfully submitted,

/s/ *Christopher S. Stake*
Christopher S. Stake (#27356-53)
DELANEY & DELANEY LLC
3646 Washington Blvd.
Indianapolis, IN 46205
Phone: (317) 920-0400
Fax: (317) 920-0404
cstake@delaneylaw.net

Rima N. Kapitan
KAPITAN GOMAA LAW, P.C.
Illinois Attorney No.: 6286541 (application for pro hac vice admission forthcoming)
P.O. Box 6779
Chicago, IL 60680
Phone: (312) 566-9590
rima@kapitangomaa.com

Filed: 4/18/2022 2:08 PM
Clerk
Lake County, Indiana

Menu

# University Policies

## Academic Freedom

ACA-32



Exhibit A

Scope

Policy Statement

Reason for Policy

Procedures

History

# About This Policy

**Effective Date:**

05-17-1966

**Date of Last Review/Update:**

04-23-2019

**Responsible University Office:**

University Faculty Council

**Responsible University Administrator:**

Provost/Chancellors of each campus

**Policy Contact:**

Director of Faculty Council Office
ufcoff@indiana.edu

**Policy Feedback:**

If you have comments or questions about this policy, let us know with the policy feedback form
</contact/index.html> .

**Print or view a PDF of this policy**

Many policies are quite lengthy. Please check the page count before deciding whether to print.

# Scope

All academic appointees with teaching, research, or librarianship responsibilities, including visiting, adjunct, acting and part-time faculty.

Back to top
# Policy Statement

A. Academic freedom, accompanied by responsibility, attaches to all aspects of a teacher's professional conduct. The teacher shall have full freedom of instruction, subject to adequate fulfillment of other academic duties. No limitation shall be placed upon the teacher's freedom of exposition of the subject in the classroom or on the expression of it outside. The teacher should not subject students to discussion in the classroom of topics irrelevant to the content of the course.

B. Academic freedom, accompanied by responsibility, attaches to all aspects of a librarian's professional conduct. No censorship shall be imposed on the librarian's freedom to select and make available any materials supporting the teaching, research, and general learning functions of the academic community.

C. Academic freedom, accompanied by responsibility, attaches to all aspects of a researcher's professional conduct. The researcher shall have full freedom of investigation, subject to adequate fulfillment of other academic duties. No limitation shall be placed upon the subject matter of the research, its publication and dissemination, or the expression of it outside the university.

D. Academic freedom includes the freedom to express views on matters having to do with the university and its policies, and on issues of public interest generally. When faculty write or speak as citizens, they should avoid appearing to be speaking for the university. They should recognize that a professional position in the community involves the obligation to be accurate, to exercise appropriate restraint, and to show respect for the right of others to express their views.

E. This policy does not override promotion and tenure guidelines, nor other university policies concerning academic ethics and misconduct.

Back to top
# Reason for Policy

Academic freedom is central to the mission of the university. Knowledge cannot be advanced unless faculty and librarians have freedom to study and communicate ideas and facts, including those that are inconvenient to political groups or authorities, without fear of recrimination.

Back to top
# Procedures

Cases involving alleged impairment of academic freedom shall be referred to the appropriate campus Board of Review and addressed according to its established procedure.

Back to top

**History**

Enacted by University Faculty Council, May 17, 1966.

Amended by University Faculty Council, May 30, 1976; April 23, 2019.

Endorsed by Board of Trustees, Nov.4, 2005.

Back to top

## <u>University Policies</u>

# Whistleblower Protection

UA-04



Exhibit B

Scope

Policy Statement

Reason for Policy

Procedures

Definitions

History

Related Information

# About This Policy

**Effective Date:**

04-23-2007

**Date of Last Review/Update:**

07-26-2021

**Responsible University Office:**

University Compliance Office

**Responsible University Administrator:**

President, Indiana University

**Policy Contact:**

Mike Jenson

Chief Compliance Officer

University Compliance

mjenson@iu.edu

**Policy Feedback:**

If you have comments or questions about this policy, let us know with the policy feedback form </contact/index.html> .

**Print or view a PDF of this policy**

Many policies are quite lengthy. Please check the page count before deciding whether to print.

# Scope

A. This policy applies to all Indiana University units and Members of the University Community.

B. This policy does not apply to alleged NCAA violations. These allegations should be directed to campus athletics compliance officials.

Back to top

# Policy Statement

Indiana University provides protection for any Member of the University Community who makes a good faith disclosure of suspected wrongful conduct. Providing this protection:

A. Encourages an atmosphere that allows individuals to meet their obligations to disclose violations of law and serious breaches of conduct covered by university policies;

B. Informs individuals how allegations of wrongful conduct may be disclosed;

C. Protects individuals from retaliation by adverse action taken by an Indiana University employee or official as a result of having disclosed wrongful conduct; and

D. Provides individuals who believe they have been subject to retaliation for reporting wrongful conduct with a means of seeking relief from retaliatory acts that fall within the authority of Indiana University.

Back to top

# Reason for Policy

A. Indiana University's Principles of Ethical Conduct <https://principles.iu.edu/> state that Members of the University Community are expected to abide by state and federal laws and regulations as well as university policies. Furthermore, an Indiana University employee cannot be compelled by a supervisor or university official to violate a law or university policy.  The interests of the university are served when individuals who have knowledge of specific acts which the individual reasonably believes violates the law or university policy discloses those acts to an appropriate university official.

B. With regard to university employees, this policy supplements Indiana state statute IC 21-39-3 <http://iga.in.gov/legislative/laws/2014/ic/titles/021/articles/039/chapters/003/> and protects IU employees who make a good faith report from retaliatory academic or employment

action, including discharge, reassignment, demotion, suspension, harassment, or other

discrimination.

Back to top

# Procedures

A. Violations of law or policy should be reported promptly to appropriate university officials. Depending on the circumstances, reports can be made to any of the offices below.  Reports to the units listed for all complaints will be routed for follow-up as appropriate.

| <u>Type of Complaint</u> | <u>Responsible Office(s)</u> |
| --- | --- |
| All compaints Depending on the subject matter, a complaint may be addressed to one of the offices below. | <ul><li>Supervisors or other management personnel</li><li>University or campus offices responsible for the policy area <https://compliance.iu.edu/compliance-areas/index.html></li><li>University Compliance Office <https://compliance.iu.edu/contact/index.html></li><li>Internal Audit <https://audit.iu.edu/contact/index.html></li><li>The Anonymous Reporting Hotline <https://secure.ethicspoint.com/domain/media/en/gui/17361/index.html></li></ul> |
| Discrimination, Harassment, or Sexual Misconduct | Office of Institutional Equity <https://equity.iu.edu/report-incident/index.html> |
| Research Misconduct | Office of Research Compliance <https://research.iu.edu/compliance/misconduct/index.html> |

| | |
|---|---|
| Fiscal Misconduct and Fraud | Controller's Office <https://controller.iu.edu/contact> |
| Programs Involving Children | Public Safety and Institutional Assurance <https://protect.iu.edu/police-safety/report-concern/index.html> |
| Formal grievances under employee grievances procedures | Campus Human Resources <https://hr.iu.edu/welcome/contact-address.htm> |

B. University employees may also make a report to any official or agency entitled to receive a report from the state ethics commission under Indiana Code 4-2-6-4(b)(2) <https://codes.findlaw.com/in/title-4-state-offices-and-administration/in-code-sect-4-2-6-4.html> , sections J and K.

C. Individuals should make a reasonable attempt to ascertain the correctness of any information; however, individuals are not required or expected to confront the individual or unit believed to be responsible for the wrongful conduct.

D. Individuals who believe they have been subjected to an adverse action based on having made or provided information about or participated in the investigation of a good faith report of alleged wrongful conduct may contest the action by filing a written complaint with the Office of the Vice President and University Counsel, the Chief Compliance Officer, campus human resources or Indiana University Human Resources, the campus chief officer for academic affairs, or the campus chief officer for student affairs.

E. Retaliation against anyone who has made a good faith report of wrongful conduct, provided information, or participated in an investigation into a good faith report of wrongful conduct is prohibited by the university and may be considered and addressed as a potential violation of this policy or other applicable university policies.

F. An individual may be subject to disciplinary actions, including suspension or dismissal in the case of academic appointees, staff, and part time employees or suspension or expulsion in the case of students, for knowingly furnishing false information. Depending on the individual and circumstances involved, disciplinary action will be undertaken by the campus human resources

office or Indiana University Human Resources (staff and part time employees), the campus chief academic officer (academic appointees), or the campus chief student affairs officer (students).

G. Nothing in this policy is intended to interfere with bona fide employment and operational decisions.

H. Nothing in this policy shall be construed in such a way as to conflict with other reporting obligations under state or federal law or the provisions and protection of the Indiana Code.

Back to top
# Definitions

**Wrongful Conduct:**  A violation of applicable state and/or federal laws and regulations; a serious violation of university policy; or the use of university property, resources, or authority for personal gain or another purpose that does not promote the university's interests.

**Members of the University Community:**  Any individual who is a student, staff, part time employee, academic appointee, university official, or any other individual employed by, or acting on behalf of, the university; other individuals while on Indiana University property, including employees of third-party vendors and contractors, volunteers, and visitors.

**Retaliation:**  Acts of retaliation include intimidation, threats, and/or harassment, whether physical or communicated verbally or via written communication (including the use of e-mail, texts, and social media), as well as adverse changes in work or academic environments, or other adverse actions or threats.

**Good Faith Report:**  An allegation of wrongful conduct made by an individual who believes that wrongful conduct may have occurred. An allegation is not in good faith if it is made with reckless disregard for or willful ignorance of facts that would disprove the allegation.

Back to top
# History

This policy went into effect on April 23, 2007, and was updated on October 25, 2019, and July 26, 2021.
Back to top


**Related Information**

Principles of Ethical Conduct <https://principles.iu.edu/>

<https://secure.ethicspoint.com/domain/en/report_custom.asp?clientid=17361>

<https://secure.ethicspoint.com/domain/en/report_custom.asp?clientid=17361> IU Anonymous Reporting Hotline <https://secure.ethicspoint.com/domain/media/en/gui/17361/index.html>

</policies/aca-30-research-misconduct/index.html>

</policies/aca-30-research-misconduct/index.html> ACA-30 Research Misconduct <https://policies.iu.edu/policies/aca-30-research-misconduct/index.html>

</policies/fin-acc-30-fiscal-misconduct/archived-03012005-08262021.html>

</policies/fin-acc-30-fiscal-misconduct/archived-03012005-08262021.html> FIN-ACC-30, Fiscal Misconduct <https://policies.iu.edu/policies/fin-acc-30-fiscal-misconduct/index.html>

</policies/fin-acc-35-fraud/index.html>

</policies/fin-acc-35-fraud/index.html> FIN-ACC-35, Fraud <https://policies.iu.edu/policies/fin-acc-35-fraud/index.html>

IC 21-39-3, Higher Education, Protection of Employees Reporting Violations http://iga.in.gov/legislative/laws/2014/ic/titles/021/articles/039/chapters/003/ <http://iga.in.gov/legislative/laws/2014/ic/titles/021/articles/039/chapters/003/>

45C01-2204-PL-000273                                    Filed: 4/18/2022 2:08 PM
                                                                                Clerk
USDC IN/ND case 2:22-cv-00137 Lake Circuit Court 1-1    filed 05/18/22    page 34 of 87   Lake County, Indiana

**Menu**

# __University Policies__

CONTACT

## Code of Academic Ethics

ACA-33

**Exhibit C**



Scope

Policy Statement

History

Related Information

USDC IN/ND case 2:22-cv-00137   document 1-1   filed 05/18/22   page 36 of 87

# About This Policy

**Effective Date:**

11-03-1970
See current policy <index.html>

**Date of Last Review/Update:**

09-12-2009

**Responsible University Office:**

Faculty Council

**Responsible University Administrator:**

University Faculty Council,
Board of Trustees, Indiana University

**Policy Contact:**

ufcoff@indiana.edu

**Policy Feedback:**

If you have comments or questions about this policy, let us know with the policy feedback form </contact/index.html> .

**Print or view a PDF of this policy**

Many policies are quite lengthy. Please check the page count before deciding whether to print.

# Scope

The provisions of this Code apply to persons whose service to the University includes teaching, scholarship, librarianship, and academic administration. Such persons are referred to in the Code as "Academic Personnel." References in the Code to "Faculty" include tenured members of the faculty, librarians, and persons whose service to the University may lead to tenure.

Back to top

# Policy Statement

### PREAMBLE

The central functions of an academic community are learning, teaching, and scholarship. They must be characterized by reasoned discourse, intellectual honesty, mutual respect, and openness to constructive change. By accepting membership in this community, an individual neither surrenders rights nor escapes fundamental responsibilities as a citizen, but acquires additional rights as well as responsibilities to the entire University community. They do not require the individual to be passive and silent. They do require recognition of how easily an academic community can be violated.

### INTRODUCTION

*Organization.* This Code contains two major sections: first, a statement of rights and responsibilities; and second, a statement of enforcement procedures. The first section is divided into three subsections. Of these, the first subsection, in seven parts, is a general statement of the rights and responsibilities of Academic Personnel adapted from the "Statement of Professional Ethics" adopted as policy by the American Association of University Professors in April 1966. The second subsection consists of representative responsibilities assumed with academic employment at Indiana University. The third subsection consists of the rules of conduct outlined in the prevailing Code of Student Rights, Responsibilities, and Conduct <http://www.iu.edu/%7ecode/index.shtml> . It is assumed that academic personnel will accept without reservation those rules of conduct which are generally applicable within the University community and which are expressed at the moment within the student code.

USDC IN/ND case 2:22-cv-00137   document 1-1   filed 05/18/22   page 38 of 87

The second section is also divided into three subsections. The first subsection deals with initiation of complaints, the second with appropriate administrative actions, and the third with reviews of administrative action.

## A. RIGHTS AND RESPONSIBILITIES

### I. General Statements

**Scholarship.** A scholar recognizes a primary responsibility to seek and to state the truth without bias. Striving to improve scholarly competence, continuing always to keep abreast of knowledge of his or her discipline, the scholar exercises critical self-discipline and judgment in using, extending, and transmitting knowledge, and practices intellectual honesty. Although subsidiary interests may be followed, these must never seriously hamper or compromise freedom of inquiry.

**Teaching.** A teacher encourages the pursuit of learning in students, holding before them the best scholarly standards of the discipline. Respecting students as individuals, the teacher seeks to establish a relationship of mutual trust and adheres to the proper role as intellectual guide and counselor. The teacher makes every effort to foster honest academic conduct and to assure that the evaluation of students' scholastic performance reflects their true achievement, with reference to criteria appropriate to the field of study. Any exploitation of students for private advantage is rejected and their significant assistance is acknowledged. The teacher protects their academic freedom and serves as an example of this principle by assuring that each student and colleague is free to voice opinions openly and to exchange ideas free from interference.

**Librarianship.** A librarian in the academic community is responsible for the collection, dissemination and preservation of information and source materials and for services in support of the teaching, research and general learning functions of the University. A librarian instructs and assists in finding and evaluating information, wherever it may be located. A librarian is entrusted with the responsibility of ensuring the availability of information and ideas, no matter how controversial, so that teachers may freely teach and students may freely learn. A librarian is a member of a profession explicitly committed to intellectual freedom and the freedom of access to information for present and future generations, following the Code of Ethics of the American Library Association and its Library Bill of Rights.

USDC IN/ND case 2:22-cv-00137   document 1-1   filed 05/18/22   page 39 of 87

***Relations with Colleagues.*** As colleagues, academic personnel have obligations that derive from common membership in the community of scholars. Such persons respect and defend the free inquiry of their associates. In the exchange of criticism and ideas, they show due respect for the opinions of others. They acknowledge their academic debts and strive to be objective in their professional judgment of colleagues. They accept their share of responsibility for the governance of the University.

***Relations with Students.*** With regard to relations with students, the term "faculty" or "faculty member" means all those who teach and/or do research at the University including (but not limited to) tenured and tenure-track faculty, librarians, holders of research, lecturer, or clinical appointments, graduate students with teaching responsibilities, visiting and part-time faculty, and other instructional personnel including coaches, advisors, and counselors.

The University's educational mission is promoted by professionalism in faculty/student relationships. Professionalism is fostered by an atmosphere of mutual trust and respect. Actions of faculty members and students that harm this atmosphere undermine professionalism and hinder fulfillment of the University's educational mission. Trust and respect are diminished when those in positions of authority abuse or appear to abuse their power. Those who abuse their power in such a context violate their duty to the University community.

Faculty members exercise power over students, whether in giving them praise or criticism, evaluating them, making recommendations for their further studies or their future employment, or conferring any other benefits on them. All amorous or sexual relationships between faculty members and students are unacceptable when the faculty member has any professional responsibility for the student. Such situations greatly increase the chances that the faculty member will abuse his or her power and sexually exploit the student. Voluntary consent by the student in such a relationship is suspect, given the fundamental asymmetric nature of the relationship. Moreover, other students and faculty may be affected by such unprofessional behavior because it places the faculty member in a position to favor or advance one student's interest at the expense of others and implicitly makes obtaining benefits contingent on amorous or sexual favors. (See quid pro quo sexual harassment in the Sexual Misconduct Policy, UA-03, definition

of sexual harassment). Therefore, the University will view it as a violation of this Code of Academic Ethics if faculty members engage in amorous or sexual relations with students for whom they have professional responsibility, as defined in number 1 or 2 below, even when both parties have consented or appear to have consented to the relationship. Such professional responsibility encompasses both instructional and non-instructional contexts.

1. Relationships in the Instructional Context. A faculty member shall not have an amorous or sexual relationship, consensual or otherwise, with a student who is enrolled in a course being taught by the faculty member or whose performance is being supervised or evaluated by the faculty member.

2. Relationships outside the Instructional Context. A faculty member should be careful to distance himself or herself from any decisions that may reward or penalize a student with whom he or she has or has had an amorous or sexual relationship, even outside the instructional context, especially when the faculty member and student are in the same academic unit or in units that are allied academically.

**Relation to the University.** Indiana University is committed to the concept of academic freedom and recognizes that such freedom, accompanied by responsibility, attaches to all aspects of a teacher's or librarian's professional conduct. Within this context, each person observes the regulations of the University, and maintains the right to criticize and to seek revision and reform. A teacher or librarian determines the amount and character of work done outside the University with due regard to paramount responsibilities within it. When considering interruption or termination of service, the teacher or librarian recognizes the effect of the decision upon the program of the University and gives due notice. Above all, he or she strives to be an effective teacher, scholar, librarian, or administrator.

**Relation to the Community.** As members of the community, academic appointees have the rights and obligations of any citizen. They should measure the urgency of these obligations in the light of their responsibilities to their subject, to their students, to their profession, and to the University. When they speak or write as citizens, they are free from institutional censorship or discipline. At the same time, their positions as members of a university and of a learned profession impose special responsibilities. When they speak or act as private persons, they will make it clear that they are not speaking or

acting for the University. They will also remember that the public may judge their profession and the University by their utterances and conduct, and they will take pains to be accurate and to exercise restraint.

II. **Specific Responsibilities**

In addition to the preceding general statements of ethical performance within the academic profession, there are specific responsibilities that devolve upon the academic appointee who accepts a position at Indiana University. Observance of such specific responsibilities as the following is also a component of academic ethics.

1. A teacher will maintain a clear connection between the advance description and the conduct and content of each course presented to ensure efficient subject selection by students.

2. A teacher will clearly state the course goals and will inform students of testing and grading systems; moreover, these systems should be intellectually justifiable and consistent with the rules and regulations of the academic division.

3. A teacher will plan and regulate class time with an awareness of its value for every student and will meet classes regularly.

4. A teacher will remain available to students and will announce and keep liberal office hours at hours convenient to students.

5. A teacher will strive to develop among students respect for others and their opinions by demonstrating his or her own respect for each student as an individual, regardless of race, sex, national origin, religion, age, or physical handicap.

6. A teacher will strive to generate a proper respect for an understanding of academic freedom by students. At the same time, a teacher will emphasize high standards and strive to protect students from irrelevant and trivial interruptions or diversions.

7. Since letters of evaluation written by a teacher may be uniquely important documents in both the academic and post-university life of a student, each teacher will strive to make such letters both candid and fair.

8. A librarian will continually develop, maintain, and make improvements to standard and specialized information resources and library services in support of the teaching, research and general learning functions of the University.

9. A librarian will cooperate with the teaching and research faculty to develop library collections in support of the curricular offerings of the academic community.

10. A librarian will strive to generate a proper respect for academic intellectual freedom in the discharge of the librarian's professional obligations to the patron, the University, and the community at large.

**Please note:** This is an archived version of the policy. View the current version on iu.edu.html>

11. A librarian will strive to care for and preserve library information resources.

12. A librarian accepts the responsibility for the care and preservation of library materials.

13. Academic personnel will strive to protect not only their own right to freedom of inquiry, teaching, and expression but also their colleagues' right to the same freedoms.

14. In the interest of avoiding actual or perceived conflict of interest, academic personnel should not directly supervise employees with whom they are having sexual or amorous relationships. Academic supervisors shall disqualify themselves from employment-related decisions concerning such employees and, in consultation with the employee involved and other appropriate persons, the Vice Provost for Faculty and Academic Affairs/Vice Chancellor for Academic Affairs or other equivalent campus administrator shall take steps for the appointment of a surrogate supervisor.

15. While in the classroom, academic personnel should refrain from adverse personal comments about their colleagues. At all times, academic personnel should exercise restraint and discretion in comments about other courses or divisions in the University.

16. Constructive criticism of colleagues is sometimes necessary in the interest of the individual criticized or the entire University community. To be constructive, however, such criticism should be channeled, in confidence, toward those persons (preferably the individual concerned, but also academic superiors, faculty committees, or administrative officers) who have the power to correct or influence conduct in a constructive way. Indiscriminate criticism or gossip about colleagues is condemned.

17. Each academic person retains the right to criticize and to seek to remedy, by appropriate means, regulations and policies of the University. Among means deemed inappropriate are: acts of physical violence against members or guests of the

University community; acts which interfere with academic freedom, freedom of speech, or freedom of movement; and acts of destruction of University property. It is equally inappropriate to advise others to commit such acts.

18. If criticizing the University, the academic person should be aware of ameliorative procedures that exist within the University and should use these procedures in preference to conducting public criticisms of the institutions or any of its divisions.

19. Each academic person will insure that outside commitments do not interfere in terms of time, energy, or conflict of interest with obligations to the University. As a safeguard against such interference, each will:
    a. report to an appropriate authority plans to engage in gainful activities of an extensive, recurring, or continuing nature; and

    b. notify an appropriate authority of any invitation to serve as advisor or consultant to an agency granting money to the University.

20. He or she will give adequate notice of interruption or termination of service. In order that instructional programs will not be interrupted, before leaving, the academic person will:
    a. complete all normal duties;

    b. provide complete records of grades and similar data to departmental chairpersons; and

    c. provide properly for incomplete class and thesis work.

21. He or she will work with colleagues individually and collectively toward furthering both personal and group interests so long as such cooperation does not require violation of intellectual and moral integrity.

22. Each academic person will accept a share of the obligation for helping the University function smoothly as a living and vigorous organization. Toward achieving this goal, each will serve on committees, accept a reasonable burden of administrative duties, and work cooperatively with administrative officers of the University in order to further all the legitimate goals of the institution.

III. **Responsibilities as University Citizens**

In retaining the rights to speak and act as citizens of the communities in which they dwell, academic personnel must assume as well the responsibilities which are incumbent upon the citizenship. Academic personnel, therefore, accept and adopt the provisions of the Indiana University Code of Student Rights, Responsibilities, and Conduct pertaining to personal misconduct on University property (Part II, Section H), which is printed below.

**Personal Misconduct on University Property**

The university may discipline a student for the following acts of personal misconduct which occur on university property, including, but not limited to, academic and administration buildings, residence halls, athletic and recreational facilities, and other university serviced property, such as sororities and fraternities:

1. Dishonest conduct including, but not limited to, false accusation of misconduct, forgery, alteration or misuse of any university document, record or identification; and giving to a university official information known to be false.

2. Assuming another person's identity or role through deception or without proper authorization. Communicating or acting under the guise, name, identification, e-mail address, signature, or other indications of another person or group without proper authorization or authority.

3. Knowingly initiating, transmitting, filing, or circulating a false report or warning concerning an impending bombing, fire, or other emergency or catastrophe; or transmitting such a report to an official or an official agency.

4. Unauthorized release or use of any university access codes for computer systems, duplicating systems and other university equipment.

5. Conduct that is lewd, indecent, or obscene.

6. Disorderly conduct, including obstructive and disruptive behavior that interferes with teaching, research, administration or other university or university-authorized activity. (See Guidelines for Dealing with Disruptive Students in Academic Settings, University Faculty Council, April 12, 2005)

7. Actions that endanger one's self, others in the university community, or the academic

process.

8. Failure to comply with the directions of authorized university officials in the performance of their duties, including failure to identify oneself when requested to do so; failure to comply with the terms of a disciplinary sanction; or refusal to vacate a university facility when directed to do so.

9. Unauthorized entry, use, or occupancy of university facilities.

10. Unauthorized taking, possession or use of university property or services or the property or services of others.

11. Damage to or destruction of university property or the property belonging to others.

12. Unauthorized setting of fires on university property; unauthorized use of or interference with fire equipment and emergency personnel.

13. Unauthorized possession, use, manufacture, distribution, or sale of illegal fireworks, incendiary devices, or other dangerous explosives.

14. Possession of any weapon or potential weapon on any university property contrary to law or university policy; possession or display of any firearm on university property, except in the course of an authorized activity.

15. Sale of any firearms from university property or using university facilities, including through computer and telephone accounts; intentional possession of a dangerous article or substance as a potential weapon.

16. Acting with violence.

17. Aiding, encouraging, or participating in a riot.

18. Harassment, defined in Part I (c) of the Code as follows: "Sexual harassment is defined as unwelcome sexual advances, including requests for sexual favors and other unwelcome conduct of a sexual nature, when submission to such conduct is made, either explicitly or implicitly, a University Policies ACA-33 6 term or condition of a student's education, or submission to or rejection of such conduct by a student is used as the basis for academic conditions affecting the student; or the conduct has the effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, or offensive learning environment. Discriminatory harassment is defined as conduct that targets an individual based upon age, color,

religion, disability, race, ethnicity, national origin, sex or gender, sexual orientation, marital status, or veteran's status and that: adversely affects a term or condition of an individual's education, housing, or participation in a university activity; or has the purpose or effect of unreasonably creating an intimidating, hostile, or offensive environment for academic pursuits, housing, or participation in university activities."

19. Stalking or hazing of any kind whether the behavior is carried out verbally, physically, electronically or in written form.

   a. Stalking is defined as repeated, unwanted contact in the forms of including, but not limited to, phone calls, e-mail, physical presence, and regular mail.

   b. Hazing is defined as any conduct that subjects another person, whether physically, mentally, emotionally, or psychologically, to anything that may endanger, abuse, degrade, or intimidate the person as a condition of association with a group or organization, regardless of the person's consent or lack of consent.

20. Physical abuse of any person, including the following:

   a. The use of physical force or violence to restrict the freedom of action or movement of another person or to endanger the health or safety of another person;

   b. Physical behavior that involves an express or implied threat to interfere with an individual's personal safety, academic efforts, employment, or participation in university-sponsored extracurricular activities or causes the person to have a reasonable apprehension that such harm is about to occur; or

   c. Physical behavior that has the purpose or reasonably foreseeable effect of interfering with an individual's personal safety, academic efforts, employment, or participation in university-sponsored extracurricular activities or causes the person to have a reasonable apprehension that such harm is about to occur.

   d. Sexual assault, including while any party involved is in an impaired state;

   e. Sexual contact with another person without consent, including while any party involved is in an impaired state.

21. Verbal abuse of another person, including the following:

   a. An express or implied threat to

      i. Interfere with an individual's personal safety, academic efforts, employment, or participation in university-sponsored activities and under the circumstances

causes the person to have a reasonable apprehension that such harm is about to occur; or

    ii. Injure that person, or damage his or her property; or

b. b. "Fighting words" that are spoken face-to-face as a personal insult to the listener or listeners in personally abusive language inherently likely to provoke a violent reaction by the listener or listeners to the speaker

22. Unauthorized possession, use, or supplying alcoholic beverages to others contrary to law or university policy.

    a. Indiana University prohibits:

        i. Public intoxication, use or possession of alcoholic beverages on university property (including any undergraduate residence supervised by the university, including fraternity and sorority houses) except as otherwise noted in Part II, Section H (22) b, and Part II, Section H(22) c.

        ii. Providing alcohol contrary to law.

    b. The Dean of Students of each campus has discretion to allow exceptions to Part II, Section H (22) a, allowing use or possession of alcohol by persons, including students, who meet the minimum drinking age standards of the State of Indiana, under the following circumstances:

        i. Use or possession of alcoholic beverages by persons who are of lawful drinking age may be generally permitted in residences supervised by the university, including fraternity and sorority houses, whenspecifically approved by the campus Dean of Students. Such use or possession may be allowed in residence rooms, apartments, and certain common areas as specifically approved by the Dean of Students. However, use or possession under this section shall be permitted only in residences supervised by a live-in employee specifically charged with policy enforcement.

        ii. Use or possession of alcoholic beverages may be permitted on an event-by-event basis in designated undergraduate residences (including fraternity and sorority houses) supervised by a live-in employee specifically charged with policy enforcement, when temporary permission is granted by the Dean of Students for events at which persons of lawful drinking age may lawfully possess and use alcoholic beverages.

c. The chancellor/provost of each campus has discretion to allow exceptions to Part II, Section H (22) a, allowing use or possession of alcohol by persons, including students, who meet the minimum drinking age standards of the State of Indiana, under the following circumstances:

   i. Use or possession of alcoholic beverages may be permitted in facilities such as student unions or on-campus hotels, including guest rooms and other areas, specifically approved by the campus chancellor/provost.

   ii. Use or possession of alcoholic beverages may be permitted in other areas, such as private offices and faculty lounges, not accessible to the public.

   iii. Use or possession of alcoholic beverages may be permitted in areas accessible to the public, if specifically approved by the campus chancellor/provost.

d. Indiana University also permits the non-conspicuous possession of alcoholic beverages on university property when in transit to areas where they may be possessed or used under the provisions above.

e. Student organizations that serve or permit possession of alcoholic beverages at student organization functions, on or off campus, may be disciplined if violations of alcoholic beverage laws or of university regulations occur. Individual students who plan, sponsor, or direct such functions also may be subject to discipline.

f. The chancellor/provost or dean of students may make rules covering these uses. Those rules shall be enforceable as provisions of this Code.

23. Unauthorized possession, manufacture, sale, distribution or use of illegal drugs, any controlled substance, or drug paraphernalia. Being under the influence of illegal drugs or unauthorized controlled substances.

24. Intentionally obstructing or blocking access to university facilities, property, or programs.

25. Violation of other disseminated university regulations, policies, or rules. Examples of such regulations include but are not limited to university computing policies, residence hall policies, and recreational sports facility policies.

26. A violation of any Indiana or federal criminal law.

27. Engaging in or encouraging any behavior or activity that threatens or intimidates any potential participant in a judicial process.

## B. ENFORCEMENT PROCEDURES

Initiation of Complaints Any concerned person may initiate complaints about alleged violations of the Code of Academic Ethics. Such complaints should be brought to the attention of an appropriate chairperson or dean, or to the appropriate Vice Provost for Faculty and Academic Affairs/Vice Chancellor for Academic Affairs or his or her deputy; the Vice Provost for Faculty and Academic Affairs/Vice Chancellor for Academic Affairs shall provide for confidential representations regarding such violations. Charges of discriminatory practice may be referred also to the appropriate Affirmative Action Officer

I. Administrative Action on Violations of Academic Ethics The line of administrative action in cases of alleged violation of academic ethics shall be the chairperson; the academic dean; the appropriate Vice Provost for Faculty and Academic Affairs/Vice Chancellor for Academic Affairs; the appropriate Chancellor/Provost; a Vice President, where appropriate; and the President. Subject to the substantive standards of University tenure policy and the procedural safeguards of the faculty institutions, sanctions appropriate University Policies ACA-33 8 to the offense should be applied by the academic administrators. Possible sanctions include the following: reprimand, consideration in establishing annual salary, consideration in promotion decisions, consideration in tenure decisions, retention of salary, termination of employment, and immediate dismissal.

II. Review of Administrative Action Academic appointees affected by administrative action taken against them on grounds of violation of the Code of Ethics, whether or not the action resulted from proceedings provided in this Code, shall have such rights as are provided by the rules governing appeals to the Faculty Board of Review (or to the Associate Instructor Board of Review) of the appropriate campus. Appointees also have the rights of hearing and appeal provided by any other procedure of the University for the review of administrative action.

Back to top

# History

*(University Faculty Council, November 3, 1970; Board of Trustees, December 19, 1970; University Faculty Council, November 30, 1976; February 11, 1986; February 11, 1992; October 3, 1996; April 27, 2004; April 12, 2005; April 28, 2009; Board of Trustees, December 13, 1996;*

USDC IN/ND case 2:22-cv-00137   document 1-1   filed 05/18/22   page 50 of 87

*June 24, 2005; June 12, 2009)*

*[Note: Some of these dates refer to changes in the Code of Student Rights, Responsibilities, and Conduct <http://www.iu.edu/%7ecode/index.shtml> .]*

Back to top

## Related Information

Code of Student Rights, Responsibilities, and Conduct
<http://www.iu.edu/~code/index.shtml>

**Menu**

## <u>University Policies</u>

<u>CONTACT</u>

# Permanent Separations for Academic Appointees

ACA-52



**Exhibit D**

Scope

Policy Statement

Reason for Policy

Definitions

History

Related Information

# About This Policy

**Effective Date:**

07-27-1969

**Date of Last Review/Update:**

12-07-2020

**Responsible University Office:**

University Faculty Council

**Responsible University Administrator:**

Board of Trustees, Indiana University

**Policy Contact:**

Campus Chief Academic Affairs Official

**Policy Feedback:**

If you have comments or questions about this policy, let us know with the policy feedback form </contact/index.html> .

**Print or view a PDF of this policy**

Many policies are quite lengthy. Please check the page count before deciding whether to print.

# Scope

All academic appointees.

Back to top
# Policy Statement

A. **Resignation**

An academic appointee shall give reasonable advance notice of resignation to the chief administrator of the academic unit so that the instructional programs of the unit are not adversely affected. When a resignation will become effective at the end of an academic year, notice should be given prior to May 15.

B. **Retirement**

1. Indiana University has no mandatory retirement age for academic appointees.

2. An appointee who intends to retire shall give reasonable advance notice to the chief administrator of the academic unit so that the instructional programs of the unit are not adversely affected. In most cases, notice should be given a year in advance so the unit has time to recruit qualified candidates to fill the appointee's position.

3. Each campus should arrange an occasion in the spring of each academic year to honor academic appointees who are retiring, along with those already retired.

4. The faculty governance organization of departments, schools, and campuses may extend local privileges to retired appointees in addition to those given to retirees generally by the university.

5. Academic appointees who have retired under the 18-20 plan are not eligible for re-hiring by the university while receiving payments under the plan. All other retired academic appointees may be re-hired at the discretion of the university on an adjunct or visiting basis.

C. **Non-Reappointment**

1. The non-reappointment of tenure-track faculty during the probationary period is covered under ACA-22, Reappointment and Non-Reappointment During Probationary Period </policies/aca-22-reappointment-non-reappointment-probationary-period/index.html> .

2. For non-tenure-track faculty on year-to-year, full-time appointments, notice of non-reappointment shall be given in writing in accordance with the following standards:
   a. Not later than February 1 of the first academic year of service, if the appointment expires at the end of that year; or, if a one-year appointment terminates during an academic year, at least three months in advance of its termination.

   b. Not later than November 15 of the second academic year of service, if the appointment expires at the end of that year; or, if an initial two-year appointment terminates during an academic year, at least six months in advance of its termination.

   c. At least twelve months before the expiration of an appointment after two or more years of service.

3. For non-tenure-track faculty with multi-year appointments, notice of non-reappointment shall be given in writing at least twelve months before the expiration of the term of the appointment. The notice does not reduce the time remaining in the appointee's current term, and separation does not occur until the end of that term.

D. **Involuntary Dismissal of Tenured Academic Appointees**

1. Involuntary dismissal of tenured academic appointees refers to the termination of employment prior to retirement or resignation. Dismissal is thus to be distinguished from the non-reappointment during the probationary period.

2. On July 27, 1969, the Board of Trustees enacted the following policy: Dismissal shall occur only for reason of (a) incompetence, (b) serious personal or professional misconduct or (c) extraordinary university financial exigency </policies/aca-41-financial-exigency/index.html> . No academic appointee shall be dismissed unless reasonable efforts have been made in private conferences between the appointee and the appropriate administrative officers to resolve questions of fitness or of the specified financial exigency. If no resolution is attained, the appointee to be dismissed shall be notified of dismissal in writing by the Provost/Chancellor or the President one year before the date the dismissal is to become effective, except that an appointee found responsible for serious personal misconduct may be dismissed upon shorter notice, but not on less than ten days' notice. Upon receipt of the dismissal notification, an academic appointee must be accorded the opportunity for a hearing. A statement with reasonable particularity of the ground proposed for the dismissal shall be available in accordance with the provisions in the Faculty Constitution. An appointee may be suspended during the pendency of dismissal proceedings only if immediate harm to the appointee or others is threatened by continuance. Any such suspension may be suspended with pay.

3. The hearing required by paragraph 2 shall be held by a campus Faculty Board of Review.

4. In any case in which the position of an academic appointee with tenure has been eliminated due to a university financial exigency, the university will make every reasonable effort to place the appointee in a comparable position elsewhere in the university or at another institution.

E. **Involuntary Dismissal of Non-Tenured Academic Appointees**

1. Involuntary dismissal refers to termination of employment of a non-tenured appointee prior to the expiration of the term of appointment.

2. Involuntary dismissal shall occur only for reason of (a) incompetence, (b) serious personal or professional misconduct, or (c) extraordinary university financial exigency </policies/aca-41-financial-exigency/index.html> , or on other grounds specified in policies regulating specific non-tenure-track appointment categories.

3. No appointee shall be dismissed for incompetence unless all reasonable efforts have been made in private conferences between the appointee and the appropriate administrative officers to resolve the question of fitness.

4. No non-tenured academic appointee shall be dismissed due to a university financial exigency unless all reasonable efforts have been made by appropriate administrative officers to resolve the financial issue or appoint the individual to a comparable position elsewhere in the university.

5. A non-tenured academic appointee notified of involuntary dismissal must be accorded the opportunity for a hearing before a campus Faculty Board of Review.

6. A non-tenured academic appointee may be suspended during the pendency of dismissal proceedings by the Provost/Chancellor only if immediate harm to the appointee or others is threatened by continuance. Any such suspension shall be with pay.

F. In order to dismiss an academic appointee in less than one year because the appointee is found responsible for serious personal misconduct, the conduct must pose an ongoing threat to the safety and security of the university community, constitute repeated acts of the same form of misconduct, or have resulted in a felony conviction.

Back to top
# Reason for Policy

The end of an academic career is as important as the beginning. The mutual rights and responsibilities of academic appointees and university administrators must be articulated to make the process transparent. In 1969, the Trustees enacted a policy governing the dismissal of a tenured faculty member, which serves as the model for this policy.

Back to top
# Definitions

**Personal or professional misconduct:** Conduct that has been determined to violate a misconduct policy of the university or a campus which has been enacted or approved by a faculty governance organization, including UA-03, Discrimination, Harassment and Sexual Misconduct </policies/ua-03-discrimination-harassment-and-sexual-misconduct/archived-08142020.html> ; ACA-30, Research Misconduct </policies/aca-30-research-misconduct/index.html> , ACA-33, Code of Academic Ethics </policies/aca-33-code-academic-ethics/index.html> , and campus policies on personal misconduct.

Back to top
# History

*(University Faculty Council, May 15, 1956; December 3, 1968; Board of Trustees, July 27, 1969; University Faculty Council, April 28, 2020; University Faculty Council, December 7, 2020)*

By way of its adoption of UA-21, Sanctions for Noncompliance with COVID-19 Health and Safety Directives </policies/ua-21-sanctions-non-compliance-covid19/index.html> , the Board of Trustees made failure or deliberate refusal to comply with the health and safety guidance and directions

adopted by the university to combat the spread of COVID-19 an act of "serious personal and professional misconduct" within the meaning of this policy. Board of Trustees, August 14, 2020.

Back to top

**Related Information**

ACA-41, Faculty Role Regarding A University Financial Exigency

</policies/aca-41-financial-exigency/index.html>
ACA-18,Regulation of Clinical and Lecturer Appointments

</policies/aca-18-regulation-clinical-lecture-appointments/index.html>
ACA-19,Regulation of Professor of Practice Appointments

</policies/aca-19-regulation-professors-practice-appointments/index.html>
ACA-20, Regulation of Research Appointments

</policies/aca-20-regulation-research-appointments/index.html>
ACA-22,Reappointment and Non-Reappointment During Probationary Period

</policies/aca-22-reappointment-non-reappointment-probationary-period/index.html>
ACA-30,Research Misconduct

</policies/aca-30-research-misconduct/index.html>
ACA-33, Code of Academic Ethics

</policies/aca-33-code-academic-ethics/index.html>
UA-03, Sexual Misconduct

</policies/ua-03-discrimination-harassment-and-sexual-misconduct/archived-08142020.html>

Filed: 4/18/2022 2:08 PM
Clerk
Lake County, Indiana





## IUN's Dismissal Procedures For Tenured Faculty & Librarians

In accord with University policy, dismissal of tenured faculty or librarians shall occur only for reasons of incompetence, serious personal or professional misconduct, or extraordinary financial exigencies of the University.

Faculty who are not yet tenured but earning credit toward tenure are subject to review and reappointment during their probationary periods. A separate policy applies to these faculty: "Policies Governing Reappointment and Non-reappointment During Probationary Periods."

The purpose of tenure is to protect and preserve academic freedom and to provide economic security. In no case shall the exercise of academic freedom be construed as professional incompetence or misconduct. University policies shall be observed, particularly concerning equal opportunity, academic freedom, academic ethics, and discrimination. No dismissal of a faculty member or a librarian shall be based on:

1. One's age, sex, color, race, national origin, religious preference, status as a veteran, political preference or allegiance, or sexual preference;
2. One's physical or emotional condition, whether legally a handicap or disability or not, except and only insofar as this condition demonstrably and seriously limits one's professional competence and was either unknown or nonexistent at the time of one's original employment (nothing in this statement precludes the faculty member's or librarian's right to disability coverage or the University's responsibility to place disabled employees on leave in accord with established policies);
3. One's performance in an area which one has been assigned without sufficient opportunity to prepare;
4. One's understanding of, or approach to, or method of pursuing an area of expertise as invidiously compared to what is considered merely preferable by others in the same or other similar discipline;
5. One's salary as an employee of the University;
6. Sources of income or other support available to one from sources other than the University unless there is a clear link to the allegation;
7. The retirement benefits for which one is eligible;
8. Unsubstantiated complaints either from within or from outside the University, even if job-related.

To the extent possible, all dismissal proceedings shall be kept confidential.

If a faculty member or librarian requests a review of an administrative action through the Faculty Board of Review.Once exonerated, a faculty member or librarian shall not be required to answer repeated charges based on substantially the same

**Exhibit E**

facts.

# I. ALLEGED PROFESSIONAL INCOMPETENCE

Professional competence involves the ability to perform adequately on a continuous basis during the years of appointment the basic tasks of a university professor or librarian. The basic tasks of a faculty member are defined with regard to teaching, research, and service, as understood in a faculty member's academic unit and particularly in his or her discipline. The basic tasks of a librarian are defined with regard to performance, professional development, and service responsibilities as understood within the particular library environment. One's status as a tenured faculty member or librarian at IUN establishes a presumption of being professionally competent throughout one's career through continuing professional growth and development. This presumption is further strengthened by the terms and conditions stated at the time of one's initial appointment, by one's professional accomplishments documented in ways established by department, school, library and campus policies, and by any changes in one' s professional responsibilities mutually agreed to during the course of employment as a member of the faculty or as a librarian. It is recognized that both institutions and the individuals who comprise them have a mutual responsibility to evolve with changes in the knowledge and practice bases of our respective disciplines.

Professional incompetence on the part of a faculty member or a librarian, respectively, is the demonstrated continuing inability to perform adequately the ordinary duties of teaching, research, and service as expected of faculty within the academic unit or the ordinary professional responsibilities expected of librarians within the unit. The burden of documenting the professional incompetence of a tenured member of the faculty or of a tenured librarian rests with the dean of the academic unit in consultation with the department chair, library director or other appropriate administrator. For this purpose, only information or evidence that relates to the alleged professional incompetence may be considered.

Notice Period Procedure:

A faculty member or librarian must be given adequate primary official notice of alleged deficiencies serious enough to warrant consideration of dismissal proceedings on the grounds of professional incompetence, and the individual must have an adequate opportunity (a notice period of at least two years) to correct deficiencies which may have contributed to professional incompetence. During the notice period, the faculty member or librarian shall have access to the provisions of Plan A of the
Policy on IUN Faculty and Librarian Review and Enhancement. Participation in a development plan shall not extend the notice period. In an extraordinary situation, the notice period can be set for less than two years, if

> The faculty member has a history of annual reviews that document performance which does not meet the specific responsibilities described in the Indiana University Code of Academic Ethics,

and

> The Dean can justify the determination that attempts to remediate the performance deficits are unlikely to be successful,

and

The Chancellor determines that a shorter notice period is required to protect the interest of the members of the University Community.

Primary official notice must be given in written form to the individual by the dean of the academic unit in consultation with the department chair/library director or other appropriate administrator (all hereafter referred to as "the administrator" throughout this document), and the written notice must specifically mention all alleged deficiencies and also the possibility of dismissal. The primary official notice should be given in confidence to the faculty member or librarian, but the person must be informed of the means whereby he or she may request an immediate peer review by the appropriate promotion and tenure committee. But, if a majority of the duly constituted promotion and tenure committee is appointed, then the departmental (or unit) faculty or the librarians shall elect a special committee for this purpose as needed. Ordinarily, for faculty the committee to be consulted under this procedure is at the departmental level, but in smaller schools without departments the appropriate committee is the school committee. Librarians may request a review by the Indiana University Librarians Promotion and Tenure Committee. The faculty member or librarian need not request peer review at this stage and may choose to work solely and privately with the dean and the administrator.

When requested by the faculty member or librarian, the appropriate promotion and tenure committee shall review the concerns addressed in the primary official notice and review the individual's performance to assess whether the issuance of the primary official notice of deficiencies was warranted. The committee will prepare a confidential written report of their proceedings and opinion, with a copy going to the dean of the unit, the administrator, and the faculty member or librarian. The report should be submitted no more than 30 days following the submission of the request by the faculty member or librarian. (In cases in which the notice period is less than 30 days, the administrator may proceed with the initiation of the formal proceedings while the committee completes its work.) If the committee finds that the accusation of professional incompetence is not warranted, the dean may withdraw the official primary notice, and if so must send a written notice of such action to the faculty member or librarian and the administrator in a timely manner.

The intent of this notice period is to allow the faculty member or librarian an opportunity to correct any deficiencies contributing to an inability to perform adequately and to seek solutions other than dismissal. Issuance of the primary official notice may not by itself be used as a reason for changing the terms and conditions of his or her employment. However, documented evidence of performance may be used to establish annual salary increases (in accord with university, campus, unit, and departmental written salary polices) or to change work assignments.

If the primary official notice is not withdrawn, the faculty member or librarian may submit evidence of having corrected the alleged deficiencies to the administrator at any time during the notice period. If the administrator believes that all deficiencies have been corrected, he or she shall notify the dean. If the dean agrees that all deficiencies have been corrected, the dean will send a written notice to the faculty member or librarian stating that such is the case and that the question of professional incompetence is closed. If the administrator can demonstrate to the dean that the faculty member is not making progress toward remediating deficiencies during the notice period, the administrator with express permission of the dean of the academic unit may undertake formal proceedings for dismissal on grounds of professional incompetence.

Formal Proceeding Procedures:

If at the end of the notice period, in the judgement of the administrator the alleged deficiencies have not been corrected, the administrator with the express permission of the dean of the academic unit may undertake formal proceedings for dismissal on grounds of professional incompetence. The administrator must send written notice of his or her decision to the individual faculty member or librarian in a timely manner.

The administrator will confer with an elected peer committee before issuing any final written recommendation for dismissal. For this stage of the procedure, a special five member peer committee must be elected by the unit faculty and librarians from among the unit's tenured members holding the rank of professor, associate professor, librarian, or associate librarian, according to procedures established by the faculty of the unit.If the committee is not elected within 30 days after the administrator calls for the formation of a committee, the unit's promotion and tenure committee will serve as the committee.

The peer committee shall notify the faculty member or librarian that proceedings have been initiated. A faculty member or librarian may request a hearing before the peer committee before that committee makes a recommendation. The request must be made within thirty days of receipt of notification from the administrator, and the faculty member or librarian shall be afforded at least thirty additional days to prepare a presentation to the peer committee. A hearing, if any, should occur no later than 60 days following the administrator's written notification to the faculty member initiating formal proceedings. The committee deliberations must be concluded and the report filed within 90 days following the initial written notification to the faculty member initiating formal proceedings.

The peer committee will meet privately to the extent permitted by law, examine all evidence, and arrive at a recommendation regarding whether or not the faculty member or librarian is professionally incompetent. At all points in this process, the faculty member or librarian is entitled to know the sources and nature of the evidence, to be present (except during initial organizational meetings and final deliberations) and to confront those alleging incompetence, to have outside experts testify, to be represented by counsel or anyone else of his or her choice, and to present evidence. Similarly, the administrator has a right to be present at meetings (except during initial organizational meetings and final deliberations), to interview witnesses, to have outside experts testify, to be represented by counsel if he or she chooses, and to present evidence.

The peer committee will make a written report regardless of its findings. The committee must file its report within 90 days of the faculty member's initial notification by the administrator; the administrator may proceed with the dismissal process after 90 days regardless. If a majority of the peer committee finds that the faculty member or librarian is professionally incompetent, the written report shall state this and the basis for its determination. If the charge of professional incompetence is unsubstantiated, the committee will state this conclusion and the basis for its determination. The written report will be forwarded simultaneously to the faculty member or librarian, to the administrator, and to the dean of the academic unit.

If the peer committee finds that the faculty member or librarian is not incompetent, the committee will recommend that the proceedings terminate and that the administrator withdraw the allegation in writing. If the administrator proceeds with the process despite the peer committee's findings, the peer committee must be notified and be afforded an opportunity to comment to the dean. All commentary from the peer committee must be a part of the record considered by all subsequent reviewers, who must explicitly address the peer committee's findings if they disagree with the written record. The administrator must keep in mind that the burden of proof that adequate cause exists rests with the institution and will be satisfied only by substantial evidence in the record considered as a whole.

If the peer committee finds that the faculty member or librarian is professionally incompetent, the administrator shall send his or her written recommendation for dismissal on grounds of professional incompetence to the dean of the academic unit. Within thirty days of the receipt of the administrator's written recommendation, the dean may proceed with dismissal procedures by forwarding the recommendation along with the peer committee report and his or her own comments to the Vice Chancellor for Academic Affairs. The dean of the academic unit will provide a copy of his or her written recommendation to the faculty member or librarian. The Vice Chancellor for Academic Affairs will add his or her own recommendation and will forward the entire file, along with any additional comments or responses from the faculty member or librarian, to the Chancellor. The faculty member or librarian must be provided with a copy of all administrative comments and recommendations before they are forwarded to the Chancellor. The Chancellor may choose to proceed with the dismissal of the faculty member or librarian. If so, the Chancellor shall issue via certified mail a written notice of dismissal, which will state with reasonable particularity the grounds for dismissal for professional incompetence. The notice shall state the effective date of dismissal.

In lieu of the one year notice period as required by the dismissal policy stated in the IU Academic Handbook, the faculty member or librarian may be offered an amount equal to his or her salary and fringe benefits for one year unless some other mutually agreeable arrangement is negotiated. The faculty member or the librarian shall have the right to resign at any point in the proceedings prior to notification of dismissal by the Chancellor.

Within ninety days of receipt of the notice of dismissal from the Chancellor, the faculty member or librarian may request a hearing before an IUN Faculty Board of Review. In the alternative, a librarian may choose to be reviewed by the Indiana University Librarians Review Board.

## II. ALLEGED MISCONDUCT

Dismissal of a tenured faculty member or librarian on grounds of misconduct shall be sought only with respect to behavior which constitutes such serious and willful personal or professional wrongdoing as to demonstrate the faculty member or librarian's unfitness to hold his or her academic appointment. The following acts exemplify, but do not exhaust the sort of activity which might constitute misconduct: acts which constitute a felony; acts which constitute a flagrant breach of University rules or academic ethics and which involve moral wrongdoing; acts of academic dishonesty such as plagiarism and falsification of reports or research; theft or misuse of University resources; persistent neglect of duties or persistent failure to carry out the tasks reasonably to be expected of a person holding the position involved. Malicious or knowingly false accusations of misconduct shall be considered serious misconduct on the part of the accuser(s). In the course of dismissal for misconduct proceedings, only information or evidence that relates to the alleged misconduct may be considered.

Where the ability of the faculty member or librarian to perform effectively is clearly and seriously impaired by the nature of the misconduct, or where the work of the department, school or library clearly would be disrupted or if immediate harm to him self, herself, or others is threatened by continuance, the faculty member or librarian may at any time be suspended by the dean with pay until the matter is decided.

Informal Discussion Period:

Actions for dismissal on the grounds of misconduct must be initiated by an administrator at the rank of dean or above, but the dean of an academic unit may base this action on the recommendations of a department chair, library director or other personnel who may be responsible for or knowledgeable about the conduct of the faculty member or librarian alleged to have engaged in misconduct. Where misconduct is suspected, the faculty member or librarian will first, as early as possible, be invited by the dean who is considering initiating action to discuss and respond to the allegations in person. The dean is obligated to collect such information and evidence as to have a reasonable and plausible belief that dismissal may be warranted by the facts; however, to the extent possible, the accusation of misconduct is to be kept confidential by the administration and those consulted. Several meetings may be required, and the faculty member or librarian must have been apprised of all allegations and evidence and been given a reasonable opportunity to respond to them prior to the end of the final exploratory meeting of the dean with the faculty member or librarian.

In cases in which the dean of the academic unit and the faculty member or librarian disagree as to whether the alleged misconduct has been properly characterized as "serious misconduct" warranting dismissal proceedings, the dean shall offer to bring this conduct characterization issue before an impartial committee composed of at least three faculty members or librarians who are jointly acceptable to the dean and faculty member or librarian against whom the allegations have been made. If the dean and faculty member can not reach agreement on at least three members to form the impartial committee after considering all eligible members of the academic unit, the following process will be used. If the Dean and the faculty member or librarian agree on two members from the academic unit, the chair of the IUN Faculty Board of Review (or the chair's designee) will serve as the third member of the committee. In all other circumstances, the committee will be composed of one member of the academic unit selected by the Dean, one member of the academic unit selected by the faculty member or librarian, and the chair of the IUN Faculty Board of Review (or the chair's designee).This group, referred to subsequently in this document as "the Committee", shall elect its own chair. If this offer for early assistance is accepted by the faculty member or librarian, the Committee, after meeting with the dean and the faculty member or librarian, is only to render an opinion as to whether the nature of the alleged conduct may properly be characterized as "serious misconduct" as defined in Section II. If the Committee deems perusal of dismissal proceedings to be inappropriate, it should so state. In that case, the Committee may weigh the interests of the faculty member or librarian and of the unit and suggest, if possible, alternative ways to accommodate those interests. In the spirit of informal resolution, all parties are expected to maintain collegiality, but nothing in these procedures precludes a faculty member, librarian or administrative officer from being represented by counsel or anyone else of choice. The entire procedure described in this paragraph should be completed within a reasonable period of time, which ordinarily would be one week. The faculty member or librarian and the dean shall be apprised of the Committee's determination before any formal proceeding may begin.

In an instance when the Institutional Review Board for the Use of Human Subjects has conducted a review of an allegation of research misconduct and made a recommendation to the Chancellor for dismissal, the requirement for an informal discussion period will be set aside. In this instance, the process of dismissal will then begin with formal written notice being sent to the faculty member or librarian by certified mail by the dean as specified in the section titled, "Formal Proceeding Period," unless the Chancellor decides to act directly. Ordinarily, the Chancellor will refer a recommendation for dismissal from the Ethics in Research Committee to the dean for action, but the Chancellor may reserve the right to act directly on the recommendation of the Ethics in Research Committee after notifying the faculty member or librarian and the dean and allowing 30 days for a response from either party.

Formal Proceeding Period:

If the preceding discussions do not resolve the matter, the dean, having a reasonable and plausible belief that dismissal is warranted, shall, within ninety days after the final informal meeting with the faculty member or librarian, provide that individual with written notice of intent to initiate formal proceedings to investigate possible misconduct; copies of the notice shall be given to the department chair/library director or other appropriate administrator, to the Vice Chancellor for Academic Affairs, and to the Chancellor. This notice shall detail the specific nature of the allegations and list the witnesses, statements, documents and other evidence on which they are based.

The formal written notice shall be sent to the faculty member or librarian by certified mail. When a formal, detailed notice has been issued, the faculty member or librarian will be allowed 30 days from date of receipt to present to the dean or other administrator initiating the dismissal proceedings, written information in response to the allegations; will be allowed to be represented by counsel or anyone else of his or her choice; and is entitled to full access to all relevant information regarding the case possessed by the dean or other administrative officers, including the names and location of all witnesses. No information to which the faculty member or librarian is denied access shall be used by the administration.

After consideration of the written response, or if no response is received at the completion of the 30 day period, the dean may proceed. If the dean believes that the faculty member or librarian is guilty of serious misconduct and wishes to pursue the dismissal of the individual, the dean must forward a written recommendation for dismissal with supporting documentation to the Vice Chancellor for Academic Affairs, who will add his or her recommendation and comments and then forward the entire file to the Chancellor. A copy of all materials forwarded, must be provided to the faculty member or librarian, who must be given an opportunity to provide comment and evidence in defense to the Chancellor.

If the Chancellor supports the recommendation for dismissal for misconduct, the Chancellor shall issue via certified mail a written notice to the faculty member or librarian stating the effective date of dismissal and stating with reasonable particularity the grounds on which the action is being taken.

The faculty member or librarian shall have the right to resign at any point in the proceedings prior to notification of dismissal by the Chancellor. The faculty member or librarian shall have 30 days from receipt of the notice of dismissal from the Chancellor to request a hearing before a Faculty Board of Review regardless of the date of dismissal.

Nothing in this policy shall prevent designated University officers, including the Affirmative Action Officer or the Director of Internal Auditing, from conducting investigations as specified by University policies. Nothing in this policy shall prevent the University from referring matters of possible misconduct to city, state, or federal agencies that may have jurisdiction in the investigation of possible misconduct.

Indiana University Northwest

3400 Broadway - Gary, Indiana  46408
**219-980-6500**
**888-YOUR IUN**
(1-888-968-7486)

Comments:  Faculty Organization Secretary
Last updated: 21 September 121
http://www.iun.edu/~facorg/meeting01/dismissprocedure.htm
Copyright 1997 - 2021, The Trustees of Indiana University
Copyright Complaints ╚ Privacy Statement

**45C01-2204-PL-000273**

Filed: 4/18/2022 2:08 PM
Clerk
Lake County, Indiana

USDC IN/ND case 2:22-cv-00137-JVB-JEM   document 1-1   filed 05/18/22   page 66 of 87

# <u>University Policies</u>

## Faculty and Librarian Annual Reviews

ACA-21



Exhibit F

Scope

Policy Statement

Reason for Policy

Procedures

Definitions

History

# About This Policy

**Effective Date:**

04-29-1976

**Date of Last Review/Update:**

11-12-2019

**Responsible University Office:**

University Faculty Council

**Responsible University Administrator:**

University Faculty Council
Board of Trustees, Indiana University

**Policy Contact:**

ufcoff@indiana.edu

**Policy Feedback:**

If you have comments or questions about this policy, let us know with the policy feedback form
</contact/index.html> .

**Print or view a PDF of this policy**

Many policies are quite lengthy. Please check the page count before deciding whether to print.

# Scope

All academic appointees who hold tenure-track, lecturer, professor of practice, clinical or research appointments.

Back to top
# Policy Statement

A. All academic appointees shall receive annual merit and salary reviews.

B. Academic appointees of less than full rank and probationary appointees shall also receive annual career progress reviews on their progress toward tenure and/or promotion. Career progress reviews may be conducted separately or at the same time as annual merit and salary reviews.

C. The Board of Trustees has resolved that the procedures used in annual reviews shall:
   1. Preserve academic freedom.
   2. Protect due process.
   3. Recognize situational differences of diverse faculty.
   4. Establish professional development as a goal.
   5. Define a mechanism for initiating the in-depth review process.
   6. Incorporate existing faculty review mechanisms.
   7. Include peer review.

D. To assist the annual review process, academic appointees shall submit annual reports.
   1. The Executive Vice President for University Academic Affairs may develop an annual report form to be used on all campuses and units, and may determine the scope, content, routing, and timing of reports, in consultation with the University Faculty Council.
   2. It is the responsibility of the Provost/Chancellor of each campus to develop the format, content, routing, and timing of annual reports for all academic appointees not covered by a university-wide report form, in consultation with the campus faculty governance body.
   3. Annual report forms shall provide for individuals to report professional activities and accomplishments during the preceding year in the areas of instructional activity, scholarship and creative work, and university and public service.
   4. Annual report forms shall also include the opportunity for individuals to volunteer additional information beyond the areas required by the form.
   5. The annual report form also may be used for purposes other than annual reviews, subject to oversight by the appropriate faculty governance body.

E. Annual merit and salary reviews shall be conducted by the principal administrator of an academic unit under procedures approved by the faculty governance body of that unit. Those procedures

may include a requirement that salary adjustments be made in consultation with a faculty committee elected by the faculty or appointed by the unit's faculty governance body.

F. Annual career progress reviews may be conducted by the principal administrator of the unit, the administrator's designee, or by a faculty promotion and tenure committee. At the time of the review, each appointee shall be informed of matters relevant to progress toward promotion and/or tenure. The principal administrator should provide the appointee with a written summary of the career progress review.

G. Academic appointees and administrators are expected to cooperate in the review process to ensure that the files on which such reviews are based contain all relevant material and the process is conducted efficiently without undue burden being placed on the appointee.

H. Each campus may adopt its own policy for reviewing and setting salaries consistent with these guidelines. Each academic unit may adopt its own salary policy consistent with these guidelines and campus policy.

1. Salaries shall be based on merit, inflation, recruitment, retention, and remedial equity, if appropriate. Merit has primacy among these.

2. The setting of salaries shall always balance two principles: rewarding comparable performance, distinction, and experience with comparable salary, and providing the support necessary to achieve the missions of the university.

3. Salary resources may be used to remedy past inequities resulting from changing market conditions, inappropriate merit judgments, inadequate funding, discrimination, or other good cause.

4. Annual salary increments may be made in percentages, fixed-dollar amounts, or a combination. However, salary decisions should avoid inappropriate widening of the disparities between low and high salaries that may result from the use of percentage increments.

5. Salary policies at every level should be written and available for inspection and other appropriate uses. A unit shall report annually on salary policy implementation to the faculty in the unit.

I. An academic appointee who takes an administrative position may receive a salary supplement for administrative service, but that supplement leaves the salary base when the administrator resumes full-time faculty status. The salary base may be adjusted so that it approximates what the appointee's salary would have been had the appointee not taken the administrative position. See ACA-08, Faculty Members Holding Administrative Positions </policies/aca-08-faculty-holding-admin-positions/archived-05152020.html> .

J. An academic appointee who would otherwise terminate and begin receiving 18/20 plan payments may, with the approval of the Provost/Chancellor, be offered retention incentive pay in the form of a $5,000 allocation for research and professional development at age 64, or 20% base salary supplement from age 65 to 70.

K. A campus or unit may adopt salary minima, which must periodically be adjusted to account for inflation and overall unit salary raises.

Back to top
## Reason for Policy

The quality and integrity of academic programs depend upon the performance of individual academic appointees. Annual reviews are important to both faculty and administrators to assess performance and progress and to provide for continued faculty development. Annual reviews also facilitate communication, openness, fairness, and faculty participation in merit-based salary decisions, and transparency concerning
progress toward promotion and tenure.

Back to top
## Procedures

Procedures for implementing this policy shall be developed by each campus and each academic unit.

Back to top
## Definitions

**Principal Administrator:** The dean, department chair, program director, or other administrative head of an academic unit or that officer's designee.

**Academic Unit:** A school, department, program, division or similar entity in which one or more academic appointees hold their primary appointment.

Back to top
## History

*University Faculty Council, April 29, 1976; Oct. 9, 1979; April 21, 1989*

*University Faculty Council April 23, 1991; Board of Trustees, June 20, 1991*

*University Faculty Council February 9, 1999; Board of Trustees, March 26, 1999*

*University Faculty Council, November 12, 2019.  As part of the 2019 revisions, ACA-21, ACA-25, ACA-28, and ACA-44 were updated and consolidated. ACA-25, Annual Reports for Faculty and Librarians, was rescinded; its content has been incorporated into ACA-21, § D. ACA-28, Faculty and Librarian Salary, was rescinded; its content has been incorporated into ACA-21, § H. ACA-44, Retention Incentive Pay for Academic Appointees, was rescinded; its content has been incorporated into ACA-21, § H-7.*

Filed: 4/18/2022 2:08 PM
Clerk
Lake County, Indiana

**Indiana University Northwest**

**Post-Tenure Review and Enhancement Policy**
**(February, 1999)**

The purpose of post-tenure review and enhancement is to focus on two small groups of faculty and librarians who a) seek a change in career direction or emphasis, or b) are failing to meet minimum levels of performance. Faculty and librarian review and enhancement provide a structure for the preparation and implementation of faculty and librarian development plans to meet the needs of these two groups of individuals.

The proposed plan is a way of addressing the issue of chronically unproductive faculty and librarians. It is also a logical step in assisting faculty and librarians who seek a change in career emphasis or a balance between teaching, research, or service in the case of faculty--performance, professional development, and service--in the case of librarians. We must recognize, however, that attempts to deal with the two groups in the absence of an adequately funded faculty and librarian development program that provides the direction-changer or under-performer with the opportunity for new challenges through a structured faculty development plan, will fail. There must be a way to link these individuals to the faculty and librarian development process.

Tenure requires mutual responsibilities. When faculty and librarians accept tenure, they also accept the obligation to grow and develop professionally, to keep current in their disciplines, and to meet the evolving needs of the University. Prior to the tenure decision, the burden is on the faculty member or the librarian to prove that tenure should be granted. However, once tenure has been earned, the burden shifts to the institution to show why the faculty member or librarian should no longer have tenure.

The University has the reciprocal responsibility to provide faculty members and librarians with the environment and resources needed for them to be as productive as possible, particularly providing strong protection for academic freedom. This includes not only meaningful faculty and librarian development programs and opportunities, but also structural and administrative support so that faculty and librarian efforts may be translated into achievement. In addition, administrators must be willing and able to make difficult decisions when individual faculty or librarian performance remains below minimally satisfactory levels.

**Guiding Principles**

Faculty and librarian review and enhancement *must be clearly aimed at performance enhancement* rather than as a punishment for performance inadequacies. This process should be congruent with the following guiding principles:

**1. Preservation of academic freedom**

The program should include an opportunity for faculty or librarians to pursue new directions throughout their careers without penalty, and without undermining the principles of academic freedom and tenure.

**Exhibit G**

**2. Protection of due process**

Due process must be assured. If unfavorable reviews lead to consideration of termination, university policies must be followed and faculty members must be guaranteed normal access to academic due process. A corollary of this policy is a fair and equitable early retirement system providing faculty and librarians the opportunity to retire from their positions in a dignified manner.

**3. Recognition of situational differences in a diverse faculty**

The review and enhancement policy must recognize the diverse cultures of faculty and librarians. These may include potential differences in those who are more recently hired from those who have been on the faculty or in a library for many years; those teaching-oriented and research-oriented schools and programs, and the differences in mission of the various schools or libraries. Moreover, all facets of faculty and librarian performance should be considered. Different units may weigh more heavily toward one area, depending on mission.

**4. Establishment of a professional development goal**

Post-tenure review *must not* be a reevaluation of tenure, but should be aimed at faculty development. Sufficient resources must be made available for faculty and librarian development, and must be formally coordinated with the review process so that programs specific to the needs of faculty or librarians may be offered and coordinated with development programs already in place. There must be ongoing analysis of current faculty and librarian development strategies and a determination of whether they are adequate to meet the needs of faculty and librarians, particularly those who are subject to a development plan. If important limitations to professional development are allowed to remain, then the issue of post-tenure becomes moot. In some cases, at least, such conditions may justify limitations in faculty or librarian performance. Therefore, the university must provide such vital resources as travel funds for access to professional meetings, as well as technical training of faculty, to an appropriate degree.

**5. Articulation of a mechanism to initiate the review process**

The review process should take into consideration all facets of faculty performance--including the distribution of effort among teaching, research, and service--and all facets of librarian activities--including the distribution of effort among performance, professional development, and service. The initiating mechanism should be designed to identify those faculty members or librarians who have been notified of persistent substandard performance over at least two or more consecutive annual reviews within a five-year period.

Thus, it is imperative that departments and divisions clearly define the notions of "substandard performance" and "chronically unproductive" individual. These definitions and mechanisms for measuring shall be determined with faculty input and full written notice to faculty and librarians upon implementation of review and enhancement. However, the definition of unsatisfactory performance must include the concept of lack of effort, rather than merely lack of results, which must take into account mitigating circumstances, such as a competitive research environment.

The dean or library director notifies the faculty member or librarian being selected for review and will provide information about the nature and procedures of the review. The dean or library director may grant an exemption to a faculty member or a librarian subject to review if there are extenuating circumstances, such as health problems, or impending retirement.

The review will be conducted by an elected committee composed of a minimum of three tenured faculty members from a given division, and will exclude administrators at the level of department chair and above. The faculty member has the right to reject a committee member in the case of a perceived conflict of interest.

The review committee may terminate the process if it finds that there is no basis for the review. The committee findings may fall under three categories: a) some strengths and no deficiencies, in which case the review is terminated; b) some strengths and some deficiencies, but not substantial or chronic, in which case the faculty member or librarian should be offered an opportunity for a development plan through the review committee process, and c) substantial chronic deficiencies--in which case the committee shall state, in writing, the specific deficiencies identified. The findings shall then be sent to the faculty member or librarian, and to the dean or library director.

The faculty member or librarian then cooperates with the committee in drawing up a faculty or librarian development plan. The plan should a) identify specific strengths to be enhanced and deficiencies to be addressed; b) define goals or outcomes needed to remedy the deficiencies; c) outline specific activities for the achievement of these goals and outcomes; d) set appropriate timelier for the completion of these activities; e) indicate appropriate benchmarks for monitoring progress; f) indicate the criteria for annual progress reviews, and g) identify sources of funding or institutional support, based on discussions with the dean or library director.

The plan becomes final upon the signatures of the faculty member or librarian, the dean, library director, and/or the department chair. Signature indicates that the formulation of a faculty or library development plan has been completed and is ready for implementation. It does not imply a faculty member or librarian's agreement with the findings.

The faculty member or librarian shall have the right of appeal, and retains all rights of appeal as specified in the *IU Academic Handbook*.

The faculty member or librarian and the review committee shall meet at least annually to review the faculty member or librarian's progress towards remedying the deficiencies.

## 6. Reliance on peer review at every step

Peer review must be part of the process at every step. A minimum of three elected faculty members may constitute the faculty peer group. The election would be divisional in scope, with the *a posteriori* exclusion of any member perceived to be in conflict of interest. The faculty or librarian under review may also request that an off-campus professional be included in the peer review.

## 7. Incorporation of existing faculty review mechanisms

The program should incorporate the review mechanisms already in place to minimize the creation of duplicate processes. For example, the existing process for annual reviews could be used as an initiating mechanism to identify those faculty members or librarians who require an enhancement plan.

Since they must be able and willing to make difficult decisions in the rare instances where corrective measures are necessary, deans, program directors, library directors, and department chairs should receive training on leadership and personnel management.

## 8. Use of intermediate sanctions for unsatisfactory performance

The faculty member or librarian should be given the necessary institutional support for a successful outcome. Intermediate sanctions prior to dismissal should be sought only after a properly conducted peer review; after due process of just cause initiation of review, and after all practical attempts at performance enhancement within the specified time frame have been exhausted. The dean or library director may then employ a variety of sanctions, developed with faculty input.

## 9. Initiation of dismissal proceedings

Initiation of dismissal proceedings, based on alleged unsatisfactory performance, may result from the inability to complete the faculty or librarian development plan after intermediate sanctions have failed.

## 10. Specification of outcome criteria

Outcome criteria for assessing the effectiveness of the policy must be specified at the time of implementation of the policy, after the review process has run its course. The implementation of the policy should follow with full disclosure to the department and--in the case of dismissal--to the entire university faculty.



# INDIANA UNIVERSITY
# NORTHWEST

4 May 2015

Dr. Mark McPhail
c/o College of Arts and Communication
University of Wisconsin at Whitewater
Whitewater, WI 53190

Dear Dr. McPhail:

**RE: Executive Vice Chancellor for Academic Affairs**

It is a pleasure to offer you the position of Executive Vice Chancellor for Academic Affairs at Indiana University Northwest.   You are also offered a tenured appointment as Professor of Communication.  The appointment begins on 1 August 2015.

Your annual salary will be $170,000.  University policy requires that the salaries of all senior academic administrators comprise both an academic and an administrative component. Consistent with this policy, your annual salary has two components: an academic base salary as a faculty member (@ 80%) of $136,000 and an administrative base salary of $34,000.  Each component of your salary will be incremented annually, in compliance with University and campus salary policies.  If the administrative title is relinquished, the administrative base salary will be removed and the ten-month, academic-year salary will revert to 10/12ths of the academic base salary.

Comprehensive information concerning academic policies, appointments and responsibilities can be referenced by following this link: http://policies.iu.edu/policies/categories/academic-faculty-students/index.shtml

The full Indiana University package of benefits will be available to you and, with the printed copy of this letter, you will find enclosed a benefit summary for your information and review. You will also find benefits described on the University's Human Resources web site (http://www.iu.edu/~uhrs/).  You will be contacted by University Human Resource Services regarding your benefit enrollment.

As we discussed, and in accordance with Indiana University policy I-310 (http://policies.iu.edu/policies/categories/financial/accounting-administration/FIN-ACC-I-310-moving-expenses.shtml), you will have up to $10,000.00 available for moving expenses, which can be apportioned between an initial move to Northwest Indiana during FY2015-16 and, if necessary, a later household relocation, which may occur in FY2016-17.  Also, prior to your start date in the Executive Vice Chancellor's position, the IU Northwest Office of the Chancellor will

**Exhibit H**

Dr. Mark McPhail
4 May 2015
Page 2 of 2

reimburse your expenses for a trip to Northwest Indiana, for purposes of finding housing and
preliminary discussions with your new campus colleagues and me.

Salary payments will be deposited to your bank savings or checking account. New Indiana
University employees are subject to employment eligibility verification (federal I-9 compliance)
and a criminal history check required by Indiana statute. This offer is contingent on the
University's verification of credentials and other information required by state and federal law.
Ms. Liz Romeo (lromeo@iun.edu), Administrative Assistant in the Office of Academic Affairs,
will assist you with the employment verification and background check, as well as the collection
of data to initiate the employment process.

During your prior visit to our campus and region (and not later than the morning of the first day
of your appointment), please arrange to visit the IU Northwest Human Resources Office
(Marram Hall Room 118), for a benefits and payroll orientation.

Please confirm your acceptance of this offer and the attendant terms by signing and dating the
letter, as indicated, and returning a scanned copy by email attachment to me at your earliest
convenience. In the meantime, please do not hesitate to let me know if I can furnish any
additional information or assist in any way.

Thank you for your interest in Indiana University Northwest and sincerest congratulations on
your appointment to this important leadership position. In behalf of our entire IU Northwest
community, welcome. We look forward to working with you and having your contribution to
the continuing success of our students and campus.

I remain

Yours,

William J. Lowe
Chancellor

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

I accept the above offer of employment for the position of **Executive Vice Chancellor for
Academic Affairs** at Indiana University Northwest and I agree to begin full time employment on
3 August 2015.

5-4-15

Signature                                                    Date
Mark. L McPhail

2

STATE OF INDIANA
LAKE COUNTY SUPERIOR COURT

| | | |
|---|---|---|
| MARK MCPHAIL, | ) | |
| | ) | |
| Plaintiff, | ) | CAUSE NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY, d/b/a INDIANA | ) | |
| UNIVERSITY NORTHWEST; | ) | |
| KEN IWAMA, in his individual and | ) | |
| official capacities; VICKI ROMÁN-LAGUNAS, | ) | |
| in her individual and official capacities; and | ) | |
| DAVID KLAMEN, in his individual and | ) | |
| official capacities; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### **E-FILING APPEARANCE BY ATTORNEY IN CIVIL CASE**

1. The party on whose behalf this form is being filed is:
   Initiating __X__              Responding ____              Intervening ____ ; and
   the undersigned attorney and all attorneys listed on this form now appear in this case for
   the following parties:

   Name of party _____Mark McPhail_____
   Address of party __Contact through counsel_____
   Telephone # of party Contact through counsel_____

2. Attorney information for service as required by Trial Rule 5(B)(2)

   Kathleen A. DeLaney                    Christopher S. Stake
   Attorney No. 18604-49                  Attorney No. 27356-53
   DeLaney & DeLaney LLC                  DeLaney & DeLaney LLC
   3646 N. Washington Blvd.               3646 N. Washington Blvd.
   Indianapolis, IN 46205                 Indianapolis, IN 46205
   Phone: (317) 920-0400                  Phone: (317) 920-0400
   Fax: (317) 920-0404                    Fax: (317) 920-0404
   kdelaney@delaneylaw.net                cstake@delaneylaw.net

**IMPORTANT**: Each attorney specified on this appearance:

(a)    certifies that the contact information listed for him/her on the Indiana Supreme Court Roll of Attorneys is current and accurate as of the date of this Appearance;

(b)    **acknowledges that all orders, opinions, and notices from the court in this matter that are served under Trial Rule 86(G) will be sent to the attorney at the email address(es) specified by the attorney on the Roll of Attorneys regardless of the contact information listed above for the attorney**; and

(c)    understands that he/she is solely responsible for keeping his/her Roll of Attorneys contact information current and accurate, see Ind. Admis. Disc. R. 2(A).

Attorneys can review and update their Roll of Attorneys contact information on the Courts Portal at http://portal.courts.in.gov.

3.    This is a  Civil-Plenary (PL)   case type as defined in administrative Rule 8(B)(3).

4.    This case involves child support issues. Yes _____ No   **x**

5.    This case involves a protection from abuse order, a workplace violence restraining order, or a no – contact order.  Yes _____ No   **x**

6.    This case involves a petition for involuntary commitment.  Yes _____ No  **x**

7.    There are related cases: Yes ____ No  **x**    *(If yes, list on continuation page.)*

8.    Additional information required by local rule: **n/a**

9.    There are other party members: Yes _____ No **x**   *(If yes, list on continuation page.)*

10.    This form has been served on all other parties and Certificate of Service is attached: Yes__ No _X_

Respectfully submitted,

*/s/ Christopher S. Stake*
Kathleen A. DeLaney (#18604-49)
Christopher S. Stake (#27356-53)
DELANEY & DELANEY LLC
3646 Washington Blvd.
Indianapolis, IN 46205
Tel: (317) 920-0400

*Attorneys for Mark McPhail*

| STATE OF INDIANA | ) | IN THE LAKE SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF LAKE | ) | CAUSE NO: |

| | | |
|---|---|---|
| MARK MCPHAIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **SUMMONS** |
| | ) | |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY, d/b/a INDIANA | ) | |
| UNIVERSITY NORTHWEST; | ) | |
| KEN IWAMA, in his individual and | ) | |
| official capacities; VICKI ROMÁN-LAGUNAS, | ) | |
| in her individual and official capacities; and | ) | |
| DAVID KLAMEN, in his individual and | ) | |
| official capacities; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

TO DEFENDANT:     David Klamen
Dean-School of the Arts, Chancellor's Professor
Indiana University Northwest
3400 Broadway
Gary, IN 46408

You are hereby notified that you have been sued by the persons named as plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint which is attached to this Summons. It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff. Such Answer must be made in court.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

4/18/2022

Dated: _____

_Lorenzo Arredondo_

_____
Clerk, Lake Superior Court

**The following manner of service of summons is hereby designated.**

     X     Registered or certified mail

Kathleen A. DeLaney (#18604-49)
Christopher S. Stake (#27356-53)
DeLaney & DeLaney LLC
3646 N. Washington Blvd.
Indianapolis, IN 46205
Phone: (317) 920-0400
Attorneys for Plaintiff

Court Address:
Lake County Superior Court
2293 N. Main Street
Crown Point, IN 46307
Phone: 219-755-3000

(SEAL: LAKE COUNTY COURTS · SEAL · INDIANA)

**SHERIFF'S RETURN ON SERVICE OF SUMMONS**

I hereby certify that I have served this summons on the _____ day of _____, 2022:

(1) By delivering a copy of the Summons and a copy of the Complaint to defendant, _____.

(2) By leaving a copy of the Summons and a copy of the Complaint at _____ which is the dwelling place or usual place of abode of _____
and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks: _____

_____
_____
Sheriff

By: _____
Deputy

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 2022, I mailed a copy of this Summons and a copy of the Complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

_____
Clerk, Lake Superior Court

Dated: _____, 2022.     By:_____
Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by the defendant on the _____ day of _____, 2022. I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2022.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by _____ on behalf of said defendant on the _____ day of _____, 2022.

_____
Clerk, Lake Superior Court

By: _____
Deputy

| Cause No. | Room No. | MARK MCPHAIL, Plaintiff, v. THE TRUSTEES OF INDIANA UNIVERSITY, d/b/a INDIANA UNIVERSITY NORTHWEST; KEN IWAMA in his official and individual capacities; VICKI ROMÁN-LAGUNAS in her official and individual capacities; and DAVID KLAMEN in is official and individual capacities; Defendants. | **SUMMONS** | COURT NO. | SHERIFF'S COSTS | Kathleen A. DeLaney Christopher S. Stake DeLaney & DeLaney LLC 3646 Washington Blvd. Indianapolis, IN 46205 |

STATE OF INDIANA      )            IN THE LAKE SUPERIOR COURT
                     ) SS:
COUNTY OF LAKE      )            CAUSE NO:

| | |
|---|---|
| MARK MCPHAIL, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )  **SUMMONS** |
| | ) |
| THE TRUSTEES OF INDIANA | ) |
| UNIVERSITY, d/b/a INDIANA | ) |
| UNIVERSITY NORTHWEST; | ) |
| KEN IWAMA, in his individual and | ) |
| official capacities; VICKI ROMÁN-LAGUNAS, | ) |
| in her individual and official capacities; and | ) |
| DAVID KLAMEN, in his individual and | ) |
| official capacities; | ) |
| | ) |
|     Defendants. | ) |
| | ) |

TO DEFENDANT:      Ken Iwama
                        Chancellor
                        Indiana University Northwest
                        3400 Broadway
                        Gary, IN 46408

You are hereby notified that you have been sued by the persons named as plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint which is attached to this Summons. It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff. Such Answer must be made in court.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

     4/18/2022

Dated: _____      *Lorenzo Arredondo* _____

                                           Clerk, Lake Superior Court

*(Seal: LAKE COUNTY COURTS · SEAL · INDIANA)*

**The following manner of service of summons is hereby designated.**

     X      Registered or certified mail

Kathleen A. DeLaney (#18604-49)                  Court Address:
Christopher S. Stake (#27356-53)                  Lake County Superior Court
DeLaney & DeLaney LLC                             2293 N. Main Street
3646 N. Washington Blvd.                         Crown Point, IN 46307
Indianapolis, IN 46205                           Phone: 219-755-3000
Phone: (317) 920-0400
Attorneys for Plaintiff

### SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the _____ day of _____, 2022:

(1) By delivering a copy of the Summons and a copy of the Complaint to defendant, _____.

(2) By leaving a copy of the Summons and a copy of the Complaint at _____ which is the dwelling place or usual place of abode of _____ and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks: _____

_____

_____
Sheriff

By: _____
Deputy

### CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 2022, I mailed a copy of this Summons and a copy of the Complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

_____
Clerk, Lake Superior Court

Dated: _____, 2022.      By: _____
Deputy

### RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by the defendant on the _____ day of _____, 2022. I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2022.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by _____ on behalf of said defendant on the _____ day of _____, 2022.

_____
Clerk, Lake Superior Court

By: _____
Deputy

| Cause No. | Room No. | THE TRUSTEES OF INDIANA UNIVERSITY, d/b/a INDIANA UNIVERSITY NORTHWEST; KEN IWAMA in his official and individual capacities; VICKI ROMÁN-LAGUNAS in her official and individual capacities; and DAVID KLAMEN in is official and individual capacities; | MARK MCPHAIL,, | SUMMONS | COURT NO. | SHERIFF'S COSTS | Kathleen A. DeLaney Christopher S. Stake DeLaney & DeLaney LLC 3646 Washington Blvd. Indianapolis, IN 46205 |

MARK MCPHAIL,,
Plaintiff,
v.

Defendants.

| STATE OF INDIANA | ) | IN THE LAKE SUPERIOR COURT |
|---|---|---|
| | ) SS: | |
| COUNTY OF LAKE | ) | CAUSE NO: |

MARK MCPHAIL,              )
                               )
    Plaintiff,          )
                               )
    v.                  )   **SUMMONS**
                               )
THE TRUSTEES OF INDIANA   )
UNIVERSITY, d/b/a INDIANA   )
UNIVERSITY NORTHWEST;   )
KEN IWAMA, in his individual and   )
official capacities; VICKI ROMÁN-LAGUNAS,   )
in her individual and official capacities; and   )
DAVID KLAMEN, in his individual and   )
official capacities;   )
                               )
    Defendants.       )
                               )

TO DEFENDANT:    The Trustees of Indiana University
                          c/o W. Quinn Buckner, Chair
                          Franklin Hall 200
                          601 E. Kirkwood Avenue
                          Bloomington, IN 47405

You are hereby notified that you have been sued by the persons named as plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint which is attached to this Summons. It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff. Such Answer must be made in court.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated:     4/18/2022

_Lorenzo Arredondo_
Clerk, Lake Superior Court

**The following manner of service of summons is hereby designated.**

   X    Registered or certified mail

Kathleen A. DeLaney (#18604-49)
Christopher S. Stake (#27356-53)
DeLaney & DeLaney LLC
3646 N. Washington Blvd.
Indianapolis, IN 46205
Phone: (317) 920-0400
Attorneys for Plaintiff

Court Address:
Lake County Superior Court
2293 N. Main Street
Crown Point, IN 46307
Phone: 219-755-3000

# *SHERIFF'S RETURN ON SERVICE OF SUMMONS*

I hereby certify that I have served this summons on the _____ day of _____, 2022:

(1) By delivering a copy of the Summons and a copy of the Complaint to defendant, _____.

(2) By leaving a copy of the Summons and a copy of the Complaint at _____ which is the dwelling place or usual place of abode of _____
and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks: _____

_____

_____

_____
Sheriff

By: _____
Deputy

## *CLERK'S CERTIFICATE OF MAILING*

I hereby certify that on the _____ day of _____, 2022, I mailed a copy of this Summons and a copy of the Complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

_____
Clerk, Lake Superior Court

Dated: _____, 2022.                    By: _____
Deputy

## *RETURN ON SERVICE OF SUMMONS BY MAIL*

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by the defendant on the _____ day of _____, 2022. I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2022.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by _____ on behalf of said defendant on the _____ day of _____, 2022.

_____
Clerk, Lake Superior Court

By: _____
Deputy

| | | | | | | |
|---|---|---|---|---|---|---|
| Kathleen A. DeLaney<br>Christopher S. Stake<br>DeLaney & DeLaney LLC<br>3646 Washington Blvd.<br>Indianapolis, IN 46205 | SHERIFF'S COSTS | | COURT NO. | **SUMMONS** | Defendants. | THE TRUSTEES OF INDIANA UNIVERSITY, d/b/a INDIANA UNIVERSITY NORTHWEST; KEN IWAMA in his official and individual capacities; VICKI ROMÁN-LAGUNAS in her official and individual capacities; and DAVID KLAMEN in is official and individual capacities; | MARK MCPHAIL,<br><br>v.<br><br>Plaintiff; | Cause No.<br><br>Room No. |

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE LAKE SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF LAKE | ) | CAUSE NO: |

MARK MCPHAIL,                                    )
                                                 )
    Plaintiff,                             )
                                                 )
    v.                                     )   **SUMMONS**
                                                 )
THE TRUSTEES OF INDIANA                          )
UNIVERSITY, d/b/a INDIANA                        )
UNIVERSITY NORTHWEST;                            )
KEN IWAMA, in his individual and                 )
official capacities; VICKI ROMÁN-LAGUNAS,        )
in her individual and official capacities; and   )
DAVID KLAMEN, in his individual and              )
official capacities;                             )
                                                 )
    Defendants.                            )
                                                 )

TO DEFENDANT:    Vicki Román-Lagunas
                    Vice Chancellor for Academic Affairs
                    Indiana University Northwest
                    3400 Broadway
                    Gary, IN 46408

    You are hereby notified that you have been sued by the persons named as plaintiff and in the Court indicated above.

    The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

    An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff. Such Answer must be made in court.

    If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated:   4/18/2022

                            *Lorenzo Arredondo*

                            Clerk, Lake Superior Court

*(SEAL — LAKE COUNTY COURTS, INDIANA)*

**The following manner of service of summons is hereby designated.**

    X    Registered or certified mail

Kathleen A. DeLaney (#18604-49)          Court Address:
Christopher S. Stake (#27356-53)           Lake County Superior Court
DeLaney & DeLaney LLC                 2293 N. Main Street
3646 N. Washington Blvd.              Crown Point, IN 46307
Indianapolis, IN 46205                Phone: 219-755-3000
Phone: (317) 920-0400
Attorneys for Plaintiff

**SHERIFF'S RETURN ON SERVICE OF SUMMONS**

I hereby certify that I have served this summons on the _____ day of _____, 2022:

(1) By delivering a copy of the Summons and a copy of the Complaint to defendant, _____.

(2) By leaving a copy of the Summons and a copy of the Complaint at _____ which is the dwelling place or usual place of abode of _____
and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks: _____

_____

_____
Sheriff

By: _____
Deputy

## *CLERK'S CERTIFICATE OF MAILING*

I hereby certify that on the _____ day of _____, 2022, I mailed a copy of this Summons and a copy of the Complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

_____
Clerk, Lake Superior Court

Dated: _____, 2022.           By:_____
Deputy

## *RETURN ON SERVICE OF SUMMONS BY MAIL*

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by the defendant on the _____ day of _____, 2022. I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2022.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by _____ on behalf of said defendant on the _____ day of _____, 2022.

_____
Clerk, Lake Superior Court

By: _____
Deputy

| Cause No. | Room No. | MARK MCPHAIL, Plaintiff, v. THE TRUSTEES OF INDIANA UNIVERSITY, d/b/a INDIANA UNIVERSITY NORTHWEST; KEN IWAMA in his official and individual capacities; VICKI ROMÁN-LAGUNAS in her official and individual capacities; and DAVID KLAMEN in is official and individual capacities; Defendants. | **SUMMONS** | COURT NO. | SHERIFF'S COSTS | Kathleen A. DeLaney Christopher S. Stake DeLaney & DeLaney LLC 3646 Washington Blvd. Indianapolis, IN 46205 |
|---|---|---|---|---|---|---|