45C01-2204-PL-000273

USDC IN/ND case 2:22-cv-00137-TLS-APR document 4   filed 04/18/22   page 1 of 21

Filed: 4/18/2022 2:08 PM
Clerk
Lake County, Indiana

Lake Circuit Court

STATE OF INDIANA
LAKE COUNTY SUPERIOR COURT

| | | |
|---|---|---|
| MARK MCPHAIL, | ) | |
| | ) | |
| Plaintiff, | ) | CAUSE NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY, KEN IWAMA, in his individual | ) | |
| and official capacities; VICKI | ) | |
| ROMÁN-LAGUNAS, in her individual and | ) | |
| official capacities; and DAVID KLAMEN, | ) | |
| in his individual and official capacities; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the plaintiff, Mark Lawrence McPhail ("Plaintiff" or "McPhail"), by counsel, and for his Complaint against the defendants, the Trustees of Indiana University ("IU" or "the University"), Ken Iwama, ("Iwama"), Vicki Román-Lagunas, ("Román-Lagunas"), and David Klamen ("Klamen") (collectively "Defendants"), alleges as follows:

## Introduction

1. On August 1, 2015 IU hired Mark McPhail, an African-American professor of Communication, as Executive Vice Chancellor for Academic Affairs for the IU Northwest campus, and simultaneously as a tenured full professor (the highest academic rank) in IU Northwest's Department of Communication.

McPhail resigned from the administrative position in 2016 and assumed a faculty position.

2.  After McPhail criticized the administration for lack of adherence to university policies and held a forum in which he said IU Northwest's campus climate contributed to racial disparities, Defendants banned him from teaching and reduced his salary by 70%. When he appealed, Defendants terminated his employment abruptly and without a hearing, substantially damaging if not ending his career.

3.  McPhail brings this action for breach of contract, intentional interference with contract, violation of the First Amendment to the United States Constitution, negligence *per se* for violation of IC 21-39-3 ("the Academic Whistleblower Statute"), violation of the Due Process Clause of the Fourteenth Amendment, and discrimination and retaliation as prohibited by the Civil Rights Act of 1866.

## Parties

4.  From August of 2015 until September of 2021, McPhail was employed at IU. He currently resides in Michigan.

5.  At all times relevant hereto, Román-Lagunas and Klamen were employees of IU.

6.  Iwama was appointed Chancellor of IU Northwest in 2020, and since that time has served as the chief administrative officer of the IU Northwest campus.

2

7.   At all times relevant hereto, IU was a public educational institution established under Title 21, Article 20 of the Indiana Code.

## Jurisdiction, Venue & Cause of Action

8.   This action is authorized and instituted pursuant to Indiana statutory and common law.

9.   This Court is a court of general jurisdiction, and thereby has jurisdiction over Plaintiff's federal claim.

10.  Lake County, Indiana is an appropriate venue for this action by virtue of Trial Rule 75 because Indiana University Northwest is located here, most of the actions alleged occurred here, and most of the evidence relevant to this action is likely to be located here.

## Factual Allegations

11.  In 1987, McPhail earned a Doctor of Philosophy in Communication from the University of Massachusetts. Thereafter, he served in several faculty and academic administrative positions, published widely, and spoke in numerous domestic and international academic conferences.

12.  In May of 2015, IU and McPhail entered into an employment contract through which IU Northwest hired McPhail as the Executive Vice Chancellor for Academic Affairs ("EVCAA") as well as a tenured Professor of Communication. Exhibit H, attached hereto.

13.  Shortly thereafter, the IU Northwest Communication Department Chair, the College of Arts and Sciences Promotion and Tenure Committee as well as the

Campus Promotion and Tenure Committee reviewed McPhail's record of teaching, research and administrative background and unanimously supported his promotion to the rank of full professor of Communication.

14.   Through his employment contract with IU, McPhail was assured a number of substantive and procedural employment rights, including those reflected in Exhibits A through G to this Complaint.

15.   Among those employment policies is IU's Academic Freedom policy, which guaranteed academic appointees the freedom "to express views on matters having to do with the university and its policies, and on issues of public interest generally." Policy ACA-32. Exhibit A.

16.   IU also protects the right of faculty to raise concerns about wrongful conduct through UA-04, IU's Whistleblower Protection Policy. Ex. B.

17.   IU also guaranteed tenured faculty several procedural protections as prerequisites to the imposition of discipline and termination. Exs. C-G.

18.   McPhail served as EVCAA from May of 2015 until July 31, 2016. At that point, he resigned due to the fact that then-Chancellor Lowe undermined his authority and resisted his attempts to implement certain IU policies.

19.   McPhail was then appointed to the faculty position for which he was approved at his hire, that of Professor of Communication.

20.   After McPhail's resignation, Román-Lagunas assumed the EVCAA position following the interim appointment of  Anna Sue Rominger and continues in that position to this day.

4

21.   On April 18, 2018 McPhail organized a public forum titled "Diversity: An unfulfilled promise at IU Northwest." The forum highlighted challenges faced by black students at IU Northwest, especially in the area of retention, and identified ways in which IU Northwest had failed to support those students. Several members of the Indiana Black Legislative Caucus of the Indiana state legislature spoke at the forum, as did McPhail.

22.   During the forum, McPhail presented a report highlighting findings of the Gary Commission ("the Commission") on the Social Status of Black Males. He presented the Commission's statistical reports about achievement gaps along racial and socioeconomic lines and its recommendation that Universities provide comprehensive supports for at-risk students." McPhail highlighted the fact that the diversity of the staff, faculty and student population on campus is important to the campus's success in retention, and that overemphasis on institutional "diversity" initiatives can obscure or frustrate progress.

23.   In the summer of 2018, IU Northwest announced that the Departments of Fine Arts and Performing Arts would be merged with the Communication Department, removed from the College of Arts and Sciences ("COAS") and placed in a new School of the Arts. IU Northwest hired Klamen, the former Associate Dean of COAS and former Chair of the Department of Fine Arts and Performing Arts, into the role.

24. On August 1, 2018 McPhail contacted IU Northwest's EEO Director, Aneesah Ali ("Ali") by phone and by electronic mail and alleged that Klamen was appointed to the position without a search and without any transparency in violation of IU's requirement that it make hiring decisions "based upon [applicants'] individual qualifications," as required by UA-01, IU's Non-Discrimination/Equal Opportunity/Affirmative Action policy.

25. The next spring, Bonita Neff ("Neff") then-Chair of the Communication Department filed a complaint with the Faculty Board of Review alleging that Klamen's appointment violated IU policies.

26. Klamen, who was Neff's direct supervisor, initiated termination proceedings against her within less than two weeks after her complaint, Román-Lagunas supported his recommendation, and Iwama made the final decision, rejecting the recommendation of the Faculty Board of Review.

27. As for McPhail, after he complained about Klamen's appointment, the University transferred him to the IU Bloomington for a two-year project. During the 2019-20 academic year, McPhail began making preparations for his return, and sought course assignments from Klamen. Klamen was non-responsive, so McPhail sought answers from Román-Lagunas. Contrary to standard practice, Klamen made unilateral course assignments nearly four months after McPhail began requesting them and shortly before the semester was to begin, without even discussing the assignments with McPhail.

28.   Klamen refused to communicate with McPhail starting on or about March 26, 2020 regarding his teaching assignment for the fall semester despite repeated requests to the Dean's representative and the EVCAA.

29.   On July 14, 2020, McPhail filed a charge with the Gary Commission on Human Relations ("the July 2020 Gary Commission complaint") alleging that Klamen and Román-Lagunas refused to assign him courses despite repeated requests because he had alerted IU that the appointment of David Klamen violated the University's EEO policy. In that charge, he alleged that Respondent adopted hiring practices that privileged white employees in appointment to high-level administrative positions.

30.   McPhail taught in the Communication Department during the 2020-21 academic year.

31.   In July of 2021, at the first opportunity for formal evaluation following McPhail's July 2020 Gary Commission complaint, Klamen issued McPhail a performance evaluation characterizing his teaching as inadequate. The evaluation relied on criteria such as McPhail's "reputation as a teacher," which Klamen gleaned from unspecified "reports," and the contention that McPhail issued failing grades to too many students.

32.   McPhail responded to Dean Klamen's evaluation, providing context for some of the stated concerns and asking for specifics and guidance. He noted, among other things, that the students who received failing grades in the course did

not submit the work required, and asked for suggestions about how he could lower the number of failing grades without lowering standards.

33. Dean Klamen provided none of the clarification McPhail requested and made no corrections to the report, instead characterizing McPhail's attempt to defend his performance as a violation of the Code of Academic Ethics. In response to McPhail's contention that the students who received failing grades did not complete the required work, Klamen responded, "I find it inappropriate that you attempt to shift blame to students for your own professional shortcomings." He concluded, "Given that your responses and desire to shift blame to the student do not mitigate these concerns, I am recommending to the Executive Vice Chancellor that you teach no classes this upcoming semester."

34. The next day, Executive Vice Chancellor Vicki Román-Lagunas concurred with Dean Klamen's recommendation, suspended McPhail from teaching for the fall semester and reduced his salary by 75%. On information and belief, Román-Lagunas made the final decision on this suspension.

35. On August 30, 2021 the American Association of University Professors ("AAUP") wrote to Iwama expressing concern about the suspension, noting that McPhail was not provided a hearing before his peers before issuing the sanction.

36. Iwama ignored the AAUP's letter.

37.  McPhail appealed the decision to the Faculty Board of Review ("FBR") on
     September 13, 2021, alleging that the suspension violated several policies. He
     alleged that the decision was in retaliation for his complaints about Klamen's
     appointment and his complaints about racial discrimination and retaliation.

38.  In that September 13, 2021 appeal, McPhail also alleged that by creating a
     new School within the College of Arts and Sciences and appointing Klamen
     as Dean without any timely consultation with faculty and without creating a
     search committee, IU and Román-Lagunas violated the requirements of ACA-
     79, Merger, Reorganization and Elimination of Academic Units and Programs
     Involving Core Schools; BL-ACA-B12, Search and Screen Procedures for
     Campus Administrators; and EEO guidelines. He explained, "The
     Administration engaged the faculty only after the fact and had created the
     School based upon an arrangement between the EVCAA and Dean that
     clearly violated EEOC guidelines and ACA-79."

39.  The next day, on September 14, 2021, IU terminated McPhail's employment
     and informed him of the termination in a dramatic and humiliating manner,
     by sending police to his home with the termination letter.

40.  In the letter, Román-Lagunas cited as the purported reason for the
     termination that McPhail made "a threat of physical violence." She wrote
     that Iwama had "been consulted and he agrees that these are exigent
     circumstances for which dismissal is warranted."

41. Dumbfounded by this accusation, McPhail asked for further information about what he was being accused of. IU informed McPhail that he was terminated because he was reported to have said "words to the effect that 'the only way to end racism is to kill all the white people.'"

42. McPhail never said words to that effect. Specifically, McPhail did not threaten to kill any people, nor did he say anything that could reasonably construed as calling for such a thing. On the contrary, McPhail published scholarship in which he characterized it as problematic that the catalyst for several significant civil rights victories was the death of white individuals.

43. When pressed for further details, IU's Senior Associate General Counsel Marcia Gonzales wrote,

> Prof. McPhail's statement was reported directly by a very concerned member of the IUN Community to EVCAA Roman-Lagunas on or about September 10th and the report was made in confidence. During this same week, Dean Klamen was also advised confidentially by a colleague that he should avoid Prof. McPhail for fear that an 'incident' may result and that he should be very concerned if he were to encounter him in person. . . . [I]n both cases, each person reported that Prof. McPhail was very angry.

44. Neither individual has been identified, nor has McPhail ever been informed whether there was any objective basis for the fears allegedly expressed to Klamen.

45. IU also declared McPhail's appeal of his salary reduction and ban from teaching as moot.

46. On November 29, 2021, the FBR nonetheless decided the appeal, finding that the salary reduction and teaching ban failed to adhere to IU's post-tenure

review policy. The FBR recommended that McPhail's salary and position be restored.

47.    On January 28, 2022, Iwama rejected the FBR's recommendation and affirmed McPhail's salary reduction and teaching ban.

48.    McPhail's appeal of his termination is pending.

49.    On February 5, 2022 McPhail sent certified mail notice of his claims to the Trustees of Indiana University and to the Indiana Political Subdivision Risk Management Commission.

50.    On April 12, 2022 the AAUP wrote to Iwama again, expressing "grave concern" about IU's having terminated the employment of a tenured professor without a hearing. The AAUP characterized a pre-dismissal hearing as an "indispensable safeguard to academic freedom" and that failure to provide one "effectively renders tenure all but meaningless at the university."

51.    The termination has been devastating to McPhail's once brilliant career. McPhail has since applied to many academic and administrative positions and has not received any offers.

52.    As a result of the above-described actions, Plaintiff suffered and continues to suffer damages that include restricted speech, loss of salary, loss of job opportunities, damage to reputation, humiliation, severe emotional distress, litigation expenses, attorney fees, and other compensatory damages.

## Legal Claims

### Count I
### Breach of Contract
### McPhail v. IU

53.    Each paragraph of this Complaint is incorporated as if fully restated herein.

54.    The University's academic policies (reflected in part by Exhibits A-G) contain clear promises and mutual obligations. These documents were among the policies explicitly incorporated into McPhail's employment contract. Ex. H. At all relevant times, they were available on IU's website.

55.    IU breached its employment contract with McPhail when it removed him from teaching, reduced his salary by 70%, and terminated his employment.

56.    When McPhail raised concerns about the racial climate on the IU Northwest campus and procedural violations relating to Klamen's hire, he was exercising his right as a professor to "express views on matters having to do with the university and its policies, and on issues of public interest generally." Ex. A.

57.    IU took the adverse actions described in this Count because of that protected speech, violating its Academic Freedom Policy. Ex. A.

58.    The adverse actions also violate IU's Whistleblower Protection Policy, which prohibits retaliation "against anyone who has made a good faith report of wrongful conduct." Ex. B.

59. IU's procedural protections prohibit discipline or termination of tenured faculty members accused of <u>inadequate performance</u> without affording them notice and a chance to improve. Ex. F at § C; Ex. G ¶¶ 2, 5, 8.

60. Prior to reducing McPhail's salary by 70%, IU did not follow the requirements of the University's Faculty and Librarian Annual Reviews policy. Ex. F at § C. Specifically, Klamen's July 2021 review of McPhail's teaching a) did not provide for peer review of McPhail's teaching, and b) was not intended nor used to "facilitate communication, openness, fairness, and faculty participation in merit-based salary decisions." Instead, Klamen raised a number of concerns and then reprimanded McPhail when he defended himself against some of those concerns and asked for clarification about others.

61. IU also violated its post-tenure review policy, which provides that reviews "*must be clearly aimed at performance enhancement*" rather than as a punishment for performance inadequacies." Ex. G p. 1 (emphasis in original).

62. IU is required to develop defined standards of performance, provide faculty with notice of those standards, and provide a review process following notification of "persistent substandard performance over at least two or more consecutive annual reviews." Ex. G ¶ 5.

63. The review committee which administers that process must consist exclusively of faculty members, must provide the faculty member with findings as to any deficiencies and then must work with the faculty member

13

to create a development plan. *Id.* The faculty member is also afforded the right to appeal during this process. *Id.*

64. Defendants did not follow any of these procedural protections before suspending and terminating McPhail.

65. IU's procedural protections also prohibit discipline or termination of tenured faculty members accused of <u>misconduct</u> without first affording them the right to defend themselves in a hearing after being apprised of the full details of the accusations against them. Ex. C at § B(I); Ex. D at § D; Ex. E at § II; Ex. G ¶¶ 2, 5, 9.

66. AC-52 guarantees the faculty member up for dismissal the right to "[a] statement with reasonable particularity of the ground proposed for the dismissal." Ex. D § D(2). Similarly, the IU Northwest Dismissal Procedures provide that a faculty member to whom formal notice of dismissal proceedings has been issued "is entitled to full access to all relevant information regarding the case possessed by the dean or other administrative officers, including the names and location of all witnesses. No information to which the faculty member or librarian is denied access shall be used by the administration." Ex. E p. 7.

67. IU did not provide McPhail with notice of the allegations or evidence against him, nor an opportunity to defend himself, prior to terminating his employment.

68.   The IU Northwest Dismissal Procedures provide for detailed informal and formal review processes and a hearing prior to termination. Ex. E. § II. Similarly, ACA-52(D) requires specific notice of grounds for a hearing and a hearing as prerequisites to termination. Ex. D. IU dispensed with those procedures entirely. Instead, Román-Lagunas simply issued a letter, copied to Klamen and Iwama, informing McPhail that his employment was terminated.

**Count** II
**Tortious Interference with Contract**
**Against Iwama, Román-Lagunas and Klamen**
**in their individual capacities**

69.   Each paragraph of this Complaint is incorporated as if fully restated herein.

70.   IU and McPhail were parties to a valid and enforceable employment contract which included the documents attached as Exhibits A-G.

71.   Iwama, Román-Lagunas and Klamen knew of the existence of this contract.

72.   Iwama, Román-Lagunas and Klamen intentionally induced breach of McPhail's employment contract by developing and implementing *ad hoc* procedures which were not reflected in IU policies to exclude McPhail from the University.

73.   Iwama, Román-Lagunas and Klamen induced these breaches without justification.

74.   The actions of Iwama, and Klamen were unauthorized and exceeded the scope of their authority.

75.   The individual defendants' inducement of a breach caused McPhail to suffer
      lost salary and benefits, severe emotional distress, attorneys' fees, and
      litigation costs.

### Count III
### First Amendment Retaliation
### (42 U.S.C. §§ 1983, 1985)
### Against all Defendants

76.   Each paragraph of this Complaint is incorporated as if fully restated herein.

77.   Plaintiff's August 1, 2018 and September 13, 2021 speech about
      administrative circumvention of faculty and the equal opportunity policy in
      the appointment of administrators related to matters of public concern and
      was protected under the First Amendment to the U.S. Constitution.

78.   Plaintiff's speech about the racial dynamics on IU Northwest's campus
      related to matters of public concern and was protected under the First
      Amendment to the U.S. Constitution.

79.   Plaintiff's right to voice his concerns outweighed any interest of Iwama,
      Román-Lagunas and Klamen in suppressing that speech.

80.   Acting under the color of law, Román-Lagunas and Klamen used their
      authority as EVCAA and Dean to suspend McPhail from teaching and
      terminate his employment.

81.   Román-Lagunas and Klamen took the actions alleged in order to punish
      Plaintiff for the protected activity alleged and preclude him from further
      speech along those lines.

16

82.  In approving the recommendations of Román-Lagunas and Klamen, Iwama acted with deliberate indifference to Plaintiff's clearly established right to criticize public officials and institutions.

83.  Plaintiff's protected speech was a substantial motivating factor in Defendants' actions.

84.  Were it not for Plaintiff's protected speech, Defendants would not have taken the actions alleged herein.

85.  Plaintiff seeks relief in the form of reinstatement from IU and from Iwama, Román-Lagunas and Klamen in their official capacities. He seeks monetary damages from Iwama, Román-Lagunas and Klamen in their individual capacities.

**Count IV**
**Negligence Per Se**
**McPhail v. IU**

86.  Each paragraph of this Complaint is incorporated as if fully restated herein.

87.  On August 1, 2018 McPhail reported to Ali that IU violated state rules by hiring Klamen without any faculty involvement. Ali copied Román-Lagunas in her response to that complaint.

88.  On September 13, 2021, McPhail alleged that by creating a new School and appointing Klamen as Dean without any timely consultation with faculty, IU and Román-Lagunas violated IU's EEO policy.

89. IU had a clear statutory duty pursuant to the Academic Whistleblower Statute, IC 21-39-3, to refrain from disciplining and terminating McPhail for his report of violations of state law.

90. IU did not discipline or terminate McPhail's employment on the claim that he filed a knowingly false report.

91. Because of McPhail's August 1, 2018 and September 13, 2021 complaints, IU reduced his salary, banned him from teaching, and terminated his employment.

**Count V**
**Violations of Right to Procedural Due Process**
**(42 U.S.C. §§ 1983, 1985)**
**Against all Defendants**

92. Each paragraph of this Complaint is incorporated as if fully restated herein.

93. McPhail had a protected property interest in his tenured position at IU.

94. Before terminating McPhail's employment, Defendants did not provide him with oral or written notice of the allegations against him, did not provide him an explanation of any evidence against him, and did not provide him the opportunity to tell his side of the story to an impartial decisionmaker.

95. In recommending and approving McPhail's termination, Iwama, Román-Lagunas and Klamen acted with deliberate indifference to Plaintiff's rights.

96. Plaintiff's pending appeal will not provide a meaningful post-termination remedy because a) McPhail still has not been provided an explanation of the evidence against him nor an opportunity to respond to that evidence by

18

presenting his side of the story and b) Iwama has authority to accept or reject the recommendation of the Faculty Board of Review, so the post-termination appeal will therefore not be decided by an impartial decisionmaker.

97.    Plaintiff seeks relief in the form of reinstatement from IU and from Iwama, Román-Lagunas and Klamen in their official capacities. He seeks monetary damages from Iwama, Román-Lagunas and Klamen in their individual capacities.

**Count** VI
**Race Discrimination**
**Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1983, 1985**
**Against All Defendants**

98.    Each paragraph of this Complaint is incorporated as if fully restated herein.

99.    IU terminated McPhail's employment on the purported basis that he threatened to commit genocide against white people.

100.   McPhail's research on race and racism has focused on reconciliation and racial justice, and he has never said or suggested that anyone should kill white people.

101.   Defendants relied on stereotypes of black men as irrationally angry and violent to exile McPhail from the University permanently.

102.   McPhail's race was a motivating factor in Defendants' decision to discharge him.

103.   Plaintiff seeks relief in the form of reinstatement from IU and from Iwama, Román-Lagunas and Klamen in their official capacities. He seeks monetary

damages from Iwama, Román-Lagunas and Klamen in their individual capacities.

### Count VII
### Retaliation for Allegations of Employment Discrimination
### Civil Rights Act of 1866, 42 U.S.C. § 1981, 1983, 1985
### Against All Defendants

104.   Each paragraph of this Complaint is incorporated as if fully restated herein.

105.   Plaintiff engaged in statutorily protected activity by filing the July 2020 Gary Commission complaint.

106.   Pursuant to McPhail's first employment evaluation following that complaint, Klamen and Román-Lagunas reduced McPhail's salary by 70% and terminated his employment shortly thereafter.

107.   Defendants would not have taken these adverse actions were it not for Plaintiff's complaint.

108.   Plaintiff seeks relief in the form of reinstatement from IU and from Iwama, Román-Lagunas and Klamen in their official capacities. He seeks monetary damages from Iwama, Román-Lagunas and Klamen in their individual capacities.

**WHEREFORE** Plaintiff respectfully requests the following relief:

1.   Reinstatement to his tenured position (against IU and the individual defendants in their official capacities);

2.   Compensation for lost salary;

3.   Prejudgment interest;

4.     Emotional distress damages;

5.     Punitive damages (against the individual defendants in their personal capacities);

6.     Attorney's fees;

7.     Litigation expenses; and

8.     Such other relief as law and justice allow.


## <u>REQUEST FOR TRIAL BY JURY</u>

Plaintiff hereby requests a trial by jury with respect to any issues so triable.

WHEREFORE, Plaintiff prays that this Court grant judgment against Defendants in an amount commensurate with their damages, punitive damages, interest as allowed by law, and all other relief just and proper in the premises.


Dated:  April 18, 2022                              Respectfully submitted,


/s/ *Christopher S. Stake*
Christopher S. Stake (#27356-53)
DELANEY & DELANEY LLC
3646 Washington Blvd.
Indianapolis, IN 46205
Phone: (317) 920-0400
Fax: (317) 920-0404
cstake@delaneylaw.net

Rima N. Kapitan
KAPITAN GOMAA LAW, P.C.
Illinois Attorney No.: 6286541 (application for pro hac vice admission forthcoming)
P.O. Box 6779
Chicago, IL 60680
Phone: (312) 566-9590
rima@kapitangomaa.com

21