**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

Mark McPhail,

          Plaintiff,                          Case No. 2:22-cv-00137-TLS-APR

The Trustees of Indiana                       Honorable Theresa Lazar Springmann
University, et al.

          Defendants.

## Plaintiff's Reply to Defendants' Statement of Additional Facts

Plaintiff Mark McPhail ("Plaintiff" or "McPhail"), by and through his attorneys and pursuant to Local Rule 56-1(c)(2) of the United States District Court for the Northern District of Indiana, responds to Defendants' Statement of Additional Facts as follows:

**I.**      **The University's Code of Academic Ethics and Appeal Process.**

64.      The University has adopted a comprehensive suite of policies and procedures to preserve and safeguard the rights of academic appointees at the University. Ex. J, ¶ 7, Ex. 3. Central among these policies are [*sic*] the Code of Academic Ethics known as ACA-33. *Id.*

**Response 64: Plaintiff disputes that ACA-33 is "central among" or otherwise more important than other policies which safeguard the rights of academic appointees; neither of the documents Defendants cite in support of this claim make any such representation, and IU's Academic University Policies website lists ACA-33 among IU's other academic policies alphabetically by title without giving it any apparent special prominence or emphasis. Dkt. No. 56 ¶ 1,** *citing* **https://policies.iu.edu/academic/index.html. Paragraph 64 is otherwise undisputed.**

65.     The Code of Academic Ethics provides the core responsibilities a member of the University faculty must adhere to and sets out the procedures by which these ethical requirements are to be enforced in the event of a faculty misconduct. *Id.*. Enforcement of the policy is reflective of progressive discipline, with egregious violations being subject to penalties such as immediate dismissal. Specifically:

> The line of administrative action in cases of alleged violation of academic ethics shall be the chairperson; the academic dean; the appropriate Vice Provost for Faculty and Academic Affairs/Vice Chancellor for Academic Affairs; the appropriate Chancellor/Provost; a Vice President, where appropriate; and the President. Subject to the substantive standards of University tenure policy and the procedural safeguards of the faculty institutions, sanctions appropriate to the offense should be applied by the academic administrators. Possible sanctions include the following: reprimand, consideration in establishing annual salary, consideration in promotion decisions, consideration in tenure decisions, retention of salary, termination of employment, and immediate dismissal.

ACA-33. *Id.* Such decisions are subject to review in accordance with the "rules governing appeals to the Faculty Board of Review (or to the Associate Instructor Board of Review) of the appropriate campus." *Id.*

**Response 65**: Undisputed.

66.     During McPhail's brief time as EVCAA at IUN he also relied on ACA-33 to impose a sanction on a then faculty member who violated ACA-33. *Poulard v. The Trustees of Indiana University, et al.,* No. 2:16-cv-00115-JTM (N.D. Ind. 2018), Dkt. # 35 at pp. 10-11; *see also Poulard v. The Trustees of Indiana University, et al.,* No. 2:16-cv-00115-JTM (N.D. Ind. 2018), Dkt. # 39-19]. Similar to the administrative action taken against McPhail under ACA-33 to remove his teaching duties for one semester and retain that portion of his pay, McPhail took similar administrative action against a former IUN faculty member when he was EVCAA, informing that faculty member that: "You will be put on leave without pay for a period of one semester

beginning January 1, 2016. Your salary for that period will be retained and allocated to your department for the purpose of securing instructional resources during your absence." *Id.* The impacted faculty member appealed McPhail's administrative action to retain his salary and put him on leave without teaching under ACA-33. *Id.* at 11.

**Response 66**: **Plaintiff objects to paragraph 66 as immaterial, in that Plaintiff does not argue IUN may never rely on ACA-33, and whether or not Defendants provided him due process in his suspension/salary reduction (as opposed to his termination), is not at issue in this motion. In any case, paragraph 66 is disputed in part, because McPhail's administrative action against Poulard was not "similar" to the sanction Defendants imposed on McPhail for alleged deficiencies in teaching performance and service following a routine performance review, alleged deficiencies which did not implicate ACA-33, did implicate ACA-21, and did implicate IUN's Post-Tenure Review and Enhancement Policy. Dkt. No. 42-2 at IU1_2315-2320; Dkt. 52-10 pp. 24-26. McPhail took administrative action against Poulard after providing Poulard notice and a meaningful opportunity to be heard for alleged personal misconduct on University property. *Poulard v. Trustees of Indiana Univ.*, No. 2:16 CV 115, 2018 WL 4680010 (N.D. Ind. Sept. 28, 2018).**

67. Likewise, McPhail appealed the administrative action that removed him from teaching for one semester with a corresponding pay adjustment under ACA-33. *See* Ex. A, p. 204:5-204:17 and Dep. Ex. 47.1 at McPhail 791; Plaintiff's Ex. 17; Dkt. # 39-13, Plaintiff's Ex. 14, at IU1 1327-29. McPhail choose [*sic*] not to continue an appeal of this decision, though he had the ability to do so. [Ex. J, ¶ 9, Ex. 5].

**Response 67**: **Undisputed that McPhail appealed the administrative action that removed him from teaching and reduced his pay. McPhail disputes that he chose not to continue an appeal of this decision, since he did appeal Román-Lagunas's rejection of the Faculty Board's**

decision to Iwama on December 29, 2021. Dkt. 42-2 at IU1_1357. McPhail does not dispute

that he did not appeal the chancellor's decision on removal from teaching and pay reduction

to the president of Indiana University.

II.         McPhail's IUN Employment

A.     McPhail Quickly Resigns from his Hired Position, takes a paid year
       leave of absence, and returns to teach in 2017 receiving his first out of
       two IUN inadequate teaching evaluations

68.      McPhail began his employment with the University as the Executive Vice Chancellor

for Academic Affairs ("EVCAA") at the IU Northwest Campus on August 1, 2015. Dkt #39-

4, Plaintiff's Ex. 4, Appointment Letter. However, on May 19, 2016, McPhail resigned from

his position as EVCAA, and Chancellor Lowe accepted his resignation. Dkt #39-1, Plaintiff's

Ex. 1, McPhail Declaration ¶ 5 at McPhail 114. Following McPhail's resignation as EVCAA,

based on the generosity of the administration, McPhail was permitted to take a year off of

work while receiving his full pay from August 1, 2016, through June 30, 2017. [Ex. A, p. 50:2-

18].

**Response 68**: **Undisputed, except that IU's decision to grant McPhail paid leave back in 2016-**

**17 (by a different Chancellor who is not a party to this case) was not based on "generosity"**

**but on past precedent, since McPhail's predecessor was also granted paid leave, and on the**

**fact that McPhail requested it. Ex. E, McPhail Dep. 278:16 – 279:2. Plaintiff further clarifies**

**that the fact that he agreed with Defendants' counsel's characterization of the paid leave as**

**generous does not mean he knew what Lowe's reasons for granting the request for leave.**

69.  McPhail taught as a Communications Professor during the 2017-2018 academic year,

though McPhail received an inadequate teaching evaluation during this period from IUN's

then Communication Chair, Bonita Neff dated March 2018. [Ex. A, p. 169:15-21 and Dep. Ex. 20].

**Response 69**: McPhail disputes that he "received" an inadequate teaching evaluation related to the 2017-2018 academic year. That evaluation, if it existed at the time, was not provided to him. McPhail Dep. 169:2-4; Ex. K, McPhail Dep. Exhibit 20. Dkt. No. 42-2 at IU1_2317 ¶ 2, 2320 ¶ 8 ("This is the first review of any kind that I have received since working at Indiana University Northwest."). The citation Defendants provide in paragraph 69 does not establish that McPhail received the evaluation. ████████████████████████

████████████████████████████████████████ Ex. F, Klamen Dep. 90:15 – 91:2. McPhail also disputes that the evaluation was "from" Bonita Neff, as it was at minimum substantially edited by Mark Hoyert, the Dean of the College of Arts and Sciences who clashed with McPhail when the latter was EVCAA. Ex. K, Klamen Dep. Ex. 9; Ex. E, McPhail Dep. 56:21 – 57:5, 105:2 – 106:3.

70. Among other things, Communication Chair, Bonita Neff's evaluation of McPhail also indicated that (a) McPhail declined to follow the model syllabus required for the communication courses that he taught, (b) instead of using required course content to teach his classes, McPhail substituted a series of YouTube lectures featuring himself, (c) there was smaller student enrollment than expected of Communication faculty in his courses, (d) and that in the future McPhail should aspire to bring his class in line with the needs of his students and the standards of the Department Ex. A, Dep. Ex. 20.

**Response 70**: McPhail disputes that the evaluation was "Bonita Neff's," as it was at minimum substantially edited by Mark Hoyert, the Dean of the College of Arts and Sciences who clashed with McPhail when the latter was EVCAA. Ex. K, Klamen Dep. Ex. 9; Ex. E, McPhail Dep. 56:21 – 57:5, 105:2 – 106:3. Admit that one version of the evaluation includes all the

allegations described in this paragraph, although it is not clear that it is Neff's version, the official version or the last version; the document is dated March 2018, revised in May of 2018, and then a redlined version is sent in 2020. Ex. K,  Klamen Dep. Ex. 9; IU1_656-57. The version Defendants claim is the official evaluation through McPhail Deposition Exhibit 20 is different than the May 2018 version but identical to the redlined version Hoyert sent to Klamen in 2020. Ex. K, Klamen Dep. Ex. 9; IU1_656-57.

71. Instead of teaching the academic year following his receipt of a 2017 inadequate teaching faculty evaluation, McPhail spent the 2018-19 and the 2019-20 academic years as a Senior Research Fellow with the Office of the Vice President for Diversity, Equity and Multicultural Affairs in Bloomington, Indiana. Ex. C, ¶ 6; Ex. B, ¶ 2, Exs. 1, 2. This role was outside the scope of McPhail's 2015 Appointment letter. *Id.* McPhail had no teaching or service obligations during this time. *Id.*

**Response 71**: Admit, except that Plaintiff denies that the fellowship was "outside the scope of McPhail's 2015 Appointment letter." Nothing in the documents Defendants cite suggest McPhail in any way relinquished his faculty appointment; rather, it was an additional and temporary administrative position. IU1_1983 ("He will continue with his IU Northwest faculty salary and have an administrative supplement"); Ex. C at IU1_4011; Dkt. No. 52-2 p. 4. As demonstrated in his appointment letter, assignment to administrative roles does not negate McPhail's tenure professorship, even when he is not teaching Communication courses during the relevant semester; at the outset of his employment, for example, he was appointed both as tenured Professor of Communication *and* as IUN's EVCAA. Dkt. 39-4; Dkt. No. 39-1 ¶ 4.

72. In McPhail's Senior Research Fellow role, McPhail was tasked with completing a book manuscript on the overarching history of inclusion on all IU campuses by August 2019. Ex.

B, ¶¶ 5-6. McPhail never completed the book manuscript. *Id.*

**Response 72**: **Undisputed, and McPhail clarifies that he received extensions on the manuscript and was still working on it at the time of his termination, which is not uncommon in academia. Ex. A, McPhail Decl. ¶ 10; Ex. E, McPhail Dep. 110:4 – 113:4, 279:6 – 279:14. When McPhail last contacted Wimbush about an update, Wimbush responded that he had been instructed not to communicate with him. Ex. A, McPhail Decl. ¶ 10; Ex. D, McPhail 3634.**

> 73. Since at least 2008, IU has maintained its long-held position that its academic policies do not create a contract of employment between Indiana University and persons with academic appointments. Ex. G, ¶ 9.

**Response 73**: **Plaintiff objects that the allegations in paragraph 73 fall short of meeting the Federal Rule 56(c)(4) standard for personal knowledge, in that it does not "show that the affiant or declarant is competent to testify on the matters stated." Kincaid served as IU's Chief Policy Officer from May 2014 to March 2018. Dkt. No. 52-7 ¶ 1. She does not explain how she would know that 6 years prior to her appointment in that role, "the university has maintained the position that its academic policies do not create a contract of employment between IU and persons with academic appointments," and the assertion is not supported by any documents, statements by any IU official, nor any other fact.**

**Plaintiff further disputes the assertion in 73 that IU maintained the position that its academic policies were not contractual since the website IU included in McPhail's appointment letter which linked to the academic policies at issue in this case did not contain any contractual disclaimer until June or July of 2016, more than a year after McPhail accepted the appointment. Dkt. No. 56 ¶¶ 1, 4-6, citing to Dkt. No. 56-1, Dkt. No. 56-2; Dkt. No. 56-3; Dkt. No. 56-4. See also Response 75.**

74. IU maintained an Academic Handbook that contained most faculty related policies for the university in one spot. *Id.* at ¶ 2. Initially, the Academic Handbook was maintained in a paper format, but was later converted to a website format that was managed by the IU Bloomington faculty and academic affairs office. *Id.*

**Response 74: Plaintiff disputes that the Academic Handbook contained "most faculty related policies for the university." The Handbook Defendants identify does not include ACA-21, ACA-33, or ACA-52. Dkt. No. 52-7 pp. 6-8. Plaintiff further denies that the Academic Handbook was the "one spot" where IU maintained its faculty related policies; IU compiled a more comprehensive compilation of its academic and faculty-related policies at the link included in McPhail's appointment letter. Dkt. No. 39-4; Dkt. No. 56 ¶¶ 1, 4, 7-12. Plaintiff otherwise admits paragraph 74.**

75. The 2008 version of the Academic Handbook, in effect since before McPhail's employment, clearly that: "Statements and policies in this Handbook do not create a contract and do not create any legal rights. In the event of differences between this document and the original documents cited therein, the wording in the original documents or master contracts shall obtain." Ex. G, ¶¶ 4, 6, Ex. 1. The Academic Handbook and this disclaimer language was available when McPhail began his employment in 2015. Ex. G, at ¶¶ 5, 6, Ex. 1.

**Response 75: Disputed. The cover page of the 2015 Academic Handbook Defendants identify in Docket no. 52-7 states at its outset, "The IU Academic Handbook you're currently trying to access is out of date. The university-wide academic polices have been moved; please access them here." Dkt. No. 52-7 p. 6. Defendant does not explain where that link directed to in 2015. When one clicks on the link on which Defendants rely now (https://archive.academichandbook.indiana.edu/index.php?title=Main_Page), it directs to**

**the Academic University Policies website, which did not have a disclaimer on it in 2015.**
**Dkt. No. 56 ¶¶ 1, 4-6, citing to Dkt. No. 56-1, Dkt. No. 56-2. Plaintiff further denies that**
**paragraph 75 sets forth any admissible evidence that the Academic Handbook and its**
**disclaimer language were available to him when he began his employment in 2015; Kincaid**
**does not claim to have been involved in the hire of McPhail, and the evidence shows he was**
**directed instead to a completely different website with no disclaimer when he was offered**
**his position. Dkt. No. 39-4; Dkt. No. 56 ¶¶ 1, 4, 7-12. See also Response 73.**

76.     A true and correct copy of the website listing of the Academic Handbook published online when McPhail began working for IUN in 2015 is available here https://archive.academichandbook.indiana.edu/index.php?title=Main_Page, and still maintains a disclaimer stating: "Statements and policies in this Handbook do not create a contract and do not create any legal rights. In the event of differences between this document and the original documents cited therein, the wording in the original documents or master contracts shall obtain." *Id.* at ¶¶ 4, 5, 6, Ex. 1.

**Response 76: Disputed. See Response 75.**

**B. McPhail resumes teaching Communications, and receives a second inadequate teaching evaluation.**

**Response to Heading II(B): Plaintiff disputes the implication that he received two teaching evaluations while employed at IU, as further explained below. See Response 69.**

77. McPhail resumed his faculty appointment as Professor of Communication at IUN in August 2018 and held this role though September 14, 2021. Ex. C, ¶ 7, Plaintiff's Ex. 14 at IU1_191-92.

**Response 77: Paragraph 77 is undisputed except to the extent that it implies McPhail had in any way relinquished or ceased to maintain his appointment as tenured Professor of Communication. See Response 71.**

78.   Despite IUN having in person class requirements during McPhail's employment through 2021, Ex. D, ¶ 12. To the best of IUN's knowledge, McPhail did not return to IUN's campus to teach in person during the 2020-2021 period. *Id.* McPhail had sold his home in Gary, Indiana in the spring of 2019. Ex. A, p. 42:1-19. He also testified that he lived in Bloomington from 2018-2020. *Id.* For example, IUN staff confirmed that McPhail was not in person on campus to teach certain classes. Ex. D, ¶ 12.

**Response 78: Defendants do not cite to admissible evidence that IUN had in-person class requirements in the 2020-2021 academic year. What Klamen's declaration says is that IUN had in-person requirements "at various points during McPhail's employment through 2021." Dkt. No. 52-4 ¶ 12. Plaintiff admits that he did not teach in person that academic year. McPhail further states that in the spring semester of 2021 (the only semester in which McPhail taught in 2021) McPhail's courses were either online or hybrid, not in person. Ex. E, McPhail Dep. 45:1-6; Ex. A, McPhail Decl. ¶ 11. COVID-19 was still widespread at that point and vaccines were not yet available until close to the end of the spring semester (and vaccination**

rates were relatively low). Ex. A, McPhail Decl. ¶ 11. When McPhail asked permission to continue teaching his one hybrid course online for the remainder of the semester, explaining that "students are OK with this," IUN did not respond, which he interpreted as acquiescence. Ex. E, McPhail Dep. 44:24 – 45:6, 218:17 – 220:21; Ex. C, IU1_8550.

79.     The Communication department where McPhail taught is housed within the School of Arts. Ex. D, ¶ 5.

**Response 79**: Admit, except that the Communication department was not housed within the School of the Arts until the second semester of 2018, at which point the School of the Arts was created as a "personnel decision" to bring David Klamen back to IUN. Ex. H, Román-Lagunas Dep. 54:6 – 56:6).

80.     David Klamen has served as Dean of the School of Arts from August 2018 to the present. Ex. D, ¶ 1.

**Response 80**: Undisputed.

81.     Dean Klamen is not responsible for assigning faculty courses or otherwise handling logistics concerning course assignments. Ex. D, ¶ 6; Ex. E, p. 78.

**Response 81**: Disputed in that Klamen does get involved with course assignments when the administrative coordinator seeks his input, and also was involved in determining whether McPhail would be assigned courses in the fall of 2020 and fall of 2021. Ex. F, Klamen Dep. 15:19 – 16:1; Dkt. No. 38 ¶ 10, Dkt. 42-2 at IU1_4495, 4502 ████████████████████████ ████████████████████████████████████████; Dkt. No. 51 Response #16; 1-3, Ex. B, Privilege Log pp. 8-11. Otherwise, undisputed.

82.     In the School of Arts, the assignment of classes is usually done the school's administrative coordinator, and it is usually done through discussions in department meetings. Ex. E, p. 15:3-10.

**Response 82**: **Undisputed that assignment of classes sometimes involves faculty and staff meetings; otherwise disputed. See Response 81.**

83. Before his appointment in Bloomington was to end on July 31, 2020 Ex. B, ¶ 2; Ex. 2, McPhail began to inquire with IUN about his course assignments in March 2020 at the height of the start of the COVID-19 pandemic in the United States, when IUN was grappling with how to organize and continue classes during a pandemic. Ex. D, ¶ 11.

**Response 83**: **Undisputed.**

84. Dean Klamen and Román-Lagunas are not tasked with assigning classes to faculty members as part of their respective roles as Dean and EVCAA, and neither one of them was responsible for assigning McPhail specific courses. Ex. C; ¶ 9; Ex. D, ¶ 6.

**Response 84**: **Disputed in that Klamen and Román-Lagunas played no role in the assignment of courses; they played a role in determining whether and which courses to assign McPhail in 2020 and 2021, and Klamen sometimes served in a supervisory capacity over course assignments as well. See Response 81. Otherwise, undisputed.**

85. McPhail was timely assigned courses for the 2020 school year. Ex. D, ¶ 7.

**Response 85. Disputed. Klamen** ████████████████████████████████ **but did not communicate course assignments to him until July of 2020, nearly four months later. Dkt. No. 42-2 at IU1_4495; Ex. C at IU1_3596.**

86. IUN faculty are assessed based on criteria including their service, teaching, and research. Ex. D, ¶ 15; Ex. E, pp. 76:12-77:8.

**Response 86**: **Undisputed.**

87. IUN administration is not responsible for assigning service activities to faculty members. Ex. D, ¶ 6.

**Response 87**: **Deny; Dean Klamen, Associate Dean Briggs, and Communication Department**

Coordinator Johnson are involved in the assignment of faculty to committees. Ex. C, IU1_3520-21, 4208-4209; Ex. F, Klamen Dep. 95:22 – 98:1; Ex. E, McPhail Dep. 81:16 – 82:9.

88.     McPhail received multiple e-mails notifying him of required meetings and expectations that he was expected and required to participate in. Ex. E, p. 88:2-7.

**Response 88: The evidence to which Defendants cite in support of this statement is inadmissible hearsay and lacks proper foundation, since it is based exclusively on a statement from Klamen about what emails McPhail allegedly received from unidentified senders on unidentified dates. Since IU has denied McPhail access to his email, he cannot verify whether this statement is accurate.**

89.     During the 2020-2021 academic year, McPhail did not report his participation in any service activity. Ex. D, ¶ 17.

**Response 89: Admit that McPhail did not identify service activity on his Faculty Annual Report.**

90.     IUN regularly monitors the rates at which students receive grades of D, F, or withdraw from a professor's course. IUN refers to this rate as the "DFW" rate. Ex. D, ¶ 22.

**Response 90: Undisputed.**

91.     McPhail's DFW rate for the 2020-2021 academic year was remarkably higher than the rates of his peers and higher than his 2017/2018 rate. Ex. D, ¶ 23. A standing concern about students receiving D or F grades or withdrawing from class is that they will not continue their path to graduation. *Id.* Indeed, based on a review of records maintained within the College of Arts and Sciences, only 30 of the 96 total students that McPhail taught in 2020-2021 returned to IUN as students. *Id.*

**Response 91: Plaintiff objects that paragraph 91 does not state material facts, as Plaintiff's arguments in this motion are procedural. Plaintiff reserves all rights with respect to his**

remaining claims for which the allegations paragraph 91 are relevant. Deny that McPhail's DFW rate was "remarkably higher" than all his peers. For example, the DFW rate of one of McPhail's colleagues was ▮▮▮ in the Fall 2020 semester, which did not even warrant mention in his performance evaluation. Ex. F, Klamen 82:15 - 84:10, Ex. K, Klamen Dep. Ex. 21; Ex. C, IU1_7367-7368. Another colleague's DFW rate was ▮▮▮ in the fall semester of 2020 and then rose to 50% in the 2021 semester. Ex. C, IU1_7956-7957. Otherwise, undisputed.

92.    McPhail did not provide any Student Evaluation Reports (SER reports) for any IUN students who took his classes during 2020. Ex. D, ¶19.

**Response 92**: Undisputed.

93.    McPhail did not provide any Student Evaluation Reports (SER reports) for IUN students who took his class during 2021 without withdrawing (*i.e.*, those students who remained in his class and received grades). Ex. D, ¶ 20.

**Response 94**: Undisputed.

94.    Aside from students who withdrew from his class, McPhail did not provide written SER feedback regarding the performance of his Spring 2021 students. Ex. D, ¶ 21.

**Response 94**: Undisputed.

95.    Dean Klamen conducted a Faculty Evaluation for McPhail in July 2021, which he sent to McPhail on August 3, 2021 in an email correspondence that gave McPhail notice of performance issues, and an opportunity to be heard regarding them via a Zoom meeting and/or an email. Ex. D, ¶ 25; Ex. E, Dep. Ex. 15. Among other things, Dean Klamen's August 3, 2021 email to McPhail gave him notice of numerous deficiencies in his performance, some of which repeated issues featured in McPhail's 2017 inadequate teaching evaluation, and list of questions for discussion. Ex. D, ¶ 25.

**Response 95**: Plaintiff objects that paragraph 95 does not state material facts. Whether

Defendants afforded McPhail due process consistent with the United States Constitution with respect to his <u>suspension and salary reduction</u> is not at issue in this lawsuit. In any event, Plaintiff denies that he was given a genuine opportunity to be heard prior to Defendants' decision to suspend him from teaching, as they had already decided to exclude him from the University in spring of 2020, more than a year before the suspension. Dkt. 42-2 at IU1_4495, 4502; Privilege Log pp. 1-3. Plaintiff also denies that Klamen provided him a meaningful opportunity to be heard, because Klamen responded to McPhail's attempt to defend himself by characterizing it as a "breach of the Code of Academic Ethics." Dkt. No. 42-2 at IU1_179-180.

Plaintiff also denies that he was given the type of notice and opportunity to be heard required by IUN's post-tenure review policy; the policy requires specific procedures for the correction of the performance of tenured faculty who are "failing to meet minimum levels of performance." Dkt. 39-6 p. 1. Román-Lagunas admitted she determined that McPhail was failing to meet the minimum levels of performance in teaching and service, yet IUN did not follow those required procedures. Ex. H, Román-Lagunas Dep. 46:2-10; Dkt. No. 38 ¶¶ 14-18.

Plaintiff also denies that all of the issues highlighted in Dean Klamen's evaluation reflected "deficiencies;" some of Dean Klamen's allegations were inaccurate and others constituted unsupported conclusions that could have resulted from issues other than deficiencies. See Dkt. No. 38 ¶ 15. For example, student failure in a course can result from the student's failure to complete the assigned work, which is what McPhail explained caused the DFW rates in his courses. *Id.* Ex. F, Klamen Dep. 80:3-8. Nor does low enrollment always result from performance problems. Ex. F, Klamen Dep. 66:18-20. Similarly, according to Klamen, student evaluation scores "correlate with charm more than performance for the students," and he is not sure whether those scores "correlate with student learning." Ex. F,

Klamen Dep. 62:17-24. IU accounts for this unreliability of student evaluations as assessments of faculty performance through the requirement in ACA-21 and the post-tenure review policy to conduct peer evaluation of faculty performance as a component of "due process." Dkt. No. 38 ¶¶ 44, 47-48.

Finally, Plaintiff denies that Klamen's 2021 evaluation reflects "repeated issues featured in McPhail's 2017 inadequate teaching evaluation." Although the redlined draft of the 2017 evaluation that Hoyert sent in 2020 mentioned that McPhail's enrollment was lower than expected for Communication courses, the May 2018 draft does not identify enrollment as a deficiency. Ex. K, Klamen Dep. Exhibit 9; Ex. C, IU1_656-657.

> 96.      In this email and in its attached annual evaluation, Klamen noted that McPhail received a rating of inadequate in teaching and service. *Id.* The purpose of the questions posed in Klamen's correspondence to McPhail was to give him an opportunity to respond to his evaluation and the serious concerns raised in Dean Klamen's correspondence to him about the evaluation. *Id.* Some of the items that contributed to McPhail's inadequate ratings included several concerns and issues regarding his teaching and service to the university this past year, as well as with his earlier record in 2018." *Id.*

**Response 96**: Plaintiff denies that Klamen gave him a meaningful opportunity to respond to his evaluation. See Response 95. Plaintiff also denies that Klamen's having rated McPhail as inadequate resulted from his earlier record in 2018. See Response 95. Plaintiff further states that the record does not indicate that Klamen's 2021 evaluation of McPhail in service was influenced by the earlier evaluation, since the draft of the 2017 evaluation that Hoyert sent in 2020 (which he sent to Klamen) rated his performance in service as adequate. Ex. K, Klamen Dep. Ex. 9.

> 97.      McPhail responded by email on August 9, 2021 to Dean Klamen's August 3, 2021

annual evaluation. Ex. D, ¶ 26; Plaintiff's Ex. 14 at IU1_2315. In his email, McPhail responded to some but not all of the questions Dean Klamen asked him, and in large part in a manner that deflected his responsibility and blamed the students for the disproportionate failure of his classes. Ex. D, ¶ 26. By way of example only, although Klamen's evaluation email raised concerns about McPhail's failure to contact any of the students in one of his online fall semester high school dual credit sections, McPhail's response ignored this point and instead alleged that he contacted a high school student in his spring semester section. *Id.* Notably, McPhail only contacted this student in the spring semester following Klamen's request that IUN staff instruct McPhail to contact his students, having failed to already do so. Most troubling to Klamen was McPhail's lack of responsibility for the disproportionately high and steadily increasing number of students who received DFWs in his classes. *Id.*; Plaintiff's Ex. 14 at IU1_2317-2318; Ex. E, pp. 99:8-100:5.

**Response 97**: **Undisputed that Plaintiff responded by email on August 9, 2021 to Dean Klamen's August 3, 2021 annual evaluation. Plaintiff denies that the documents cited in paragraph 97 establish the remaining assertions therein. The statement that Plaintiff's responses "deflected his responsibility" assumes that he had the "responsibility" Klamen attributed to him, which Defendants have not established. Rather, Plaintiff's response indicates that he and Klamen have a different understanding regarding several of the facts at issue in the 2021 evaluation. Dkt. No. 42-2 at IU1_2317-2318. With respect to the dual high school credit student, McPhail responded about the spring student because he was not aware of any high school dual credit students in his fall courses, and assumed Klamen had misunderstood; to date, he does not have any record of dual credit students in his fall 2020 courses, nor did Klamen address this with him at any point in the academic year. Ex. A, McPhail Decl. ¶ 4. McPhail denies Klamen's statement that "[n]otably, McPhail only**

contacted this student in the spring semester following Klamen's request that IUN staff instruct McPhail to contact his students, having failed to already do so." The statement is inadmissible hearsay, McPhail has not seen any documents supporting such an assertion, and McPhail remembers being proactive about contacting the spring dual credit student; after he could not reach her, he contacting the Registrar and resolved the issue. *Id.*

Plaintiff also disputes Klamen's assertion that "[m]ost troubling to [him] was McPhail's lack of responsibility for the disproportionately high and steadily increasing number of students who received DFWs in his classes." Klamen did not raise this issue with McPhail at any point during the 2020-2021 year. Instead, he compiled a record starting before McPhail even began teaching and throughout the year to use against him after it was too late to make any corrections. Klamen Dep. 86:19 – 87:5; see also Response 158. In fact, when McPhail specifically asked for "suggestions that you can offer on how I can improve my DFW rates without lowering standards or expectations while holding students accountable for failing to complete assignments," Klamen responded by characterizing that question as a violation of the Code of Ethics. Dkt. No. 42-2 at IU1_179, IU1_2317. Plaintiff also admits in part and denies in part Defendants' contention that "McPhail responded to some but not all of the questions Dean Klamen asked him." McPhail's response addressed nearly all of the questions Klamen asked him, with the exception of the question "How do you feel your teaching is going at IU Northwest?" and part of the question about attending meetings. Dkt. No. 42-2 at IU1_2315-2320.

98.     In Fall 2020, McPhail was provided a course release from 1/3 of his teaching load that provided McPhail with additional time, teaching resources and instruction, in particular given performance problems that McPhail had with teaching, and IUN's transition to some hybrid in person and remote online classes due to the COVID-19 pandemic. Ex. D, ¶ 27. IUN

invested in McPhail in providing him this course release, which was not provided to every professor. *Id.*

**Response 98**: **Plaintiff objects that paragraph 98 is immaterial but does not dispute that he was provided a course release from ⅓ of his teaching load in Fall of 2020, that he received additional time, teaching resources and instruction, and that this course release was not provided to every professor. Plaintiff disputes the remaining allegations. See Response 99.**

99.     Given McPhail's inadequate classroom performance and his prior inadequate teaching evaluation, IUN granted McPhail this course release and associated training to increase his opportunities to succeed in the classroom. Ex. D, ¶ 28. Notably however, McPhail's teaching performance worsened following the course release and associated training that he participated in. *Id.* At this point in his career, McPhail was the department's most trained, experienced, and highest ranking faculty member, which made it clear to Dean Klamen that McPhail's poor performance was not a matter of competency. *Id.*

**Response 99**: **Plaintiff denies that IUN granted him a course release to "increase his opportunities to succeed in the classroom." In their privilege log, Defendants identified more than 40 emails between IU's General Counsel's office and Klamen and/or Román-Lagunas about McPhail's course assignments and/or "termination" before the 2020-21 academic year even began, and** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮**. Ex. B, Defendants' Privilege Log; Dkt. 42-2 at IU1_4495, 4502. Plaintiff also denies Klamen's claim that his teaching "worsened" and the implication that any alleged "poor performance" was intentional. See Response 95. In fact, even his immediate response to Klamen's evaluation seeks clarification and demonstrates willingness to address deficiencies. Dkt. No. 42-2 at IU1_2317-2320.**

100.     Despite participating in a course release that provided McPhail with additional time,

teaching resources and instruction, and having the opportunity to provide context and an explanation for McPhail's exceedingly poor student performance, on August 9, 2021, McPhail responded to his August 3rd evaluation email without giving any explanation for his poor student performance. McPhail also disregarded his faculty responsibility to provide SER student performance feedback every two weeks, which if done, might have prevented the significant rate of students who received D or F grades or withdrew from McPhail's classes. Ex. D, ¶ 29; Plaintiff's Ex. 14 at IU1_2315-2320.

**Response 100: Plaintiff denies the allegation that he "responded to his August 3rd evaluation email without giving any explanation for his poor student performance." Dkt. No. 42-2 at IU1_2315-2320. Plaintiff also denies the allegation that his declining to provide SER student performance feedback every two weeks, which certain other faculty members also declined to do, constituted disregard of his "faculty responsibility." Ex. C, IU1_3621-3623. Although he did not use that particular platform, McPhail provided feedback to students through correspondence and the online CANVAS platform. Ex. A, McPhail Decl. ¶ 12.**

101.    As Dean, in this context and based on several concerns related to McPhail's teaching performance, including after additional opportunities and time had been provided to McPhail for teaching training, on August 12, 2021 Dean Klamen notified McPhail of his recommendation that McPhail be temporarily removed from teaching for one semester in the Fall 2021-2022 academic year and that his salary be reduced in an amount commensurate with the removal of his teaching responsibilities for this one semester. Ex. D, ¶ 30. This recommendation was informed by the persistent and escalating very bad student outcomes that resulted from McPhail's last round of teaching prior to this academic year as well as by several concerns related to McPhail's teaching performance, including after additional opportunities and time had been provided to McPhail for teaching training. *Id.* In this context,

Dean Klamen recommended to EVCAA Román-Lagunas that, for one semester in Fall of 2021, McPhail not teach classes and that the teaching component of his salary be adjusted to reflect this temporary change. *Id.*

**Response 101: Disputed. See Responses 95-99.**

102.      In making this recommendation, Dean Klamen was focused on his concern for student welfare and success, knowing in particular that students with Ds and Fs, are likely to withdraw from, or leave, higher education. Ex. D, ¶ 31.

**Response 102: Plaintiff denies that the reason for Klamen's recommendation was student welfare and success, as demonstrated by the fact that Klamen did not raise any of these supposed concerns with McPhail during the entire 2020-2021 year, and instead simply compiled a record starting before McPhail even began teaching to use against him after it was too late to make any corrections. See Response 158.**

103.      On August 12, 2021, Dean Klamen notified McPhail of this recommendation made to the EVCAA. Ex. D, ¶ 30; Plaintiff's Ex. 14 at IU1 179-80. In 2021, IUN took these recommended administrative actions in accordance with ACA-33. Ex. C, ¶ 19. Among other things, ACA-33 allowed among possible sanctions for violations of academic ethics "retention of salary." Ex. J, ¶ 7, Ex. 3 at ACA- 33 § (B) Enforcement Procedures (b) Administrative Action on Violations of Academic Ethics.

**Response 103: Admit the first sentence of paragraph 103. Deny that IUN took these administrative actions in accordance with ACA-33, which states that "sanctions appropriate to the offense" should be applied "[s]ubject to the substantive standards of University tenure policy and the procedural safeguards of the faculty institutions." Dkt. No. 56 ¶ 18; Dkt. No. 52-10 p. 27. IUN completely disregarded the procedural safeguards in IUN's post-tenure review policy. The policy requires specific procedures for the correction of the performance**

of tenured faculty who are "failing to meet minimum levels of performance." Román-Lagunas admitted she determined that McPhail was failing to meet the minimum levels of performance, yet IUN did not follow those required procedures. Appx. Ex. 6; Ex. H, Román-Lagunas Dep. 46:8-10; Dkt. No. 38 ¶¶ 14-18.

Plaintiff also denies that the sanction of suspension and 75% reduction in salary was "appropriate" to the alleged offense, as required by ACA-33; when other faculty had high DFW rates, Klamen and/or Román-Lagunas notified them about high DFW rates in time to improve them for the next semester, work hard with them to identify the reasons for the high rates and adjust their pedagogy accordingly, or in the case of █████████ refrained from mentioning his significantly above-average DFW at all in his performance evaluation. Ex. H, Román-Lagunas 52:20 – 54:5; Ex. F, Klamen 82:15 - 84:10, 84:19 – 85:4; Ex. K, Klamen Dep. Ex. 21; Ex. C, IU1_7367-7368; IU1_7956-7957. In contrast, IUN imposed a severe sanction on McPhail about his DFW rates without even giving him notice that it judged his DFW rate to be too high. Ex. F, Klamen Dep. 86:19 -87:5; Ex. A, McPhail Decl. ¶ 3. That omission was particularly important since there is no particular percentage of DFW rates that is acceptable; IUN determines what is acceptable by judging faculty according to the DFW rates of their peers. Ex. H, Román-Lagunas Dep. 52:20 – 53:5; Ex. F, Klamen Dep. 79:4 – 80:2.

104.    On August 13, 2021 Executive Vice Chancellor of Academic Affairs Román-Lagunas informed McPhail among other things, that she (a) concurred with Dean Klamen's recommendation that McPhail teach no classes virtual and/or in person for the Fall 2021 semester, (b) that since he would not have teaching responsibilities during this semester, his fall semester salary would be reduced by 75%, thus paying McPhail commensurate with his research activities, and (c) that McPhail had the right to appeal this administrative action. *See* Plaintiff's Ex. 14 at IU1 171 (of which Defendants do not dispute the authenticity); Ex. C, ¶

19.

**Response 104: Undisputed.**

105.    The purpose of taking this temporary action was to protect the quality of education provided to IUN's students, and also to provide the opportunity for McPhail to recalibrate and find out what the problems were and to solve them so his teaching could improve. Ex. E, p. 99:8-20.

**Response 105: Disputed. See Response 99. And in fact, no one contacted McPhail about improving his teaching or gave him any instruction about how this purported recalibration would take place. Ex. F, Klamen Dep. 98:22 – 103:8; Ex. A, McPhail Decl. ¶ 6. To the contrary, Iwama and Román-Lagunas had already concluded that improvement was impossible for McPhail since his purported performance inadequacies were "deliberate." Dkt. No. 38 ¶ 20; Dkt. No. 42-2 at IU1_1328; Ex. H, Román-Lagunas Dep. 46:12 – 47:8, 53:19 – 54:5.**

106.    McPhail challenged his 2021 teaching evaluation and ultimately appealed the decision to remove him from teaching and reduce his salary to the Faculty Board of Review ("FBOR") in accordance with University Policies and the Constitution of the Indiana University Faculty (the "First Appeal"). (Ex. A, Dep. Ex. 47.1).

**Response 106: Undisputed.**

107.    The Faculty Board of Review to which McPhail appealed is an independent board, Ex. F, ¶ 12, of which none of the Defendants are a member. Ex. C, ¶ 22; Ex. D, ¶ 12; Ex. F, ¶ 40.

**Response 107: Admit, except that the members of the Faculty Board of Review are employees of IUN, which means they are not fully independent and can only make recommendations, not final decisions. Dkt. No. 52-10 p. 34 § B(1), p. 35 §§ B(9), D(6).**

108.    Faculty Boards of Review, as established by Article 5 of the Constitution of the

Indiana University Faculty, Article 5, serve as the reviewing entity for "complaints of faculty members concerning academic freedom, reappointment, tenure, promotion, salary adjustment, and the nature or conditions of work." Ex. J, ¶ 5, Ex. 1; ACA-04 at § 5.1(C).

**Response 108: Undisputed.**

109.    After a written review has been requested, "the campus Faculty Board of Review shall consider the complaint and make recommendations for disposition of a case and furnish copies to the aggrieved faculty member and to the campus vice president or chancellor/provost." *Id.* If requested, a further appeal may be made to the President of the University and the Board of Trustees." *Id.*

**Response 109: Admit, except that the words "If requested" do not appear in the policy Defendants are quoting.**

110.    The FBOR reviewed the First Appeal, ultimately disagreeing with the decision made by IUN subject of that appeal. Plaintiff's Ex. 7.

**Response 110: Undisputed.**

111.    Román-Lagunas, however, maintained her decision and wrote to the FBOR indicating the basis for doing so. Ex. C, ¶ 37; Dkt # 39-13, Plaintiff's Ex. 14 at IU1 1327-29.

**Response 111: Undisputed.**

112.    McPhail continued to challenge his First Appeal, this time to Chancellor Iwama. Ex. A, p. 216:5-217:10 and Dep. Ex. 51.

**Response 112: Undisputed.**

113.    Following investigation into the matter on, January 28, 2022, Iwama responded to McPhail's appeal, approving the administrative decision to temporarily remove McPhail from teaching and to adjust his salary to reflect this one change for one semester. Ex. F, ¶ 3.

**Response 113**: Undisputed.

114.    McPhail was afforded due process regarding his First Appeal.

**Response 114**: **Disputed. See Response 95.**

### III.    McPhail's employment was terminated in exigent circumstances due to a threat of violence.

115.    McPhail was terminated in exigent circumstances due to a threat of violence that he was reported to have angrily made, stating that the only way to cure racism is to kill all white people ("McPhail's Violent Threat"). Ex. C, ¶ 28; Ex. F, ¶ 8.

**Response 115**: **Disputed. Dr. Charles Hobson, the individual alleged to have reported this threat, denies both that McPhail made the alleged threat and that he reported it to anyone. Ex. I, Hobson Dep. 12:22-13:20, 17:16-18:7. See also Ex. E, McPhail Dep. 135:2-22. Plaintiff also disputes that Defendants' allegations present "exigent circumstances" that justified summary termination. See Response 116.**

116.    McPhail's employment was not terminated for any reason beside McPhail's Violent Threat, which posed a public safety concern that IUN could not ignore considering among other things, that in a worst-case scenario, not treating this reported statement gravely could have caused campus violence. Ex. F, ¶ 10.

**Response 116**:  **Disputed. Defendants began plotting to terminate McPhail's employment in spring of 2020, long before the alleged threat. Dkt. 42-2 at IU1_4495, 4502; Ex. B, Defendants' Privilege Log pp. 1-3.[1] Deny that Román-Lagunas was concerned about safety. After speaking with Hobson she waited a full week before even filing a formal police report,**

---

[1] Plaintiff sorted the rows on Defendants' Privilege Log so that they appear in date order.

explaining that since McPhail lived in Wisconsin, "that it wasn't of urgent matter at -- on that day." Román-Lagunas Dep. 138:3 – 138:4. Termination of McPhail also cannot have been motivated solely by safety concerns because IU has procedures through which faculty members who pose an alleged threat to safety can be suspended and banned from campus while the threat is being investigated, and Defendants bypassed those procedures to summary termination. Dkt. No. 52-10, ACA-52 ¶ 8, pp. 31-36 ("An appointee may be suspended during the pendency of dismissal proceedings only if immediate harm to the appointee or others is threatened by continuance. Any such suspension may be suspended with pay."); see also Ex. K, Deposition Exhibit 23 p. 5 ("Where the ability of the faculty member or librarian to perform effectively is clearly and seriously impaired by the nature of the misconduct or where the work of the department, school or library clearly would be disrupted or if immediate harm to himself, herself, or others is threatened by continuance, the faculty member or librarian may at any time be suspended by the Dean with pay until the matter is decided.").

Neither Iwama nor Román-Lagunas were able to explain why the extreme measure of termination was necessitated by safety concerns. Ex. H, Román-Lagunas Dep. 149:17 – 151:11; Ex. G, Iwama Dep. 131:12 – 132:14, 180:18 – 183:4. In fact, Román-Lagunas specifically denied that the allegations against McPhail rose to the level necessitating immediate suspension. In explaining why ACA-52's "immediate harm" provision was not applicable, Román-Lagunas testified, "The egregiousness of Dr. McPhail's threat does not meet this, while it's egregious. . . . It was not an immediate threat to anyone." Ex. H, Román-Lagunas Dep. 165:19-22. Along the same lines, Plaintiff disputes that the termination was caused by a "public safety concern." After speaking with Hobson, Román-Lagunas waited a full week before even filing a formal police report, explaining that since McPhail lived in Wisconsin,

"that it wasn't of urgent matter at – on that day." Ex. H, Román-Lagunas Dep. 149:17 –

151:11; Iwama Dep. And Defendants waited a full 12 days after hearing of the alleged threat

to terminate McPhail's employment. Dkt. 52-9 at 134:8-11.

Plaintiff further denies Defendants' allegation that he threatened to kill any people. Ex.

E, McPhail Dep. 135:2-22.

117.    Out of the blue, on September 2, 2021 an IU professor (the "Informant Professor")

contacted the Dean of his school to report a "potentially explosive situation involving Mark

McPhail" that he wanted to escalate to his Dean as well as to EVCAA Román-Lagunas and/or

Chancellor Iwama. Cindy Roberts Declaration, Ex. H, ¶2,3, Ex. 1.

**Response 117: Admit, but deny the implication that Hobson was referring to a literal**

**explosion; he explained that he was referring to his concern that IU could suffer serious**

**reputational harm as a result of the suspension and McPhail's reaction thereto. Ex. I, Hobson**

**Dep. 47:22-49:7.**

118.    On September 2, 2021, the Informant Professor reported to his Dean the substance

of a conversation that he had with McPhail during which McPhail was extremely upset and

agitated about administrative decisions recently made related to about him at IUN, and

McPhail stated that the only way to end racism is to kill all white people. Ex. H, ¶2-4, Ex. 1.

**Response 118: Deny that Hobson told Cynthia Roberts, his Dean, that McPhail stated that**

**the only way to end racism is to kill all white people. Ex. I, Hobson Dep. 17:16-18:7. Admit**

**that McPhail was extremely upset about having been suspended and having his salary**

**reduced by 75%.**

119.    The Dean had worked with the Informant Professor for several years, but this was

the first and only communication that the Informant Professor had with the Dean about a

faculty personnel matter that caused alarm. Ex. H, ¶5.

**Response 119**: Plaintiff objects that the question of whether or not Roberts felt alarm as a result of a statement that McPhail did not make and Hobson did not report to her is not material to this lawsuit. Plaintiff further disputes that Roberts felt alarm; given the fact that Roberts misrepresented what Hobson told her and that Román-Lagunas is her direct supervisor, it is more likely that she was telling her supervisor what she knew the latter wanted to hear. Ex. H, Román-Lagunas Dep. 9:9 – 10:5; Ex. I, Hobson Dep. 17:16 -18:4. There is also an indication that Roberts was predisposed to be hostile to McPhail's statements about race; she shared Román-Lagunas's cynicism about the public forum McPhail hosted about achievement gaps for black males at IUN; she forwarded the announcement about the forum to Román-Lagunas, who responded defensively, "Diversity is an unfulfilled promise here?," to which Roberts replied, "I know, go figure." Ex. H, Román-Lagunas Dep. 61:20 – 63:23; Ex. K, Román-Lagunas Dep. Ex. 50; Ex. C, IU1_2824-2830.[2]

> 120.    The Informant Professor sought permission from the Dean to also share McPhail's Violent Threat with either EVCAA Román-Lagunas or Chancellor Iwama. Ex. H, ¶3.

**Response 120**: Admit that Hobson sought permission to speak with Román-Lagunas or Chancellor Iwama, but deny that Hobson claimed McPhail made a "violent threat" and deny that McPhail made any such threat. Ex. I, Hobson Dep. 12:22-13:20; Ex. E, McPhail Dep. 135:2-22.

> 121.    Thereafter, also on September 2, 2021, the Informant Professor communicated by phone with EVCAA Román-Lagunas regarding this matter and informed her of McPhail's Violent Threat. Ex. C, ¶ 25. The Informant Professor informed Román-Lagunas that McPhail said at least three times in the conversation the Informant Professor had with McPhail, that

---

[2] This document is the same as deposition exhibit 50 but includes the attachment with the wording Román-Lagunas and Roberts were referencing.

the only way to cure racism is to kill all the white people. *Id.* Román-Lagunas took the reported statement seriously given that among other things, the Informant Professor is a respected member of the IU community, and was a known friend of McPhail, which heightened the credibility of this statement. Ex. C, ¶ 26; Ex. A, pp. 132.

**Response 121: Admit that on September 2, 2021, the Informant Professor communicated by phone with EVCAA Román-Lagunas. It is undisputed that Hobson is a respected and credible member of the IU community and that he was a known friend of McPhail. Otherwise, disputed. Ex. I, Hobson Dep. 12:22-15:2. In particular, Hobson testified that he did not tell Roman-Lagunas that McPhail had said to him that the only way to cure racism is to kill all the white people. Ex. I, Hobson Dep. 12:22-13:20.**

122.     Following this report from the Informant Professor, EVCAA Román-Lagunas called the police and had a conversation with the IUN's Chief of Police to notify authorities about McPhail's Violent Threat. Vicki Roman- Lagunas Deposition, Ex. I, pp. 135:23-136:5, 137:22-138:11; Ex. C, ¶ 27.

**Response 122: Admit that Román-Lagunas reported having talked to the Chief of the IUN police "informally" about her threat allegation. Ex. H, Roman-Lagunas Dep. 137:8 – 138:11. Deny that McPhail made a "Violent Threat." Ex. I, Hobson Dep. 12:22-13:20; Ex. E, McPhail Dep. 135:2-22.**

123.     IUN had every reason to deem McPhail's Reported Violent Threat credible. Ex. F, ¶ 10.

**Response 123: Disputed. See Responses 115-122.**

124.     At the time McPhail's Violent Threat was reported, McPhail owned at least five different guns including a Glock, a lady Glock, a .40 caliber Glock and a Smith & Wesson M&P5 and a Beretta 9mm carbine. Ex. A, pp. 235:23-236:13.

**Response 124**: Plaintiff objects to paragraph 124 as immaterial since IUN first learned that McPhail owned guns in February of 2023. Ex. E, McPhail Dep. 235:25 – 236:15. Deny that McPhail owns "at least five" guns but admit that he owns four. *Id.* Deny that Hobson ever reported "McPhail's Violent Threat" to anyone. Ex. I, Hobson Dep. 12:22-13:20, 17:16-18:7.

125.     McPhail further admits to knowing that the Informant Professor relayed the substance of this conversation to university administration. *Id.* McPhail described his temperament in this conversation with the Informant Professor, as being "upset, kind of hurt by the whole thing." Ex. A, p.133:6-19.

**Response 125**: **Admit, except that Defendants mischaracterized the substance of the conversation they reference. See Response 115.**

126.     Concerning the University's decision to terminate his employment, McPhail has no recollection of what exactly he said to the Informant Professor or its severity, undercutting the notion that the University did not have the right to act with expediency in moving to terminate his employment, without providing him with notice and a pre-termination hearing:

```
·2· ·   Q.      Do you know the first thing that you told him when
·3·             he picked up the call?
·4·     A.      Probably that I got suspended and my pay was cut,
·5·             and this is crazy.
·6·     Q.      I have -- I have that you just testified you
·7·             probably said that you were suspended and your pay
·8·             was cut, this is crazy.
·9·     A.      Yeah, something like that.
10      Q.      Well, I want to know exactly what your --
11      A.      I don't remember exactly what I said.
. . . .
·9·     Q.      Do you recall any other part of that conversation?
10      A.      Other than -- I mean, I had been asked did I say
11              kill all the white people.· I did not say anything
12              about killing white people.· The only thing I can
13              imagine is I was working on the book at that point.
```

| 14 | | There was a section that I was working on on Native |
| 15 | | American people and the way they had been treated |
| 16 | | by IU.· I probably -- I think I made the comment |
| 17 | | that something -- I don't even know what I said, |
| 18 | | honestly.· I don't.· But the only thing I can |
| 19 | | imagine is that it had something to do with Native |
| 20 | | Americans and how they were treated.· I didn't say |
| 21 | | kill any white people.· I didn't say -- threaten |
| 22 | | David Klamen or Vicki Lagunas or anyone else. |
| 23 | Q. | Then you don't recall how long the call was? |
| 24 | A. | I don't. |

Ex. A, pp. 134:2-11, 135:9-24.

**Response 126: Disputed. McPhail unequivocally denies saying anything about killing white people in the very passage Defendants quote in paragraph 126. Ex. E, McPhail Dep. 135:9-22. McPhail similarly denies that this passage "undercut[s] the notion that the University did not have the right to act with expediency in moving to terminate his employment, without providing him with notice and a pre-termination hearing." McPhail testified that termination prior to investigating a hypothetical threat against black people would be inappropriate, and that in fact when he was EVCAA and a professor was accused of advocating for the lynching of black people, he did investigate prior to disciplining the professor, and did not terminate his employment. Ex. E, McPhail Dep. 235:9-18, 275:25 – 278:2. Plaintiff further denies any implication that his inability to remember all the details of his conversation with Hobson supports Defendants' contention that they had the "right" to terminate his employment without notice and a hearing.**

127.     Close in time to when McPhail was notified that he would temporarily be removed from teaching and that his salary for Fall 2021 would reflect this change, a senior faculty member advised Dean Klamen to stay away from McPhail because McPhail was very upset at him. Ex. D, ¶ 37. This same faculty member also recommended that he avoid all contact with

McPhail, and expressed concern that his office was directly accessible from the hallway. *Id.*
Dean Klamen reported these safety concerns about McPhail to EVCAA Román-Lagunas on
or about September 9, 2021. Ex. D, ¶ 38.

**Response 127: Plaintiff objects to the first sentence of ¶ 127 because it is inadmissible hearsay
by an unidentified faculty member. If ¶ 127 refers to Bala Arshanapalli, Professor Arshanapalli
denies having expressed safety concerns to Klamen, and in fact was merely warning Klamen
about avoiding an unpleasant disagreement (as opposed to avoiding violence). Ex. J,
Arshanapalli Dep. 22:11-18, 23:3-12, 26:17-27:17, 28:23-29:22, 30:24-31:9; see also Dkt. No. 39-7
p. 4.**

128.     Around September 2021, soon after the time that McPhail was terminated from
IUN, Klamen received an unexpected telephone call from McPhail's ex-girlfriend who
requested that he tell her the whereabouts of his daughter. Ex. D, ¶ 36. This alarmed him,
and he considered it threatening. Following this encounter, he warned his daughter of the
situation and encouraged her to be careful, and carry pepper spray. *Id.*

**Response 128. Plaintiff denies any knowledge of any ex-girlfriend of his calling Klamen,
denies any connection to that alleged call in 2021, and denies having talked to or corresponded
with any ex-girlfriend in or around September of 2021 or knowing anything about why an ex-
girlfriend of his would be calling Klamen. Ex. A, McPhail Decl. ¶ 13.**

129.     The police Chief on IUN's campus was supposed to make one visit to McPhail's
home to deliver the termination letter and the no-trespass warning. Ex. I, p. 111:14-21; Ex. C,
¶ 31.

**Response 129:  Undisputed.**

130.    McPhail was notified of the reasons for his termination, and exercised his right to appeal his termination decision. Dkt. # 39-13, Plaintiff's Ex. 14 at IU1 191-92; *see also* Dkt. # 39- 30, Plaintiff's Ex. 31 at McPhail 163-67. McPhail testified that Chancellor Iwama informed him of the reason why he was being fired in writing:

```
 3    Q.   So specifically, did you have a conversation
·4          with -- with Chancellor Ken Iwama regarding the
·5          topic that you're presenting right now?
·6    A.   Yes.· Well, I didn't personally.· I sent him an
·7          email.· I asked him to respond to my concerns.· He
·8          said no.· I filed the appeal to him after the
·9          vice -- vice-chancellor's rejection of my position.
10          And his response was, basically, I had done all
11          these bad things, and that's why I was being fired.
```

Ex. A, p. 60:3-11.

**Response 130**: Admit that the documents to which Defendants cite indicate that IU gave McPhail partial information about why it was terminating his employment and that McPhail filed a post-termination appeal. Plaintiff disputes Defendants' misleading characterization of Plaintiffs testimony when it contends, "McPhail testified that Chancellor Iwama informed him of the reason why he was being fired in writing." McPhail is clearly referring in the cited testimony to his appeal of Román-Lagunas's suspension decision and Iwama's subsequent suspension decision, although he mistakenly characterizes Iwama's letter as referencing his termination. Dkt. No. 38 ¶¶ 19-20; Ex. C, IU1_4700-4702; IU1_6610-6611; Dkt. No. 42-2, 1356-1358. Iwama never "informed [McPhail] of the reason why he was being fired in writing," and Defendants cite to no such document; to the contrary, Iwama claimed he did not believe there was a requirement for him to make a decision on McPhail's termination following the Faculty Board's recommendation, and he declined to do so for the reasons stated in Román-Lagunas's "See you in Court" email. Ex. G, Iwama Dep. 189:14 –

**191:15; Ex. K, Iwama Dep. Exhibit 43.**

131.     McPhail attempted to involve the American Association of University Professors ("AAUP") in his personnel decision. Ex. F, ¶ 14. IUN is not affiliated with the AAUP. *Id.* IUN is not required to follow third-party recommendations made by the AAUP, including when it comes to employment termination decisions. *Id.* The AAUP holds itself out as a nonprofit membership association of faculty and other academic professionals; it has no authority over IUN. *Id.*

**Response 131: Plaintiff objects to Request 131 as immaterial to Plaintiff's motion for partial summary judgment; Plaintiff brought up the AAUP in the context of discussing Román-Lagunas's retaliatory motive for short-circuiting Plaintiff's termination appeal, and is not contending that AAUP has some kind of formal structural affiliation with IUN. Plaintiff nonetheless denies that the statement "IUN is not required to follow third-party recommendations made by the AAUP, including when it comes to employment termination decisions" is wholly accurate. The AAUP is, as Román-Lagunas put it, "a respected organization that did some really good work back in the '40s to protect faculty's rights and responsibilities for -- for tenured faculty." Ex. H, Román-Lagunas Dep. 15:19-22.**

**The AAUP's interpretations of academic standards are authoritative to the extent that IU's standards are based on them. IU's Senior Associate General Counsel quoted the AAUP as an authoritative source in the context of communications with counsel for another faculty member whose employment Defendants terminated. Ex. D, McPhail 1619. Indeed, some of IU's academic freedom policies are based on and sometimes quote verbatim from that "really good work" the AAUP did "back in the 40s." See e.g. Dkt. No. 56 ¶ 10, citing Dkt. No. 56-8; Ex. C, IU1_2928-2934; see also Ex. C, IU1_5034. Paragraph 131 is otherwise undisputed.**

132.     McPhail admits to speaking with the Informant Professor at or near the time that McPhail learned about the administrative decision regarding the removal of his Fall 2021 teaching duties and related pay. Ex. A, p. 132:9-133:3.

**Response 132: Undisputed.**

133.     McPhail emphasized in his sworn testimony that he did not remember what he told the Informant Professor:

| 12 | Q. | You don't recall exactly what you told [Informant Professor] |
| 13 | | when you called, upset and hurt, as you say, about |
| 14 | | the suspension of your teaching for the fall |
| 15 | | of 2021? |
| 16 | A. | Apart from that which you just stated, I can't tell |
| 17 | | you exactly what I said. I know I was upset. I |
| 18 | | told him about what had happened. I asked him if |
| 19 | | he could help I do remember that [Informant Professor] at that |
| 20 | | point was on the Faculty Board of Review, and he |
| 21 | | decided to recuse himself, so I do remember having |
| 22 | | that conversation with him. |
| 23 | Q. | That was later, correct? |
| 24 | A. | As -- I think. |
| 25 | Q. | I want to focus on your call here. |

| 1 | A. | I don't remember all the details. I'm sorry. |
| 2 | Q. | So you -- you don't recall all of the details of |
| 3 | | your call with [Informant Professor] |
| 4 | | regarding how you were so upset about the |
| 5 | | suspension of your teaching duties for fall |
| 6 | | of 2021? |
| 7 | A. | Uh-huh. I was just -- I was upset. I asked for |
| 8 | | his help. |

Ex. A, pp. 134:12-135:22.

**Response 133: Plaintiff denies testifying "that he did not remember what he told" Hobson. Rather, the deposition statement Defendants quote in paragraph 133 says McPhail does not remember "all the details" of that conversation but specifically denies having advocated for killing white people. Ex. E, McPhail Dep. 135:2-22.**

3

### C. Post-Termination Appeal and This Lawsuit

134.    McPhail was also afforded due process related to his employment termination.

Ex. F, ¶ 11. McPhail was afforded the opportunity to appeal his employment termination to

the FBOR, which he did on October 12, 2021. Dkt. # 39-30, Plaintiff's Ex. 31 at McPhail 161-

62.

**Response 134: Plaintiff objects that paragraph 134 does not specify whether it is referring to**

**Constitutional due process or due process as understood by IU policies. In any event, Plaintiff**

**denies that he was "afforded due process related to his employment termination." "Due**

**process" from the perspective of the U.S. Constitution requires, in the case of terminations,**

**notice, an explanation of the employer's evidence, and an opportunity to be heard *before* the**

**termination takes place. Dkt. 37 pp. 4-5. Defendants provided McPhail with none of these.**

**Ex. H, Román-Lagunas Dep. 111:25 – 112:17; Ex. G, Iwama Dep. 119:10 – 121:8; Dkt. No. 38**

**¶¶ 21-31. IU's "due process" standards as set forth in its policies require, among other things,**

**a "statement with reasonable particularity of the ground proposed for the dismissal," a pre-**

**termination hearing before the campus Faculty Board, a written decision by the Chancellor,**

**and a further appeal to the President and Board of Trustees. Dkt. No. 52-10 pp. 30-32; Dkt.**

**No. 39-29, pp. 5-7; Dkt. No. 56 ¶ 21. Defendants provided McPhail with none of these. Ex. H,**

**Román-Lagunas Dep. 111:25 – 112:17; Ex. G, Iwama Dep. 119:10 – 121:8; Dkt. No. 38 ¶ 21-31.**

**McPhail admits that he appealed his employment termination to the FBOR on October 12,**

**2021.**

135.    On April 20, 2022 the Faculty Board of Review concluded its review of McPhail's

termination appeal, ultimately disagreeing with the decision made by IUN to terminate

McPhail's employment but not recommending that McPhail's employment be reinstated

4

("FBOR Termination Opinion"). Ex. C, ¶ 33; Plaintiff's Ex. 7, at McPhail 0255-0262.

**Response 135:** **Plaintiff does not dispute the assertions in paragraph 135, but clarifies that the Faculty Board refrained from recommending reinstatement as a remedy not because it found such a remedy would be unwarranted but because it "speculate[d] that, at this point, what McPhail may want more than anything else is an 'equitable and honorable' separation from Indiana University," and urged IU to reach such a settlement. Dkt. No. 39-7 (incorrectly cited by Defendants as Exhibit 7).**

136.     Notably, the FBOR's findings identified a tension between McPhail's termination appeal requests for both reinstatement and a settlement, and accordingly the FBOR Termination Opinion made the following recommendation which are highlighted for emphasis with which Iwama and Román-Lagunas Declaration did not disagree:

> There seems to be a tension between the components of the remedy McPhail proposes. Points 1 and 2 speak to reinstatement whereas point 3 speaks to separation and a settlement. We speculate that, at this point, what McPhail may want more than anything else is an "equitable and honorable" separation from Indiana University. We urge our campus Administration and all other applicable offices of Indiana University to work with Dr. McPhail and his representatives to reach a settlement that is honorable and acceptable to him.

Ex. C, ¶ 33; *see also* Plaintiff's Ex. 7, at McPhail 0255-0262.

**Response 136:** **Plaintiff does not dispute Defendants' characterization of the Faculty Board's report but denies that Iwama and Román-Lagunas "did not disagree" with that recommendation. Iwama testified during deposition that he "disagreed with the FBOR determination and conclusions" regarding McPhail's termination. Dkt. No. 52-12 at 199:2-10. Román-Lagunas's May 31, 2022 letter following her receipt of the Faculty Board report says nothing to McPhail about accepting or agreeing with the recommended remedy of the Board, nor about seeking to amicably resolve the dispute; to the contrary, the language**

about "fully participat[ing] in the federal court process" expresses the opposite intention.

Dkt. No. 39-32, Answer ¶ 54; Ex. H, Román-Lagunas Dep. 154:6-18; Ex. K,  Román-

Lagunas Dep. Ex. 67.

137.    EVCAA Román-Lagunas was not opposed to the campus working towards reaching

an amicable settlement with McPhail and agreed with this specific aspect of the FBOR

Termination Opinion. Ex. C, ¶ 34.

**Response 137: Disputed. See Response 136.**

138.    EVCAA Román-Lagunas did not think that any settlement, if it could be achieved,

would include any admission of wrongdoing; Román-Lagunas viewed and still views McPhail's

reported threats as egregious. *Id.* at ¶ 35. Her role is to protect the health and safety of all

members of IUN's community. *Id.*

**Response 138: Plaintiff denies that Román-Lagunas genuinely believed McPhail made a**

**threat and that she "viewed and still views McPhail's reported threats as egregious." Rather,**

**she intentionally mischaracterized what Hobson told her in order to effectuate the plan she**

**had been working on with IU's General Counsel, Iwama and Klamen since at least spring of**

**2020 to terminate McPhail's employment. Dkt. No. 38 ¶ 10; Ex. H, Román-Lagunas Dep. 81:9**

**– 83:1; Ex. B, Defendants' Privilege Log line 40; Ex. F, Klamen Dep. 33:7 – 35:3.**

139.    EVCAA Román-Lagunas also thinks the decision to temporarily remove McPhail

from the classroom for one semester and adjust his corresponding pay was appropriate. *Id.*

**Response 139: Undisputed that Roman-Lagunas apparently thinks the decision was**

**"appropriate." Deny that the decision was "appropriate."**

140.    Because IUN did not disagree with the specific recommendation in the FBOR

Termination Opinion that urged the campus to reach a settlement with McPhail and not

reinstate his employment, no final written decision from her office or the Chancellor's office

as contemplated by ACA-17 was required regarding McPhail's termination appeal. *Id.* at ¶ 36; Deposition of Ken Iwama, Ex. L, pp. 198:15-199-1.

**Response 140: Disputed. Both ACA-04 and ACA-17 require the campus administration to issue a final decision, from which the faculty member can then appeal. Dkt. No. 52-10 p. 11 ("The campus vice president or chancellor/provost shall give the faculty member his or her written decision, with a copy to the Faculty Board of Review. . . . A further appeal may be made to the President of the University and the Board of Trustees . . . ."); Dkt. No. 52-10 p. 35 ("The Board's recommendations shall be addressed to the appropriate university appellate official specified in the underlying misconduct policy. If no official is specified, its recommendations shall be sent to the Chancellor/Provost of the campus. . . . The grievant retains the right to appeal the <u>final decision</u> to the President.") (emphasis added). Defendants do not dispute that following the Faculty Board's recommendations, the campus chancellor renders a written decision. Dkt. No. 51 at Response 42. This paragraph 140 acknowledges that a "final written decision from [the EVCAA's] office or the Chancellor's office" is "contemplated" by ACA-17. Plaintiff also denies that "IUN did not disagree with the specific recommendation in the FBOR Termination Opinion." See Response 136.**

141.    That said, on or about May 31, 2022, EVCAA Román-Lagunas still responded to both McPhail and the FBOR in writing. Ex. C, ¶ 37. EVCAA Román-Lagunas saw the ongoing litigation regarding this matter as a separate process in which attempting to reach a settlement like the one recommended by the FBOR Termination Opinion could have been a possibility. *Id.* EVCAA Román-Lagunas viewed the litigation as a totally distinct process from McPhail's IU administrative termination appeal process. *Id.* When she sent the letter on or about May 31, 2022, she did not intend to stop any aspect of McPhail's termination appeal process, nor did her letter stop any aspect of McPhail's termination appeal process. *Id.*

**Response 141**: Disputed. Román-Lagunas's May 31 letter responding to the Faculty Board's recommendation thanks the Faculty Board, refrains from rendering her own decision, and instead announces, addressing McPhail, "Since you have chosen to have this matter addressed in litigation, we will fully participate in the federal court process regarding this matter over the next year or more." Ex. K, Román-Lagunas Dep. Ex. 67. When asked in her deposition who the "we" referred to in that sentence, Román-Lagunas said, "IU or IUN, whoever he wrote up in his federal court process." Ex. H, Román-Lagunas Dep. 155:18-25. In other words, she claimed to be speaking not only on behalf of herself or IUN campus leadership, but all of the defendants to this case, including Indiana University itself. Román-Lagunas's claim that she did not intend the letter to stop the appeal process is inconsistent with the plain language of the letter and also with the fact that before writing the letter, she consulted with counsel for IU and with Iwama. *Id.* at 154:8 – 155:8; Ex. G, Iwama Dep. 189:14 – 190:3.

> 142.    EVCAA Román-Lagunas agreed with the tension identified in the FBOR Termination Opinion of reinstating McPhail, including because of the exigent circumstances and public safety concerns that she previously reported in writing to the FBOR about the reported threat. Ex. C, ¶ 38; Plaintiff's Ex. 14 at IU1 1327-29.

**Response 142**: Plaintiff denies that Román-Lagunas genuinely espoused "public safety concerns" regarding McPhail. See Response 138. Plaintiff also denies that EVCAA Román-Lagunas agreed with the Faculty Board's recommendation that IUN should provide McPhail with an equitable and honorable separation. See Response 136. Plaintiff denies that McPhail's case presented any "exigent circumstances," and in fact Román-Lagunas's allegations against McPhail fall squarely within the type of circumstance contemplated by ACA-52 and IUN's Dismissal Procedures. Dkt. No. 52-10 ¶ 8, pp. 31-36 ("An appointee may be suspended

during the pendency of dismissal proceedings only if immediate harm to the appointee or others is threatened by continuance. Any such suspension may be suspended with pay."); see also Ex. K, Deposition Exhibit 23 p. 5 ("Where the ability of the faculty member or librarian to perform effectively is clearly and seriously impaired by the nature of the misconduct or where the work of the department, school or library clearly would be disrupted or if immediate harm to himself, herself, or others is threatened by continuance, the faculty member or librarian may at any time be suspended by the Dean with pay until the matter is decided."). See also Response 116.

143.    Following the FBOR's April 20, 2022 decision of his termination appeal, McPhail did not attempt to further appeal his employment termination decision, although he continues to have the ability to do so pursuant to University's policies including ACA-04. Ex. C, ¶ 42. EVCAA Román-Lagunas did not terminate any appeal process involving McPhail. Further, Román- Lagunas' response did not stop any appeal process under applicable policies, nor could it. Ex. C, ¶ 39.

**Response 143: Disputed. IUN must issue a final decision following the FBOR's recommendation, and IUN did not issue any such decision. See Responses 140, 141. Dr. McPhail therefore had nothing to appeal to the President or Board of Trustees. Román-Lagunas's May 31, 2022 letter also tells McPhail that IU will litigate rather than proceed further with the appeal. See Response 141.**

144.    Although McPhail has had the ability to further appeal his employment termination decision including, but not limited to, with the President of Indiana University, McPhail declined to do so. Ex. F, ¶ 17.

**Response 144: Undisputed that IU's policies authorized Plaintiff to appeal the <u>final decision</u> of the IUN administration to the President and Board of Trustees. See Response 140. Plaintiff**

denies that there has been any final decision and that he had the "ability" to appeal. See Response 143.

> 145.     EVCAA Román-Lagunas did not retaliate against McPhail or take any adverse action against him for any reason. She did not retaliate against McPhail or take any adverse action against him because he filed this lawsuit that is now pending in federal court. Ex., C, ¶ 41.

**Response 145:** Disputed. The month after having receiving McPhail's lawsuit which criticized public officials and alleged civil rights violations, and days after learning of media coverage of the lawsuit, on May 31, 2022 Román-Lagunas sent a letter to McPhail that thanked the Faculty Board, refrained from rendering her own decision on his termination appeal, and announced, "Since you have chosen to have this matter addressed in litigation, we will fully participate in the federal court process regarding this matter over the next year or more." Response 141; Dkt. No. 38 ¶¶ 33, 34, 37; Ex. K, Deposition Exhibit 67. Plaintiff objects to Defendants' reference to retaliation allegations that are not at issue in this motion and asks that it be disregarded. Plaintiff moved for partial summary judgment on his retaliation claim solely in connection with his protected activity of filing this lawsuit. Plaintiff did not seek summary judgment in connection with his retaliation claims arising out of any of his other protected activities, but reserves all rights with respect to such claims.

> 146.     Chancellor Iwama did not retaliate against McPhail or take any adverse action against him for any reason. He did not retaliate against McPhail or take any adverse action against him because he filed this lawsuit that is now pending in federal court. Ex. F, ¶ 25.

**Response 146:** Disputed. The month after having receiving McPhail's lawsuit which criticized public officials and alleged civil rights violations, and days after learning of media coverage of the lawsuit, Iwama approved the May 31, 2022 "See you in Court" letter from Román-Lagunas to McPhail, which said explicitly that the appeal would proceed no further because

10

of McPhail's litigation. Ex. G, Iwama Dep. 189:14 – 191:15; Ex. K, Deposition Exhibit 43; Response 141; Dkt. No. 38 ¶ 33, 34, 37. Iwama confirmed that he refrained from making a decision regarding McPhail's appeal for the reason identified in that letter, namely this lawsuit. Ex. G, Iwama Dep. 193:3-9. Plaintiff objects to Defendants' reference to retaliation allegations that are not at issue in this motion and asks that it be disregarded.  Plaintiff moved for partial summary judgment on his retaliation claim solely in connection with his protected activity of filing this lawsuit. Plaintiff did not seek summary judgment in connection with his retaliation claims arising out of any of his other protected activities, but reserves all rights with respect to such claims.

> 147.     IUN did not retaliate against McPhail or take any adverse action against him for any reason. IUN did not retaliate against McPhail or take any adverse action against him because he filed this lawsuit that is now pending in federal court. Ex. F, ¶ 26.

**Response 147**: **Disputed. See Responses 145 and 146. In sending the May 31, 2022 "See you in Court" letter to McPhail, Román-Lagunas confirmed that she sent that letter on behalf of "IU or IUN, whoever he wrote up in his federal court process" and that before writing the letter, she consulted with counsel for IU and with Iwama. Ex. H, Román-Lagunas Dep. 154:8 – 155:25.**

> 148.     None of the Defendants interfered in any way with any appeal process involving McPhail. Ex. C, ¶ 44; Ex. D, ¶ 41; Ex. F, ¶ 16;

**Response 148**: **Disputed. See Responses 143, 145, 146, and 147.**

> 149.     McPhail did not exhaust his appellate rights concerning his employment termination, including those available related to his post-termination appeal. Ex. F, ¶ 19.

**Response 149**: **Admit that McPhail did not exhaust his appellate rights because Defendants prevented him from doing so. See Responses 143, 145, 146, and 147. Plaintiff denies any**

implication that he could have appealed or that his inability to appeal was his decision. *Id.*

150.    McPhail has had the ability to further appeal his termination decision, including, but not limited to, with the President of Indiana University and beyond. McPhail has declined to do so. Ex. F, ¶ 17.

**Response 150**: Disputed. IUN must issue a final written decision regarding the FBOR's recommendation, and IUN did not issue any such decision. See Responses 140, 141. Dr. McPhail therefore had nothing to appeal to the President or Board of Trustees. Instead, through Román-Lagunas's May 31, 2022 letter, Defendants told McPhail that they would litigate rather than proceed further with the appeal. See Responses 141, 143, 145, 146, and 147.

151.    McPhail did not send Román-Lagunas, Iwama nor IU any correspondence regarding or presenting any post-termination appeal following the Faculty Board's findings regarding his employment termination. Ex. C, ¶ 43; Ex. F, ¶ 18.

**Response 151**: Undisputed that McPhail did not initiate an appeal which Román-Lagunas told him he was precluded from initiating. See Responses 143, 145, 146, and 147; Ex. K, Deposition Exhibit 67. Plaintiff denies any implication that he could have appealed or that his inability to appeal was his decision. *Id.*

## D. It is undisputed that McPhail lacks evidence of retaliation, or that any of the individual defendants took action against him in their individual capacities.

152.    McPhail testified that he has no personal knowledge or evidence that any of the Individual Defendants acted with any sort of retaliatory motive towards him. Ex. A, pp. 73:13-16, 74:2-10-25.

**Response 152**: Disputed. Ex. E, McPhail Dep. 65:4-14, 74:11 – 76:7, 225:16 – 226:15, 230:2 – 231:20. For example, McPhail pointed out that Román-Lagunas's having ignored his

complaint that Klamen was appointed as Dean in violation of University processes and in a manner that precluded individuals of African descent from even applying is evidence of retaliatory motive. Ex. E, McPhail Dep. 74:11 – 76:7. He also pointed out that there are emails in the record indicating that Román-Lagunas and Klamen discussed that complaint. Ex. E, McPhail Dep. 230:2 – 231:20. There are indeed such emails in the record in which Román-Lagunas forwards the complaint to Klamen and Iwama and writes about the complaint disparagingly. Dkt. No. 38 ¶ 9. Plaintiff further denies that McPhail's testimony indicates that he has no other evidence of retaliatory motive; McPhail, a non-lawyer, is not personally familiar with all the types and standards of evidence for retaliation in the Seventh Circuit, nor is it reasonable to expect a plaintiff to recite all possible evidence of retaliatory motive in a deposition from memory. Ex. E, McPhail Dep. 279:25 – 280:5. See also Responses 153, 155, 157, and 158.

> 153.      McPhail has no evidence that Román-Lagunas did not believe, in good faith, the conclusion set forth in her letter of September 14, 2021 Plaintiff's Ex. 14 at IU1 191-92; Ex. A, p. 213:7-16.

**Response 153: Plaintiff objects to Request 153 as immaterial to Plaintiff's motion for partial summary judgment, since the EVCAA's good faith with respect to her initial termination decision is not at issue; Plaintiff's retaliation claims relate to her post-termination actions. Plaintiff reserves all rights with respect to the claims not at issue in this motion. In any case, paragraph 153 is disputed. See Responses 138, 152, 155, 157, 158; See also Ex. I, Hobson Dep. 12:22-15:2.**

> 154.      At his deposition, McPhail testified that his speech about matters of public concern was about the reorganization of the School of the Arts and the appointment of Klamen in 2018:

```
 4   Q.      In terms of your third claim, you have a First
 5           Amendment retaliation claim indicating that -- that
 6           you were speaking on matters of public concern and
 7           were retaliated against for that.· What matters of
 8           public concern were you raising that caused -- that
 9           you are -- are thinking were at issue here?
10   A.   That -- a violation of the university's policies
11        regarding reorganization of programs and the hiring
12        of administrators without searches.
13   Q.   Okay.· So that whole count about First Amendment
14        retaliation related to your 20 -- is it 2017
15        complaints related to the reorganization of the
16        School of the Arts and Dean Klamen's appointment?
17   A.   Yes.
18   Q.   Is there anything else?
19   A.   I think that -- not that I can think of.
```

Ex. A, p. 274:4-19.

**Response 154**: It is undisputed that paragraph 154 accurately reflects an excerpt from Plaintiff's deposition transcript but denies that the speech identified therein is the only matters of public concern Plaintiff has identified as the basis of his First Amendment claim. Plaintiff also alleged that the public forum he organized about achievement gaps for black males, his September 13, 2021 appeal, and this lawsuit itself are matters of public concern in response to which Defendants retaliated against him. Dkt 18 ¶¶ 79-88. Plaintiff also objects to having to make a comprehensive case about his protective activity when not all of his protected activity is at issue in Plaintiff's summary judgment motion, and reserves all rights with respect to those claims.

155.    McPhail admits that he has no knowledge that anything he said related to the creation of the School of the Arts and appointment of Dean Klamen was causally connected to any employment decisions related to him. Ex. A, p. 268:13-19.

**Response 155**: Disputed. See Response 152. Plaintiff further states that although Román-Lagunas did not have the opportunity to retaliate against McPhail during the 2018-19 and

2019-20 academic years since he was working at the Bloomington campus (DSOF 71), at the first opportunity following the August 2018 complaint referenced in this paragraph, before McPhail even returned to campus and began the semester, she exchanged more than 40 emails with IU's General Counsel's office about McPhail's course assignments and/or "termination," at a time when Klamen, Román-Lagunas and IU claimed they were scrambling at the "height of the start of the COVID-19 pandemic" to manage course assignments, new technologies, and "health and safety requirements." Ex. B, Defendants' Privilege Log; Dkt. No. 52-4 ¶ 11; Ex. H, Román-Lagunas Dep. 79:13 – 80:6; Ex. K, Dep. Ex. 56. ██████████████████████████████████████████████████████████

████████████████████████████ Dkt. No. 38 ¶ 10. Like Klamen, she began compiling negative information about McPhail before he even began teaching in 2020, even though she is not normally involved in the evaluation of tenured faculty members. Ex. H, Román-Lagunas Dep. 11:15-23. She wrote to Dean Hoyert in April of 2020, "Do you have any information, complaints, etc. about McPhail from the year he taught here (right before he went to Bloomington)?" Ex. C, IU1_7845.

> 156.   McPhail's employment at IUN was not terminated because of any reasons concerning his competency or performance concerns. The sole reason that McPhail's employment ended was because of a threat of violence that he was reported to have angrily made stating that the only way to cure racism is to kill all white people. These dangerous statements were the only basis for the decision to terminate McPhail's employment. Ex. F, ¶ 8.

Response 156: It is undisputed that Iwama and Román-Lagunas assert that the alleged threat was the only basis for the termination. Plaintiff denies that Defendants genuinely believed McPhail had threatened violence. See Response 138.

157.     Román-Lagunas and Klamen did not take any action against McPhail based on his suggestion that by Dean Klamen's appointment or the creation of the School of the Arts as a subunit within the College or Arts and Sciences IUN that the appointment, IUN may have allegedly violated any policies or standards. Ex. C, ¶ 17; Ex. D, ¶ 34. In fact, McPhail personally congratulated Klamen on his appointment to Klamen, stating that he would have made the same decision had McPhail been the EVCAA. Klamen did not feel that McPhail had any concern regarding his appointment. Ex. D, ¶ 34.

**Response 157: Plaintiff denies the first sentence in paragraph 157. See Response 155; see also Ex. B, Defendants' Privilege Log lines 6-44. Plaintiff denies the assertion that he congratulated Klamen on his appointment and said he would have made the same decision had he been the EVCAA. Ex. E, McPhail Dep. 79:11-16. Plaintiff also denies that "Klamen did not feel that McPhail had any concern regarding his appointment." Ex. F, Klamen Dep. 16:19 – 18:8 ("I remember that he was objecting to the procedure that was used to either appoint me as dean or create a School of the Arts."); Ex. K, Deposition Exhibit 1.**

158.     McPhail's concerns made about Dean Klamen being appointed a Dean in 2018 and about the creation of the School of the Arts had no effect on any administrative decisions related to McPhail, and had no effect on his employment termination decision. Ex. C, ¶ 18; Ex. D, ¶ 9; Ex. F, ¶ 20.

**Response 158: Disputed. Román-Lagunas says Klamen specifically predicted that McPhail would complain about the procedure (or lack thereof) that they used to appoint Klamen as Dean of the School of the Arts. Ex. H, Román-Lagunas Dep. 67:13 – 70:16; Ex. K, Deposition Ex. 53. Once McPhail did object to the manner in which the appointment was made, Román-Lagunas immediately forwarded the complaint to Klamen, to which he responded, "Ugh!" Ex. K, Deposition Exhibit 1. Klamen did not have the opportunity to**

retaliate against McPhail during the 2018-19 and 2019-20 academic years since McPhail was working at the Bloomington campus. DSOF 71. He did, however, initiate the termination of another faculty member after she filed a complaint about his appointment as dean to the Faculty Board of Review, and IU (with the participation of Román-Lagunas and Iwama) terminated her tenured appointment. Dkt. 24, Defs' Answers to ¶¶ 23, 24; Ex. F, Klamen Dep. 18:20 – 20:1; Ex. C, IU1_4773-4778.

Then, at the first opportunity following the August 2018 complaint referenced in this paragraph, before McPhail even returned to campus and began the semester, Klamen exchanged 20 emails with IU's General Counsel's office about McPhail's course assignments, "at the height of the start of the COVID-19 pandemic in the United States, when IUN was grappling with how to organize and continue classes during a pandemic." Ex. B, Defendants' Privilege Log; Dkt. No. 52-4 ¶ 11. He also declined to respond to McPhail's request for course assignments for nearly four months even though he already had courses set aside for him, instead characterizing McPhail's request for course assignments as a "problem" and writing to Román-Lagunas, ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████ Dkt. No. 38 ¶ 10; Dkt. 42-2 at IU1_4495, 4502.

████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████ **Ex. B, Defendants' Privilege Log lines 6-44; Ex. A, McPhail Decl. ¶ 1. Klamen also engaged in extensive correspondence with administrators (but not with McPhail, despite serving as his direct supervisor) about alleged problems with McPhail's teaching before McPhail even began the fall 2020 semester, and continued compiling what he viewed as incriminating information on McPhail throughout the year without a word to McPhail until he sent him the August 2021 evaluation. See e.g. Ex. C, IU_3493-3494, 4406, Ex. K, Deposition Exhibits 8, 13, 21; Ex. F, Klamen Dep. 86:19 – 87:5.**

> 159.    McPhail's complaint made with the Gary Commission on Human Relations in or about July 14, 2020, had no effect on any administrative decisions related to McPhail, and had no effect on his employment termination decision. Ex. C, ¶ 23; Ex. D, ¶ 39; Ex. F, ¶ 23.

**<u>Response 159</u>. Plaintiff objects that fact 159 has nothing to do with the causes of action for which Plaintiff seeks summary judgment. Plaintiff did not seek summary judgment in connection with his retaliation claims arising out of any of his Gary Commission complaint, but reserves all rights with respect to such claims. Plaintiff also disputes 159. Román-Lagunas and Iwama indicated after McPhail withdrew his Gary Commission charge that he was "probably up to something else." Dkt. No. 38 ¶ 12. They then suspended him from teaching, reduced his salary by 75%, and terminated his employment without following their own policies, including ACA-04, the Constitution of the Indiana University Faculty; ACA-21, IU's policy on Faculty and Librarian Annual Reviews; ACA-33, IU's Code of Academic Ethics; and ACA-52, IU's policy on Permanent Separations for Academic Appointees, IUN's Dismissal Procedures and IUN's post-tenure review policy. Dkt. No. 38 ¶¶ 43-63. See also Responses 153, 155, 157, and 158.**

Respectfully submitted,

/s/ Rima N. Kapitan
Illinois Attorney No.: 6286541
KAPITAN GOMAA LAW, P.C.
rima@kapitangomaa.com

/s/ Christopher S. Stake
Attorney No.: 27356-53
DELANEY & DELANEY LLC
cstake@delaneylaw.net